# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### (MIAMI DIVISION)

CASE NO. 06-20975-CIV-HUCK/SIMONTON

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

SECURITIES AND EXCHANGE COMMISSION

**Plaintiff,**

vs.

JACK P. UTSICK, ROBERT YEAGER, DONNA YEAGER, WORLDWIDE
ENTERTAINMENT, INC., THE ENTERTAINMENT GROUP FUND, INC.,
AMERICAN ENTERPRISES, INC., AND ENTERTAINMENT FUNDS, INC.

**Defendants.**

**RECEIVER, MICHAEL I. GOLDBERG'S, SECOND REPORT CONCERNING THE
CONDITION OF THE ENTERTAINMENT GROUP FUND, INC.,
WORLDWIDE ENTERTAINMENT, INC., AMERICAN ENTERPRISES, INC. AND
ENTERTAINMENT FUNDS, INC.**

**Dated: JULY 19, 2006**

{FT331248;1}

# TABLE OF CONTENTS

Page

I.    Introduction ................................................................................................... 3
      A.    The Original Lawsuit .................................................................................. 3
      B.    The SEC Enters the Picture .......................................................................... 4
II.   The Receiver's Efforts Since the First Report ........................................................ 7
III.  The Receivership Entities' Business Operations Since Receivership .................... 9
      A.    The Receivership Entities are Attempting to Expand
            Certain Operations in an Effort to Maximize Recoveries ............................ 9
      B.    Venue Ownership and Management ......................................................... 11
            1.    Keswick Theatre ......................................................................... 11
            2.    Royal Oak ................................................................................ 15
            3.    Wuhlheide Amphitheater .............................................................. 16
            4.    Quay Park Arena ........................................................................ 18
            5.    Masquerade Nightclub ................................................................. 19
            6.    Jacksonville Property .................................................................. 20
      C.    Content Ownership ................................................................................ 21
            1.    National Lampoon's Pledge This ................................................... 21
            2.    Iron Chef .................................................................................. 23
            3.    Sinatra ..................................................................................... 24
            4.    Defending the Caveman ................................................................ 25
            5.    Little Women ............................................................................. 26
      D.    Worldwide Affiliates ............................................................................. 27
            1.    Domestic Affiliates ..................................................................... 27
                  a.    Worldwide Miami—Portofino Office ...................................... 27
                  b.    Worldwide Miami –Washington Avenue ................................... 27
                  c.    Worldwide Midwest LLC .................................................... 28
                  d.    Jack Utsick Presents, N.E., Inc. ............................................ 28
                  e.    TEGFI – Stone City ........................................................... 29
                  f.    Worldwide New England, LLC ............................................. 30
                  g.    Worldwide - BACI ............................................................ 31
            2.    International Affiliates ................................................................. 32
                  a.    Australia ...................................................................... 32
                        i.    The Jacobsen Group/ Dirty Dancing ............................. 33
                        ii.   Michael Chugg/ MCE Entertainment ........................... 35
                  b.    New Zealand .................................................................. 37
                  c.    3A London ..................................................................... 41
                  d.    Amsterdam .................................................................... 43
                  e.    China ........................................................................... 44
      E.    Miscellaneous Investments ...................................................................... 44
            1.    Real Estate ............................................................................... 44
            2.    Joe Zada ................................................................................... 45
            3.    Michele Pommier Model Management, LLC ...................................... 46
            4.    Marvana Day Spa ........................................................................ 47
            5.    Luna Restaurant ......................................................................... 48
            6.    Omega Records ........................................................................... 48

## TABLE OF CONTENTS

**Page**

IV.     Utsick ................................................................................................................ 49

V.      American Enterprises ......................................................................................... 50

VI.     Yeagers .............................................................................................................. 52

VII.    Pension Custodians ............................................................................................ 55

      A.     American National Pension Services ........................................................... 55

      B.     1ST Source Bank ...................................................................................... 63

      C.     Pilot Retirement Services ............................................................................ 65

VIII.   Claims Process .................................................................................................. 65

IX.     Conclusion ......................................................................................................... 66

## IMPORTANT—PLEASE READ CAREFULLY

THE STATEMENTS CONTAINED IN THIS REPORT ARE BASED ON THE RECEIVER'S INVESTIGATION CONDUCTED IN THE SHORT TIME ELAPSING FROM THE ESTABLISHMENT OF THIS RECEIVERSHIP. THE RECEIVER COMPILED THIS REPORT BASED ON BOTH THE RECEIVER AND HIS PROFESSIONALS': *I)* REVIEW OF THOUSANDS OF PAGES OF DOCUMENTS; AND *II)* INTERVIEWS OF DOZENS OF THE DEFENDANTS' EMPLOYEES, AFFILIATES, INVESTORS AND OTHER RELATED PERSONS. THE FACTS AND CONCLUSIONS STATED HEREIN MAY BE SUBJECT TO CHANGE AS THE RECEIVER'S INVESTIGATION PROGRESSES.   OTHER THAN AMOUNTS CONTAINED IN BANK AND/OR BROKERAGE ACCOUNTS, THE VALUE OF ANY OTHER ASSET HAS NOT YET BEEN DETERMINED. THE RECEIVER INTENDS TO FILE ADDITIONAL REPORTS, FROM TIME TO TIME, AS ADDITIONAL INFORMATION IS DIVULGED.

IN WRITING THIS REPORT, THE RECEIVER HAS ATTEMPTED TO BALANCE THE IMPORTANCE OF FULL AND FRANK DISCLOSURE OF MATERIAL INFORMATION WITH THE CONCERNS OF THE UNDERLYING BUSINESSES THAT SUCH INFORMATION REMAINS CONFIDENTIAL FOR COMPETITIVE REASONS. TO THAT END, THE RECEIVER HAS OPTED, IN MOST CASES, TO DISCLOSE A SIGNIFICANT AMOUNT OF FINANCIAL INFORMATION AND CAUTIONS THOSE PERSONS OR ENTITIES WHO INTENTIONALLY MISREPRESENT THE INFORMATION CONTAINED HEREIN IN AN ATTEMPT TO DISPARAGE THE RECEIVERSHIP ENTITIES OR THEIR AFFILIATES, OR SEEK TO UNFAIRLY USE IT TO OBTAIN A COMPETITIVE ADVANTAGE, THAT ANY SUCH ACTION MAY HAVE SIGNIFICANT LEGAL CONSEQUENCES. FINALLY, THE RECEIVER STRESSES THAT ANY ALLEGED IMPROPRIETIES OR VIOLATION OF FEDERAL OR STATE SECURITIES LAWS SET FORTH

HEREIN OCCURRED SOLELY (IF AT ALL) IN WORLDWIDE ENTERTAINMENT, INC. AND THE ENTERTAINMENT GROUP FUND, INC. AND NOT AT THE AFFILIATE LEVEL. IN MOST CASES, WORLDWIDE ENTERTAINMENT GROUP, INC. AND/OR THE ENTERTAINMENT GROUP, INC. ARE SIMPLY INVESTORS IN AFFILIATED COMPANIES AND THE AFFILIATED COMPANIES ARE SEPARATE AND DISTINCT COMPANIES, WHOSE DAY TO DAY OPERATIONS ARE MANAGED BY COMPLETELY DIFFERENT INDIVIDUALS. ANY STATEMENT THAT IMPLIES THAT THIS REPORT STATES THAT ANY OF WORLDWIDE ENTERTAINMENT GROUP INC.'S OR THE ENTERTAINMENT GROUP FUND, INC.'S AFFILIATES ENGAGED IN IMPROPER CONDUCT IS FALSE AND COULD SUBJECT THE PERSON OR PERSONS MAKING SUCH DISPARAGING STATEMENTS TO LEGAL LIABILITY. FINALLY, THE RECEIVERSHIP ENTITIES ARE INVOLVED IN LITIGATION ALL OVER THE WORLD. THE RECEIVER HAS NOT SET FORTH ALL INFORMATION SURROUNDING THESE LAWSUITS SO AS NOT TO DISCLOSE PRIVILEGED INFORMATION.

## I.    Introduction

This Second Report of Receiver, Michael I. Goldberg, is intended as a follow-up to the Receiver's Initial Report Concerning the Condition of the Entertainment Group Fund, Inc. and Worldwide Entertainment, Inc. dated March 1, 2006 ("Receiver's Initial Report").

### A.    The Original Lawsuit

As described in the Receiver's Initial Report, on January 15, 2006, The Big Four-Oh, LLC, Summer 2003, LLC and EFI No. 32, LLC (collectively, "Original Plaintiffs"), filed their Verified Complaint for the Appointment of a Receiver and Related Relief (the "Original Complaint") against Worldwide Entertainment, Inc. ("Worldwide") and The Entertainment Group Fund, Inc. ("TEGFI") ("Worldwide" and "TEGFI" are collectively referred to as the "Original Receivership Entities") in the United States District Court for the Southern District of Florida (the "Receivership Court" or the "Court"), seeking the appointment of a Receiver for the Receivership Entities and an accounting (the "Original Case"). The Original Plaintiffs were owed substantial monies by the Original Receivership Entities.[1]

The Original Receivership Entities consented to the appointment of a receiver and, pursuant to the Court's Agreed Order Appointing Receiver entered on January 18, 2006 (the "Original Receivership Order"), the Receivership Court appointed Michael I. Goldberg as receiver (The "Original Receiver") over the Original Receivership Entities

---

[1] Prior to the filing of the Original Complaint, the Original Receivership Entities informed the Original Plaintiffs of their inability to make an upcoming payment and that the Original Receivership Entities' books and records were disorganized. Accordingly, the Original Plaintiffs filed the Original Complaint, in part, to obtain an accounting.

with the power, duty and authority to administer and manage the Receivership Entities'

business affairs, funds and assets.[2]   The Original Receiver's essential duty was to

safeguard the Original Receivership Entities' assets by taking whatever actions were

necessary for the protection of the Original Receivership Entities' creditors.

### B.     The SEC Enters the Picture

On April 18, 2006, the Securities and Exchange Commission ("SEC") filed a

complaint in the Receivership Court, *SEC v. John P. Utsick, et al.*, against Worldwide,

TEGFI, American Enterprises, Inc. ("AEI"), Entertainment Funds, Inc. ("EFI"), John P.

Utsick ("Utsick"), and Robert Yeager ("Yeager") and Donna Yeager (jointly the

"Yeagers"), (the "SEC Receivership Case" or the "SEC Receivership") (Worldwide

TEGFI, AEI, EFI, Utsick and the Yeagers are collectively the "Receivership

Defendants"). The SEC alleged that Utsick and the Yeagers sold unregistered securities

in the form of loan agreements or units in special purpose limited liability companies (the

"Loan Agreements") to raise funds for a variety of entertainment ventures, violating

various sections of the Securities Act of 1933 and the Securities Exchange Act of 1934.

The SEC Receivership Case was assigned to the Honorable Paul Huck.

In the SEC Receivership Case, the SEC included additional defendants that were

not included in the Original Case. In particular, the SEC named AEI, EFI, the Yeagers

and Utsick as additional defendants. Utsick was the principal of Worldwide and TEGFI,

and the Yeagers were the principals of AEI. On April 20, 2006, upon the request of the

SEC, the Receivership Court entered an Order Appointing Receiver (the "Receivership

Order") appointing Michael I. Goldberg (the "Receiver") as receiver over Worldwide,

---

[2] The Original Receivership Order also prohibited investors and other parties from bringing independent
suits against the Original Receivership Entities.

TEGFI, AEI, EFI, their subsidiaries, successors and assigns (collectively, the "Receivership Entities").

On April 28, 2006, upon stipulation of all parties in the Original Case and, in light of the existence of the SEC Receivership Case, the Receivership Court dismissed the Original Case. The Receivership Court's dismissal order specifically provided, among other things, that the dismissal of the Original Case would not operate in any way as a disruption or interference with the Receiver's powers and duties and that all aspects of the Original Case were transferred to the SEC Receivership Case. The Receivership Court's order also provided that all orders previously entered in the Original Case were automatically ratified without any interruption thereto. Accordingly, there was a "seamless" transition from the Original Case to the SEC Receivership Case.

The SEC Receivership Case is an SEC equity receivership. The Receiver has greater powers under the SEC Receivership Case than the Original Case, both under the terms of the Receivership Order and by operation of law. With respect to the terms of the Receivership Order, the Receiver is now allowed to engage United States marshals to assist him in carrying out his duties and responsibilities. The Receivership Order also permits the Receiver to open and view Utsick's and the Yeagers' personal mail. Unlike the Original Receivership, statutory law provides that under a SEC equity receivership, the Receiver is now an officer of the Court with complete jurisdiction over property located within the Court's jurisdiction as well as property located in other jurisdictions based on filings undertaken by the Receiver. The Court sits in equity and has broad powers and wide discretion to determine the appropriate relief in an equity receivership.

For this reason, in addition to the Receiver's statutory powers, the Receiver has a substantial amount of equitable power.

The case law surrounding SEC equity receiverships clearly and repeatedly demonstrates that the Receiver's powers in operating the estate are extraordinary and virtually limited only by the Receivership Court's concept of equity. Some key receivership powers include:

1.     the ability to sell receivership property free and clear of liens of third parties in certain circumstances;

2.     the ability to enjoin actions against the receivership estate and third parties in order to assist in the efficient administration of the estate;

3.     the ability to sue defendants residing in the United States and foreign countries in the court where the receivership is pending; and

4.     the ability to fashion a "fair and equitable" distribution process.

Simply put, the Receiver, as a receiver in an SEC equity receivership, has tremendous tools available in order to attempt to help the Receivership Entities' creditors.

In addition to placing the Receivership Entities into receivership, the Receivership Court also entered permanent injunctions against the Receivership Entities, Utsick and the Yeagers enjoining each of them from violating federal securities laws (the "Permanent Injunctions"). The Permanent Injunctions also "freeze" Utsick's and the Yeagers' individual assets and prohibit any person who receives personal notice of the order from in any way interfering with such assets. Accordingly, any person with notice of the Permanent Injunctions is barred from attempting to interfere with, or in any way obtain possession of, the Receivership Defendants' assets. The Permanent Injunctions also require the Receivership Defendants to repatriate to the United States all assets and

to provide the SEC with an accounting of all of their assets. The Receivership Defendants' accounting is discussed in greater detail below.

## II.      The Receiver's Efforts Since the First Report

Since the inception of the SEC Receivership, the Receiver has spent the bulk of his time attempting to identify the Receivership Defendants' various assets and securing those assets for the benefit of creditors. To accomplish this, the Receiver has spoken with hundreds of individuals, issued subpoenas to numerous banks and other entities, and reviewed computer files and business records to gather relevant documents necessary to trace investors' funds. To date, the Receiver has identified tens of millions of dollars spent by the Receivership Defendants in amassing its assets, including millions of dollars sent across the world to fund foreign and domestic promoters' business operations. Moreover, although the necessary forensic accounting has not been completed, the Receiver believes that millions of dollars were returned to some investors in the form of "profits". As of the date of this report, the Receiver has approximately $12 million in trust for the benefit of investors. Other assets discovered to date, and the status of the Receivership Defendants' investment in various co-promoting businesses, are detailed in this report.

The Receiver has also devoted a substantial amount of time to meeting with Worldwide's domestic and international affiliates to determine the relationship between Worldwide and its affiliates as well as the status of Worldwide's investments in the affiliates. To that extent, the Receiver traveled to Australia, Berlin, Amsterdam, London, New Zealand, Las Vegas, California, New Orleans and other places to meet with Worldwide's business partners and investigate its assets. The Receiver has learned that

Worldwide essentially served as a bank to many of its affiliates providing the funding necessary for the affiliates to promote concerts and other live entertainment events. Many of these affiliates are not profitable or viable without Worldwide continuing to fund their operations. The Receiver is currently evaluating each affiliation to determine the best course of action to attempt to maximize recoveries.

The Receiver has also spent a great deal of time educating himself on pre-existing disputes between Worldwide and its affiliates located in Australia and New Zealand. The Receiver has met and spoken with Worldwide's counsel in Australia and New Zealand and is attempting to formulate a plan that will enable the receivership estates to realize the greatest possible recoveries. The status of these lawsuits is set forth in greater detail below, however, because Worldwide is actively engaged in litigation, the Receiver is precluded from setting forth all the information surrounding these lawsuits.

The Receiver has also established an informal panel of nine investors to assist the Receiver in understanding investors' concerns. This panel is comprised of various investors chosen from more than 160 applicants. Panel members are located throughout the United States and are diverse with respect to their investment in Worldwide. More specifically, some panel members have been involved with Worldwide for over a decade while others have been involved with Worldwide for less than a year. Some panel members received large amounts of interest while others received nothing. Most panel member have large amounts of money invested in Worldwide while a couple have less than $500,000. Simply put, the members of the panel are a good representation of the entire creditor body. To date, the Receiver has had four telephonic conferences with the panel and they have been very helpful.

### III.    The Receivership Entities' Business Operations Since Receivership

#### A.    The Receivership Entities are Attempting to Expand Certain Operations in an Effort to Maximize Recoveries

Over the past six months, the Receiver has had an opportunity to examine the various business activities of the Receivership Defendants. Aside from the pre-receivership money raising activities, there were a number of, what the Receiver would characterize as, "legitimate" business activities, the success of which varies from business to business. For example, the Receivership Defendants' investments in the Wuhlheide Amphitheater in Germany and the Keswick Theatre in Pennsylvania, discussed further below, represent two such business enterprises which the Receivership Defendants invested in pre-receivership and which, as far as the Receiver can determine, have been operated by the Receivership Defendants' respective partners and/or employees with a high degree of professionalism producing cash for the receivership estates. Other business ventures, discussed below, such as the Receivership Defendants' investments in Jack Utsick Presents, N.E., Inc., Stone City Production/ Jack Utsick Presents, Inc., 3A, and Worldwide New England, also appear to be legitimate business enterprises which have experienced various degrees of success.

In an effort to afford the creditors of the estates with the best possibility of a full recovery, and, to take advantage of a few of Worldwide's key assets, the Receiver has considered pursuing those business activities in which the Receivership Defendants were previously engaged which the Receiver believes have the best possibility of delivering a positive cash return to the receivership estates at the least risk. In narrowing down the businesses to pursue, the Receiver has focused on concepts where the Receivership Defendants already had highly skilled or experienced partners and/or employees in place

and on those activities that allow for large profit margins with respect to the dollar amounts that would have to be allocated to those endeavors.

At the present time, the Receiver has narrowed his consideration of these "going forward" business activities to two different concepts. The first is a new company, the working title of which is "Fiestar". Fiestar is going to be formed among the current owners of Worldwide New England. Dan Hartwell, Worldwide New England's current managing partner, is going to be the CEO of Fiestar. The business plan is designed to take Worldwide New England's successful rock festival and export it to other locations and, at the same time, build rock music circuits to feed the festivals' talent pipeline. Fiestar will have ten to fifteen employees with offices in Florida and Massachusetts. Fiestar will also exploit other festival concepts and attempt to find high margin opportunities in the live entertainment field. The receivership estate will own fifty percent (50%) of this venture and has a total funding commitment of approximately $1.1 million.[3]

The second concept's working title is "Third Point". Third Point will be a smaller company which will focus almost exclusively on identifying high quality/high profit margin live entertainment concepts, packaging them, and then selling those concepts/content to third parties. Third Point will initially have three employees, all of whom are drawn from Worldwide's Miami office. The total annual funding requirement for this venture will be approximately $500,000. Based on the current working models for both the Fiestar and Third Point ventures, the estate should be able to generate several

---

[3] The Receiver will file a motion with the Court seeking authorization to pursue this project within the next few weeks.

million dollars from these combined enterprises. However, as with any business venture, success is not guaranteed.

### B.   Venue Ownership and Management

The Receivership Entities, either by themselves or in conjunction with others, own and/or operate all, or portions of, various venues throughout the world in which live entertainment takes place. The status of those venues is as follows:

### 1.   Keswick Theatre (www.keswicktheatre.com)

In February 2002, TEGFI purchased the Keswick Theatre (the "Keswick"), a 1365 seat theater, located in Glenside, Pennsylvania (suburban Philadelphia). The Keswick was built in 1928 and designed by architect Horace Trumbauer. The National Park Service lists the building on its Register of Historic Places. It is nationally recognized as one of the most comfortable, acoustically perfect venues in the Philadelphia market and predominately serves a three state - five county region (the Delaware Valley). The internal patron base for the Keswick is 70,000 mail and 40,000 email subscribers with total attendance ranging from 150,000 to 200,000 per year. Pollstar Magazine ranks the Keswick as one of the Top Theater Venues Under Capacity Of 5000 (26th in 2004, 57th in 2005 and 48th for mid-year 2006). The events hosted at the Keswick are shows produced and promoted by Keswick Entertainment Group, Jack Utsick Presents N.E., Inc., other outside promoters, co-promotions, as well as corporate, community and private events. The Keswick derives its income from the production of events (self promoted and rentals), ticketing services, concessions, merchandise sales and marketing/sponsorship.

The Keswick is owned free and clear of any recorded liens. In connection with the TEGFI purchase of the Keswick, TEGFI formed two entities (currently referred to as subsidiaries). Keswick Holdings, LLC ("Keswick LLC") was established to own the real estate. The Receiver was provided with information showing that TEGFI owns ninety-five percent (95%) and Yeager owns five percent (5%) of Keswick LLC. In addition, Keswick Entertainment Group, Inc. ("Keswick Entertainment") was established as an operating company, to manage the Keswick and is currently reported, upon information and belief, to be one-hundred percent (100%) owned by TEGFI.

A team of professionals manage Keswick Entertainment. The five members of the senior staff have more than 80 years of combined experience in entertainment production, venue/facility management, promotions/marketing, technical direction and ticketing services.

Keswick Entertainment posted a net income of $91,316 in 2004 (165 events) and a net loss of ($136,982) (these figures are estimates since the financials are in draft form) (157 events) in 2005 inclusive of all revenues and expenses and inclusive of the $1/ticket expense noted below and interest to TEGFI for notes payable.

Keswick LLC, the owner of the real property, derives revenue from rents on a triple net basis to Keswick Entertainment. The lease allows for $1,000 per month rent with a clause that additional rent may be paid as determined. Since $1,000 will not cover the loan amounts, Keswick Entertainment has paid rent on a basis that allows loans to be paid up to $120,000 over the past five years. The decision is made based on the net result to both entities so that one does not "gain" while the other "loses" as is appropriate for an "arms length" transaction.

Because of its structure, Keswick LLC has generally been profitable since its inception. After payment of operating expenses, taxes, and improvements to the physical plant, Keswick LLC's net income was $46,041 and $1,972 for 2004 and 2005, respectively. Keswick Entertainment is current in its rental requirement of $12,000 per year to Keswick LLC having paid $20,000 year to date, $13,000 of which is in a pre-paid account as of June 30, 2006, and $7,000 of which has been expensed. The mid year 2006 results are anticipated to be close to a break-even situation. The Receiver has allowed Keswick Entertainment to cease loan payments and reduce rent to Keswick LLC until a business plan is completed.

The busy winter/spring seasons did not allow much time to accomplish general building improvements and, as a result, summer initiatives have been put in place. The following are among the goals to be achieved: Overhaul of computer files so that company files contain the most current forms, information, and procedure books; the finalization of a five year building plan and the development of electrical phase of same; improvements to the bathrooms; and painting and maintenance. The overall financial picture is better this year to date than last. There are currently 146 events, including rentals and Jack Utsick Presents N.E., Inc., on sale at the venue. The Keswick currently has 36 events confirmed for 2007 including all in-house, rental and co-promoted events.

The Keswick successfully hosts its own ticketing system via licenses with an independent software company. The products that are associated with ticketing services are service charges, a membership program ("E-Seats Club"), gift cards, group sales, and "E-Corp" (currently under redevelopment). In 2005, the Keswick introduced on-line interactive ticketing. The cost of this development was approximately $35,000 of which

over one-third has been recouped in staff savings during the first six months of 2006. The next initiatives require the ability to expand credit card services on-line and within the building. The Keswick is also working on redevelopment of the group sales initiative to meet more current social and tour group needs.

Food and beverage sales at the Keswick have improved steadily over the past few years. This year, the venue is working on cost-of-sales improvement as well as increased revenue generation. However, serving from two 8-foot tables hampers the process and the Keswick is in need of improved facilities. Investment into smaller equipment, such as a mobile bar and beer stations, has improved sales. Summer 2006 will include further improvements.

The Keswick started sponsor relationships in 2003 and is just beginning to see positive results from sponsorships. For the balance of the year, these relationships will be further developed and 2007 agreements completed.

Another development regarding the Keswick relates to an agreement TEGFI entered with BS Entertainment (TEGFI's partner in Jack Utsick Presents N.E., Inc.) pursuant to which TEGFI agreed to pay BS Entertainment $1 per ticket for the first 80,000 tickets sold each year to entice BS Entertainment to promote shows at the Keswick.  Jack Utsick Presents N.E., Inc. enjoys preferred rental client status, co-promotes various events with the Keswick and generally has been a beneficial partner. The Receiver is reviewing current "discounts" and "incentives" made available by Keswick Entertainment to Jack Utsick Presents N.E., Inc. and the $1/ticket obligation. Finally, in the past few weeks, the Receiver was approached by various entities interested

in purchasing the Keswick. The Receiver will explore these opportunities to determine if a sale is in the creditors' best interests.

## 2.     Royal Oak  (www.royaloakmusictheatre.com)

As described in the Receiver's Initial Report, the Royal Oak Music Theatre (the "Royal Oak") located in Royal Oak, Michigan, was built in the 1920's and opened its doors in 1928. In 2003, Worldwide decided to attempt to enter into a long term lease for the Royal Oak and to purchase the liquor license associated with the lease. Accordingly, WWE-ROMT, LLC ("WWE-ROMT"), a Michigan limited liability company, was formed to act as the lessee and purchaser. However, partly because Worldwide had not filed a current tax return as required to obtain all necessary licenses and consents for finalizing the transaction, Worldwide decided to transfer its interest in WWE-ROMT to Greg Young, who thereafter became the sole member of WWE-ROMT. As part of this transaction, Worldwide loaned WWE-ROMT $400,000, evidenced by an unsecured note which is to be repaid in accordance with the terms of the note with five percent (5%) interest. In return for the loan, Worldwide was granted the exclusive right to book events at the theater. However, upon information and belief, Worldwide was unable to book the agreed number of acts at the Royal Oak resulting in WWE-ROMT defaulting under the terms of the note.

The Receiver is working with WWE-ROMT in an attempt to sell the Royal Oak to a third party to generate sufficient proceeds for WWE-ROMT to satisfy the repayment of its obligations to Worldwide. The Receiver and Greg Young have met with several companies that are in the venue ownership business to determine what, if any, interest they have in purchasing the Royal Oak. As a result of these efforts, WWE-ROMT

received a term sheet last week from an entity which, if consummated, should result in the repayment of Worldwide's loan. The Receiver and Mr. Young are hopeful that an acceptable deal can be concluded shortly.[4]

### 3. Wuhlheide Amphitheater (www.wuhlheide.de)

As discussed in the Receiver's Initial Report, the Wuhlheide is an outdoor amphitheater located in what used to be East Berlin, Germany. The Wuhlheide site is approximately 50 years old and is owned by the city government. The Wuhlheide is well known and is on Berlin's list of historic sites. In 1997, the private group that was running the facility (and invested about 10 million dollars into it for upgrades, etc.) went bankrupt. At that time, Bruce Glatman ("Glatman"), an acquaintance of Utsick, introduced Utsick to a local promoter named Wolfgang Kollen ("Kollen"). The three men negotiated a ten-year lease with the city to operate the Wuhlheide for 160,000 euros the first year, increasing by 20,000 euros each year thereafter. For the privilege, they paid the prior ownership group's bankruptcy estate approximately $2.7 million, a portion of which TEGFI funded. The lease expires next year, but there is a right to exercise another five year option without any additional payments although the annual lease payment to the city will increase. The Receiver directed Kollen to exercise this option. It is uncertain if an additional extension on the lease beyond the five-year option period can be obtained. The entity that holds the lease is owned seventy-five percent (75%) by TEGFI; fifteen percent (15%) by Kollen; and ten percent (10%) by Glatman. Kollen

---

[4] In early July, the Receiver lent WWE-ROMT $40,000 for it to satisfy certain obligations. The Receiver decided it was in the estate's best interest to make this loan based on the Receiver's discussions with third parties who expressed interest in buying the Royal Oak. In connection with this loan, WWE-ROMT executed a new note in the amount of $475,000.00 (representing the original principle sum of $400,000, accrued interest in the amount of $35,000 and the additional $40,000 loan). WWE-ROMT also pledged its liquor license and assigned its lease to secure this obligation.

manages the amphitheater and is paid 5,000 euros a month. He has one assistant and they use her apartment in Berlin as their office. Kollen lives in Munich and has another job which fills his time when the amphitheater is closed. The theater is shaped in a horseshoe and has a capacity for 17,000 persons – space for 12,000 in the surrounding forum type seating and another 5,000 in the open area in front of the stage. The stage is covered but the rest of the area is exposed to the elements. Because it is an outdoor theater, the Wuhlheide's show season is limited, running from May to September. While its lease with the city allows it to host up to eighteen shows a season, it generally averages around ten. This coming season, it is anticipated that the Wuhlheide will present approximately 14 shows.[5]

Pursuant to their agreement, Kollen and Glatman do not participate in any profit distributions until TEGFI's initial investment is repaid. TEGFI was repaid a considerable sum, and to date, only approximately $335,000 of the $2.7 million is still owed.[6] The average ticket price charged by presenters of events at the Wuhlheide is approximately 35 to 40 euros per ticket. The Wuhlheide receives ten percent (10%) of the net income from ticket sales as rent. On average, the rent charged each year is approximately 25,000 to 30,000 euros. In addition, the Wuhlheide receives approximately 1.5 euros on concession sales, per person, per event. A typical show generates approximately 70,000 to 75,000 euros. Additionally, the local brewery, "Kindl-Buhne" is the main sponsor and pays 100,000 euros per season for naming rights. The Wuhlheide netted approximately 300,000 euros in 2005 and is expected to net approximately 400,000 euros in 2006.

---

[5] The main competitor to the Wuhlheide is the Waldbuehne, a 21,000 seat amphitheater located about 20 miles away which is considered the more prestigious of the two venues. Some shows will only go to the Waldbuehne (such as the Berlin Symphony Orchestra).

[6] This sum has not yet been verified.

In June 2006, the Receiver visited the Wuhlheide and met with Kollen and the Wuhlheide's accountants to discuss the Wuhlheide's operations.   While in Berlin, the Receiver also met with representatives of LiveNation and SMG Entertainment, two major venue owners, to discuss their interest in purchasing the Wuhlheide. Both companies expressed interest and Worldwide and its partners are exploring these opportunities. Finally, the Wuhlheide has a top notch concert line-up scheduled for the summer of 2006 including Eric Clapton, Pearl Jam and the Red Hot Chili Peppers.  It is expected that the Wuhlheide's economic performance for 2006 will enable it to satisfy most of its remaining loan to Worldwide.   Needless to say, the Receiver is pleased with the performance of this investment.

### 4.    Quay Park Arena (www.vectorarena.co.nz)

As discussed in the Receiver's Initial Report, Worldwide, indirectly, has a twenty-five percent (25%) interest in the management agreement of the Quay Park Arena, a modern 12,000 seat facility under construction in Auckland, New Zealand.  The Quay Park Arena is intended to serve as a world class multi-use indoor sports and entertainment arena.  It is now known as the "Vector Arena."   QPAM Ltd. holds a long term lease over this arena for a period of forty-five (45) years pursuant to a "Boot Agreement" entered into between QPAM Ltd. and the Auckland City Council.  At the expiration of the lease's term, QPAM Ltd. must transfer the arena back to the Auckland City Council.  The current anticipated date of completion is December, 2006 with an anticipated cost of construction exceeding $68 million.

Worldwide has the option of increasing its ownership in the management company to forty-five percent (45%) in exchange for a significant payment.  The

Receiver is thoroughly analyzing whether it is in the best interest of the Receivership Entities' creditors to exercise this option. **Importantly, and as set forth more fully below, there is currently pending litigation between Worldwide and its partners with respect to Worldwide's ownership interest in the Quay Park Arena and the interpretation of certain clauses in the partnership agreement. The status of this litigation is described more fully below. The value of Worldwide's investment in the Quay Park Arena depends heavily on the outcome of this litigation.**

### 5.    Masquerade Nightclub (www.masqueradetampa.com)

As discussed in the Receiver's Initial Report, the Receivership Entities and a partner in Atlanta, Georgia, though an entity known as Ybor City Masquerade, Inc. ("Masquerade"), own a club located in Ybor City, Florida (near Tampa) known as the Masquerade Nightclub. The Receivership Entities and the Atlanta Partner each own fifty percent (50%) of Masquerade. After his appointment, the Receiver discovered that the Masquerade was in arrears on its lease, owed a great deal of money to its creditors and had no future concert bookings. The partner in Atlanta had already funded many of the Masquerade's debts and refused to fund any more money unless the Receivership Entities paid their rightful share. Accordingly, the Receiver was faced with the decision of paying nearly $100,000 in past due bills to keep the Masquerade open or letting it close. After discussing this with his consultants, Utsick and the Receivership Entities' business partner, the Receiver learned that, at best, the Masquerade could be sold for approximately $500,000 to $600,000 in a few years if it could achieve profitability (of which the Receivership Entities would only get fifty percent). The Receiver did not believe that the financial cost of carrying this venue for the next several years in consideration for the identified possible return was a reasonable risk to undertake at this

time.  Accordingly, the Receiver decided not to burden the Receivership Entities with the past due lease and other payment obligations and determined not to pay the debts.[7]  No value will be realized from this investment.

### 6.    Jacksonville Property

As discussed in the Receiver's Initial Report, in January 2003, Worldwide purchased 49.6 acres of land just off of I-95 near Route 16 between Jacksonville and St. Augustine, Florida with the intent of building an amphitheater on the property (the "Jacksonville Property").  The Jacksonville Property is highly visible from I-95, the major interstate highway.  Towards that end, Worldwide hired attorneys, architects and engineers to rezone the Jacksonville Property and prepare it for the development of an amphitheater.  The rezoning efforts were successful.  Immediately after his appointment, the Receiver paid a $97,000 fee to the applicable government authority as an impact fee to preserve the traffic concurrency for the site.

The purchase price of the Jacksonville Property was $1.5 million.  However, based upon the significant increase in the value of raw land in northern Florida, the Receiver estimates that the current value of the Jacksonville Property is between $3.5 million and $5 million.  There is no mortgage on the Jacksonville Property.  In addition, Worldwide has spent approximately $350,000 to accomplish the rezoning and preliminary site work necessary to develop the amphitheater. The Receiver has met with several venue developers to inquire about their interest in co-developing this property as an amphitheater.  To date, no one has expressed an interest and in fact several large venue

---

[7] On or about February 22, 2006, the landlords, Capitano & Garcia, LLC, commenced an eviction proceeding against Ybor City Masquerade, Inc. (the lessee) in the Circuit Court of the Thirteenth Judicial Circuit In and for Hillsborough County, Florida, *to wit, Capitano & Garcia, LLC. v. Ybor City Masquerade, Inc.*, Case No. 06-01557 Div. J.

operators have affirmatively declined the opportunity. However, numerous residential and commercial developers have expressed an interest in buying the land. The Receiver is currently having the Jacksonville Property appraised and expects to formally market the property in the next few months. The Receiver is hopeful that the sale of the Jacksonville Property will generate significant proceeds for the estate.

### C.   Content Ownership[8]

As mentioned in the Receiver's Initial Report, as net profits for traditional concert promotions substantially declined in recent years, the Receivership Entities started focusing on other areas of the entertainment business with greater potential profit margins. One such area was the direct ownership of the entertainment product itself. To that end, the Receivership Entities invested in show production. To date, the Receiver has learned that the Receivership Entities have investments, in varying degrees, in the following entertainment products:

### 1.   National Lampoon's Pledge This

As more fully discussed in the Receiver's Initial Report, TEGFI, through a wholly-owned subsidiary named SBO, LLC ("SBO") made a significant investment in a movie entitled "National Lampoon's Pledge This" ("Pledge This"). This movie stars Paris Hilton who attends a South Beach University and heads the "hot" sorority. The sorority is competing in a national contest among sororities to determine which sorority is the "hottest". As is typical of National Lampoon movies, Pledge This is replete with sophomoric humor scenes involving nudity and depicting wild college parties and various pledges attempting to be accepted into the sorority.

---

[8] Certain investments in product are more appropriately discussed in other parts of this report.

SBO invested approximately $5.3 million in Pledge This Holdings, LLC and TEGFI loaned approximately $500,000 to Pledge This Holdings, LLC.  There are also other investors in the movie.  More specifically, an initial investor group, comprised of three hedge funds, invested $1 million which is secured by a copyright mortgage (the "Initial Investor Group"). Another investor, English Distribution, invested additional money, on an unsecured basis, and is also entitled to a percentage of the net distribution. There are also several additional, smaller investors in the movie.  Currently, the distribution of Pledge This' net proceeds, which is broken down by domestic and international revenues, are to be distributed ("waterfall") as follows:

### Domestic Revenues

1. Initial Investor Group receives the first $1.4 million;

2. TEGFI receives the next $650,000;

3. SBO receives 92% of the next revenues (up to $6.89 million); and

4. English Distribution receives 8% of the remaining domestic revenues.

### International Revenues

1. SBO receives 92% of the next revenues (up to $6.89 million); and

2. English Distribution receives 8% of the remaining domestic revenues.

After SBO receives $6.89 million, the waterfall changes for both Domestic and International revenues to the following:

1. Miscellaneous investor group receives $750,000;

2.    SBO receives 38% of the net revenues and other investors, actors, the director, writer, etc. receives 62% of the net revenues.

After filming began, the movie encountered certain problems resulting in delays and increased expenses. SBO paid an additional $500,000 and guaranteed $800,000 of the $1 million note owed to the Initial Investor Group. In return, SBO received five "equity points" from National Lampoon and five "equity points" from the Initial Investor Group (resulting in the above stated percentages). The Initial Investor Group note became due on July 1, 2005 and was extended through December 31, 2005. Moreover, in August 2005, part of the movie had to be re-filmed at a cost of $425,000. SBO paid this amount. English Distribution also paid $400,000 in overrun costs. Finally, it will cost approximately an additional $500,000 to complete the film's editing, visual effects and music.

Since the start of the SEC Receivership, the Receiver has funded Worldwide's portion to complete the film. The film has been completed and Worldwide and its partners are currently entertaining distribution offers. The Receiver expects to recoup a substantial portion of Worldwide's investment in Pledge This over time, although it is still too early to project such recovery with specificity.

## 2.    Iron Chef

As discussed in the Receiver's Initial Report, the Receivership Entities optioned the rights to produce a show based upon the "Iron Chefs" concept. Essentially, the show involves celebrity chefs competing in front of a live audience in a culinary competition. The Receivership Entities own the rights to produce and exhibit the show in Las Vegas, Atlantic City, San Francisco and Bransom, Missouri. The Receiver is currently exploring

the possibility of partnering with a well known casino to produce this show and exhibit it at the casino's venues in Las Vegas and Atlantic City.

### 3.    Sinatra

Prior to the SEC Receivership, Worldwide invested in "Sinatra", a show that depicts the life of Frank Sinatra through dance and videography ("Sinatra").  On June 5, 2006, the Receiver traveled to London to meet with Sinatra's producer and to discuss the status of Worldwide's investment.  At the meeting, the producer stated that Worldwide committed to fund 1.2 million pounds for a twenty five (25%) percent interest in the show, but only funded half of that causing the producer to scramble immediately prior to the show's opening to raise the necessary funds.  Accordingly, the producer stated Worldwide's interest in Sinatra is currently approximately thirteen (13%) percent.[9]  The producer stated that, even though Worldwide was in breach of its initial funding obligation, he would permit Worldwide to recoup its initial investment as well as a return--albeit smaller based on the aggravation and risk he incurred in having to scramble to raise additional money at the last minute. The Receiver is working with the producer to reach an acceptable resolution as to the extent of Worldwide's interest.

The Sinatra show is currently in the midst of a 16 week run at the historic Palladium Theater in London.  The show is currently being showcased for sale of future productions around the world.  Initially, the show lost some money, however, it is now making a little money.  The Receiver is hopeful Worldwide will be able to recoup its investment and potentially earn a profit on this investment.

---

[9]  The Receiver does not necessarily accept this position and is reviewing the entire transaction to determine the accuracy thereof.

### 4.    Defending the Caveman

In early 2002, Utsick, on behalf of TEGFI, entered into discussions with Robin Tate ("Tate") concerning the formation of a joint venture. The joint venture was to be called "Caveman Video." The joint venture partners were to be Tate Entertainment Group Inc. ("TEG") and TEGFI. The purpose of the joint venture was to promote a production known as "Deliver the Caveman" starring Robert Becker ("Becker"). Tate would mange the daily operations/affairs including the promotion of this work, while Utsick would tend to the accounting. The parties' discussions culminated in the signing of a joint venture agreement on or about May 25, 2002.

On or about July 26, 2002, a license agreement was entered into between Caveman Productions, Inc. (the "Licensor") and TEG (the "Licensee"). The license agreement was entitled: "Rob Becker's Defending the Caveman Video/DVD License Agreement" ("License Agreement"). The License Agreement granted TEG the right to distribute Becker's "Defending the Caveman" on video and DVD throughout North America. The license fee was $1,000,000.00. Tate asked, and TEGFI did in fact advance, the funds for the license fee. Because of extremely poor ticket sales, Becker's engagements were cancelled on or about October 3, 2002.

On or about October 8, 2002, TEGFI, Tate and TEG entered into a settlement agreement which sought to resolve the parties' dispute surrounding the failure of the Becker performances. In sum, Tate supposedly had a long term relationship with Becker, the creator and star of the Caveman project. This was the selling point that Tate used to get Utsick involved in the deal. Supposedly, because of this relationship, Becker would not allow Tate, and consequently Utsick's company, TEGFI, to suffer damages if the project did not succeed. When the project failed, Tate represented to Utsick that he did

not have any money with which to reimburse TEGFI for the losses suffered. Accordingly, under the settlement agreement, Tate promised to repay the funds out of future events which could include other Becker projects or other projects in which Tate was involved (the "Tate Settlement Agreement"). Despite the Tate Settlement Agreement, Tate failed, or refused, to offer TEGFI any other projects that Tate was later involved in, and which generated substantial profits to Tate. Litigation followed.

Specifically, on or about October 9, 2003. TEGFI filed a demand for arbitration with the American Arbitration Association alleging breach of the Tate Settlement Agreement. On February 12, 2004, Stanley A. Beiley was selected as the arbitrator ("Arbitrator"). On February 23, 2004, a preliminary hearing ("Preliminary Hearing") was scheduled for March 4, 2004. According to the Preliminary Hearing Report, TEG and Tate denied TEGFI's claim but indicated they would not be filing a formal answer. Thereafter, the parties engaged in limited discovery and a final hearing was originally scheduled for September 20, 2004. Shortly before the final hearing, the parties notified the Arbitrator that they agreed to cancel the hearing in light of the parties' settlement discussions. The final hearing was continued indefinitely.

After the Receiver was appointed, and given that the parties' settlement discussions failed to yield any concrete results, the arbitration proceedings were re-activated. The parties are currently in the process of scheduling a status conference with the Arbitrator, which is expected to take place July 31, 2006 or shortly thereafter

### 5.     Little Women

In or about November, 2004, Worldwide invested $250,000 in Little Women, LLC, for 9.5% co-producer interest in the Little Women Broadway Tour. The amount of $250,000 has been recouped as of May 28, 2006 (the "Recoupment Date"). The

Recoupment Date was during the 42nd week, out of an estimated 49 projected playing weeks, of the Little Women Broadway Tour. It is anticipated that Worldwide will receive some additional money based on profits and future ancillary or subsidiary income generated in the remaining seven weeks of the tour and beyond.

### D.  Worldwide Affiliates

#### 1.  Domestic Affiliates

##### a.  Worldwide Miami—Portofino Office

Worldwide and TEGFI have two offices located in Miami Beach, Florida. The first in the Portofino Towers, Unit 3702 (the "Portofino Office"). Utsick works out of the Portofino Office and all of the dealings with investors, AEI and American National Pension Services were conducted out of the Portofino Office.  Prior to receivership, Jennifer Homan, Utsick's long time girlfriend, assisted Utsick in dealing with investors. Utsick also employed several other assistants in this office to assist him in dealing with investors.  Currently, Utsick and one assistant are the only employees in the Portofino Office.

**THE RECEIVER ONCE AGAIN STRESSES THAT THE RECEIVERSHIP ENTITIES' AFFILIATES LISTED BELOW ARE COMPLETELY SEPARATE AND DISTINCT BUSINESSES FROM WORLDWIDE AND TEGFI. MOREOVER, THE DAY-TO-DAY OPERATIONS OF THESE AFFILIATES ARE MANAGED BY INDIVIDUALS NOT IN ANY WAY INVOLVED IN THE MANAGEMENT OR OPERATION OF WORLDWIDE OR TEGFI.  ANY ALLEGED DEALINGS WITH INVESTORS OR INVESTORS' MONEY DID NOT TAKE PLACE AT THE AFFILIATE LEVEL. THE RECEIVERSHIP ENTITIES SIMPLY HAVE AN OWNERSHIP INTEREST IN THE AFFILIATES.**

##### b.  Worldwide Miami –Washington Avenue

The second office is located at 119 Washington Avenue, Suite 502, Miami Beach, Florida 33139 (the "Washington Avenue Office").  Prior to the receivership, the Washington Avenue Office had eleven employees consisting of the general manager, an

executive producer, three booking agents, a production manager, a bookkeeper, two marketing agents and two administrators. This staff was responsible for promoting its own live entertainment events as well as assisting affiliates in their attempt to promote live entertainment events.

During the six month period between January 1 and June 30, 2006, the Washington Avenue Office presented or co-presented 24 shows which combined to gross $5.5 million in ticket sales revenue from 88,309 ticket buyers. The Washington Avenue Office generated $82,000 in gross profit and $406,000 in overhead expenses, resulting in a negative net income of $324,000 during the period. The Washington Avenue Office reduced its staff from eleven employees to seven employees and monthly overhead fell from approximately $75,000 to $55,000. Although it incurred a loss, these 2006 results compare favorably to the similar period between January 1 and June 30, 2005, during which the Washington Avenue Office incurred negative net income of several millions of dollars. The Receiver intends to close the Washington Avenue Office in the near future and transfer certain of its employees to Fiestar and Third Point.

### c.      Worldwide Midwest LLC

Worldwide also has a division in Detroit, Michigan operating as Worldwide Midwest LLC. The office is located at 306 S. Washington Ave, Suite 219, Royal Oak, Michigan 48067 (Royal Oak Music Theatre). Since the commencement of the SEC Receivership, all employees in this office have been laid off and this office will be closed in the next few weeks.

### d.      Jack Utsick Presents, N.E., Inc.

In, or about, January 2002, TEGFI and BS Entertainment, LLC, a limited liability company owned by William Rogers ("Rogers") and Sidney Payne ("Payne"), two long-

time, highly respected promoters located in Pennsylvania, created an entity called Jack Utsick Presents, N.E., Inc. ("North East"). North East was created to provide a vehicle for the promotion of events in the northeastern United States. On occasion, North East co-promotes events with Worldwide or other parties. North East is owned fifty percent (50%) by TEGFI and fifty percent (50%) by BS Entertainment. Rogers and Payne handle North East's day-to-day operations and essentially run the business.

Since its inception, North East has promoted hundreds of concerts and other events. In 2004, North East had gross revenues of $8,490,440 and gross profits of $607,622. Its operating expenses were $591,053.[10] Accordingly, North East had net income of $16,589, which was retained by North East to fund future operations. In 2005, North East had gross revenues of $7,305,509 and gross profits of $314,270. Its operating expenses were $512,030.[11] North East suffered a loss of $197,759 in 2005. To assist North East with its lack of liquidity caused by this loss and cash flow issues, Worldwide lent North East $90,000. To date, approximately $30,000 of this loan has been repaid. Additionally, North East also owes TEGFI approximately $50,000 for advances on past shows.

### e. TEGFI – Stone City

Stone City Productions/ Jack Utsick Presents, Inc. ("Stone City") is a corporation whose stockholders are Jack Orbin and TEGFI. Each shareholder owns a fifty percent (50%) interest in Stone City. Stone City was formed in 2003 for the purpose of promoting concerts, stage productions, musical productions, corporate events and other entertainment events. Jack Orbin, who has in excess of 30 years experience in the

---

[10] Included in this amount is approximately $58,000 in salary paid to Utsick as well as salaries paid to Rogers and Payne.

[11] Included in this amount are salaries paid to Rogers and Payne.

concert promotion business and is well regarded in the industry, is the managing partner and manages the business out of the company's offices in San Antonio, Texas.

Stone City produces approximately 20 to 40 shows per year, primarily in Texas and throughout the Southwest portion of the United States. Gross ticket sales have averaged between $2 million and $5 million per year. Stone City's fiscal year ends March 31st. From April 1, 2005 to March 31, 2006, Stone City had gross revenue of $2.8 million and made gross profits of approximately $160,000. Stone City had other income of approximately $100,000. After application of general overhead and administrative expenses, Stone City had a net loss of approximately $65,000. Despite this loss, Stone City's management is optimistic that Stone City's performance will improve.

### f. Worldwide New England, LLC

In February 2005, Worldwide entered into an agreement with 3-D Entertainment, Inc., a Massachusetts corporation ("3-D"), to form Worldwide New England, a Delaware limited liability company ("New England"). The partnership was formed for the purpose of Worldwide sharing in one-half of the profits of The Locobazooka Festival held in Massachusetts, (the "Locobazooka"). Worldwide paid $800,000 to purchase a fifty percent (50%) share of New England. 3-D is the managing member of New England. Located in Worcester, Massachusetts, New England is a promotion and production company whose principals have produced concerts and festivals for more than 20 years. 3-D is run by Daniel Hartwell and John Carnegie.

New England's flagship event is the Locobazooka rock festival which has been held annually in the Boston area since 1991. In previous years, Locobazooka attracted more than 15,000 attendees. However, in 2005, upon information and belief, because of

internal challenges and personnel turnover, the anticipated timely signing of certain headliner acts never occurred. Lost time negotiating any remaining acts not already routed resulted in the Locobazooka festival attracting approximately only 10,000 attendees, and was accordingly, not as profitable as in previous years.[12]   In 2005, Worldwide's fifty percent (50%) share made approximately $80,000 from its investment in New England.

In 2006, New England entered into an agreement with LiveNation to exhibit the Locobazooka festival on August 13, 2006 in the Tweeter Center in Boston, which is owned by LiveNation. LiveNation paid New England approximately $350,000 for the right to hold the Locobazooka show at the Tweeter Center. As is set forth in greater detail above, the Receiver and 3D are currently exploring the expansion of the Locobazooka concept in other states through a venture currently referred to as Fiestar.

### g.    Worldwide - BACI

BACI Worldwide LLC ("BACI") was formed in January 2004. Worldwide and BACI Management, Inc. ("BM") each own fifty percent (50%) of BACI. BM's principal is Nick Litrenta ("Litrenta"). BM and Litrenta manage BACI's business from offices located at 300 East Joppa Road, Suite 309, Towson, Maryland, 21286. BACI's primary business is the operation of Broadway and theatrical subscription seasons in four markets: Detroit, Michigan; Washington DC; Norfolk, Virginia; and Richmond, Virginia. The subscription series in each of these markets consists of anywhere from three to six shows per season in theaters with capacities ranging from 2,000 to 5,000 seats. The shows that are presented in these series typically begin either on or off Broadway or are shows such as "Riverdance" and "Stomp". The subscription list usually accounts for anywhere from

---

[12] These are contentions made by 3D and have not been verified.

ten percent (10%) to thirty percent (30%) of the advance ticket sales. The balance of the tickets must be sold through promotional activities. The shows usually play for eight performances over the course of one week.

At inception, BM contributed its existing promotional bookings in each of the four markets and Worldwide contributed $2.5 million to BM which, in turn, upon information and belief, paid the money to BACI. BACI's operating expenses are approximately $600,000 annually. BACI lost approximately $1 million in 2004 and is showing a loss in 2005 through the first three quarters. Gross sales for the prior year, net of admissions tax, were approximately $15 million. According to Litrenta, the cost of promoting these kinds of shows has doubled in the past ten years and today's available product is "top heavy" and limited. As a result, the marketing strategy for these types of performances has changed dramatically. In an effort to achieve profitability, Mr. Litrenta is looking to add shows that have better margins and lower risk.   Additionally, Worldwide and BM co-promoted events in 2005 in areas outside of the subscription markets which lost money. BACI and Litrenta currently owe Worldwide approximately $100,000 in connection with such co-promotions.

The Receiver has been in discussions with Litrenta to jointly sell their respective interests in BACI to a third party that has expressed interest. This is the only alternative, outside of litigation, pursuant to which the Receiver believes Worldwide will be able to recoup its investment.

## 2.   International Affiliates

### a.  Australia

As discussed in the Receiver's Initial Report, the Receivership Entities had two promoting relationships in Australia with well known Australian promoters.  The first

was with Kevin Jacobsen and the Jacobsen Group. The second was with Michael Chugg and MCE Entertainment. The updated status of these relationships is as follows:

### i.    The Jacobsen Group/ Dirty Dancing

Worldwide Australia LLC ("WWA") [13] was created in 2003. It became a partner with Kevin Jacobsen ("Jacobsen") and/or his affiliate(s) forming Jacobsen Utsick, Pty, Ltd. ("JJU" or the "JJU Partnership"), as a vehicle for promoting concerts throughout Australia. On or about December 17, 2004, WWA filed a lawsuit (hereinafter referred to as the "Australian Litigation" or the "Australian Case") against nine (9) defendants in The Supreme Court of New South Wales, Sydney Registry, Equity Division, Commercial Division, in a case styled: "*Worldwide Australia, LLC  v. Jacobsen Platinum Pty Limited, Kevin George Jacobsen, Time of My Life Pty Limited, Dirty Dancing Investments Pty Limited, Dirty Dancing Asia Pacific, Jacobsen Entertainment Limited, Amber Lucy Jacobsen, Michael Aaron Jacobsen, and Jacobsen-Jack Utsick Pty Limited, No. 50183 of 2004*," (these nine defendants are hereinafter referred to as the "Australian Case Defendants").

At the time of the Receiver's Initial Report, the parties in the Australian Litigation had obtained, by consent, an adjournment of the proceedings pending WWA's posting of the second half of the $500,000 bond as required under Australian law. WWA was also in the process of amending the complaint that had been filed in the Australian Litigation. Since the Receiver's Initial Report, WWA has posted the second half of the required bond (with the Receivership Court's authorization). In addition, on or about May 18, 2006, WWA filed its amended complaint with The Supreme Court of New South Wales,

---

[13] Worldwide is the sole member of WWA. WWA is a Delaware limited liability company having its principal place of business at 300 South Point Drive, Suite 3702, Miami Beach, Florida 33139.

Sydney Registry, Equity Division, Commercial Division (the "Australian Case Amended Complaint"). In short, the purpose of the Australian Case Amended Complaint was to: (1) clarify the role of the JJU Partnership, the Australian partnership that was formed between WWA (the Plaintiff) and Jacobsen Platinum Pty Limited ("Platinum") (the First Defendant); (2) clarify the JJU Partnership's rights (the "Dirty Dancing Rights") in a musical dramatic work based on the screenplay of the motion picture known as "Dirty Dancing" (the "Dirty Dancing Work"); and (3) add causes of action based on the Fair Trading Act of New South Wales.

Specifically, the Australian Case Amended Complaint alleges that the JJU Partnership was formed to, among other things, exploit and profit from the Dirty Dancing Rights acquired on behalf of, and for the benefit of, the JJU Partnership by the Australian Case Defendants known as Time of My Life Pty Limited ("Third Defendant"), Dirty Dancing Investments Pty Limited ("Fourth Defendant"), and Dirty Dancing Asia Pacific Pty Limited ("Fifth Defendant") and that therefore, any profits derived from the Dirty Dancing Work were obtained for the benefit of, and on behalf of, the JJU Partnership. In addition, the Australian Case Amended Complaint alleges that the Australian Case Defendants violated the New South Wales Fair Trading Act of 1987. Finally, the Australian Case Amended Complaint seeks an order for an account of profits derived from the exploitation of the Dirty Dancing Rights from any and all of the Australian Case Defendants.

Following the filing of the Australian Case Amended Complaint, the Australian court issued Consent Orders which essentially outline an approximate time frame for the filing of certain documents as follows: (a) the Australian Case Defendants' Request for

Particulars is to be filed by May 26, 2006; (b) WWA's Response to the Request for Particulars is to be filed by June 9, 2006; (c) the Australian Case Defendants' defenses and cross claims, if any, are to be filed by July 21, 2006; and (d) WWA's reply and defenses thereto are to be filed by August 18, 2006.  These same Consent Orders also provide that the parties are to: (a) exchange documents for discovery by August 25, 2006; (b) serve a verified list of documents by September 22, 2006; and (c) inspect documents by October 6, 2006.

On May 26, 2006, the Australian Case Defendants served WWA with a Request for Particulars which requested that WWA provide more specificity concerning the negotiations and oral agreement surrounding the Dirty Dancing Work.  WWA timely filed its Reply to the Defendants' Request for Particulars on or before June 9, 2006. Pursuant to the court's Consent Orders, the Australian Case Defendants have until July 21, 2006 to file defenses and cross claims to the Australian Case Amended Complaint.

## ii. Michael Chugg/ MCE Entertainment

Prior to commencement of the receivership, Worldwide had a co-promotional relationship with Michael Chugg ("Chugg") and Michael Chugg Entertainment Pty Limited ("MCE") pursuant to which the parties were to co-promote live entertainment events throughout Australia. In connection with this, Worldwide invested several million dollars with MCE to co-promote various events.  After a period of a couple of years, MCE reported that Worldwide's investment was worthless.   Worldwide retained an auditor to audit MCE's books and records and discovered that MCE over reported expenses, which resulted in Worldwide being shorted approximately $8,000 to $10,000 per show.  A settlement was subsequently reached whereby Chugg recognized that MCE owed Worldwide approximately $2 million Australian dollars.  In Las Vegas in February,

2006, during his initial conversation with the Receiver, Chugg acknowledged this obligation and stated that it was his intention to repay the debt through funds generated from a Cold Play tour scheduled to take place in June and July, 2006.

On or about October 12, 2005, Worldwide Downunder Pty Ltd. ("WWDU') was incorporated in New South Wales, Sydney, Australia. Serge Bolzonello was listed as the only director of WWDU. On this same day, a Declaration of Trust was purportedly executed by WWDU (although the signature on the document is illegible), which seemingly acknowledges that Diego Matamoros ("Matamoros") acquired 100 ordinary shares of WWDU. Matamoros is, upon information and belief, a lawyer practicing in Costa Rica.

Between October 24 and 31, 2005, the sum of approximately $3 million was transferred to the WWDU account. However, the source of these funds is far from clear. In October and November 2005, a total of $2 million was transferred out of the WWDU account purportedly by Utsick upon Matamoros' instructions. Pursuant to Matamoros' instructions, some of the money was applied to the "Robbi Williams Show". In addition, Chugg acknowledged receiving some of the monies from the WWDU account for use toward the "Cold Play Tour", which was the original purpose for which WWDU was established. Moreover, in conversations with the Receiver and his professionals, Chugg has intimated that the "Cold Play Tour" -- the purpose for which WWDU was created -- is a project that belongs, at least in part, to TEGFI and/or Worldwide.

In March, 2006, the Receiver traveled to Sydney, Australia to meet with Chugg in an effort to memorialize a debt repayment plan and to finalize the details surrounding the Cold Play tour. While in Sydney, the Receiver learned that Utsick took the position that

Worldwide had no interest whatsoever in the Cold Play tour but rather such interest belonged to Matamoros.

Recently, the Receiver and Chugg have engaged in settlement discussions pursuant to which the Receiver expects that Chugg and MCE will memorialize a repayment plan pursuant to which they will repay their debt to Worldwide. If such an arrangement is not concluded shortly, the Receiver will commence litigation against Chugg and MCE to collect this debt. The Receiver and his professionals are in the process of investigating what, if any, interests the Receiver has on behalf of the Receivership Entities in WWDU and what, if any, rights the Receiver has against Matamoros.

### b. New Zealand

As set forth in the Receiver's Initial Report, Worldwide owns a one hundred percent (100%) interest in a Delaware limited liability company known as Worldwide New Zealand, LLC ("WWNZ"). WWNZ owns a twenty five percent (25%) interest in a New Zealand company known as QPAM, Ltd. ("QPAM"). The remaining seventy five percent (75%) interest in QPAM is held by Jacobsen Venue Management New Zealand, Ltd. ("JVM") and Jacobsen F.T. Pty, Ltd. ("JFT") (collectively the "Jacobsen Parties"). QPAM holds a valuable lease to manage and operate a large concert venue in Auckland, New Zealand known as the "Vector Arena". The Vector Arena is still under construction with an anticipated opening date of sometime after August, 2006. To date, WWNZ has invested approximately $3,972,400 in QPAM with the funds used primarily for the construction of the Vector Arena. This investment in QPAM constitutes a significant investment of the receivership.

On March 13, 2006, the Receiver traveled to New Zealand to participate in negotiations with the Jacobsen Parties in an attempt to amicably settle certain controversies which existed prior to the appointment of the Receiver between WWNZ, QPAM and the Jacobsen Parties. In addition, the Receiver sought financial information on QPAM and other information on construction-related issues which could effect the opening of the Vector Arena and the value of WWNZ's interest in QPAM. Unfortunately, the Receiver's efforts to amicably resolve WWNZ's disputes with the Jacobsen Parties were unsuccessful. Moreover, the Jacobsen Parties, who control the board of directors of QPAM, refused to provide the Receiver, or his designated representatives in New Zealand, crucial financial information which would assist the Receiver in fulfilling his fiduciary obligations with respect to the maintenance and operation of the business interest. As such, the Receiver was forced to seek appropriate relief in the High Court of New Zealand to protect the receivership's interest in QPAM.

At the beginning of April, 2006, WWNZ, through the Receiver, filed an application with the High Court of New Zealand to restrain QPAM from conducting a directors' meeting until such time as QPAM provided the Receiver and his designated representative, current financial information on the business affairs of QPAM. Subsequent to the application, the Jacobsen Parties sent correspondence to the Receiver in which it advised that the appointment of the Receiver constituted a "change of control" in the ownership of QPAM which purportedly provided the Jacobsen Parties the right to purchase WWNZ's twenty five percent (25%) interest in QPAM. On May 9, 2006, WWNZ, through the Receiver, sought further injunctive relief in the High Court of New Zealand to preserve the status quo and require QPAM to disclose to the Receiver

financial information on QPAM's business operations.  WWNZ, through the Receiver also sought a determination of whether the Jacobsen Parties were entitled to exercise their purported preemptive rights to purchase WWNZ's twenty five percent (25%) interest for no consideration.

Through a series of hearings and orders entered in May, 2006, the High Court of New Zealand considered WWNZ's various applications and ultimately entered a judgment against WWNZ and in favor of QPAM and the Jacobsen Parties.  The High Court of New Zealand found that once the Jacobsen Parties exercised their preemptive rights to purchase WWNZ's twenty five percent (25%) interest in QPAM, they then became the beneficial owner of the stock interest and WWNZ held a mere legal interest in QPAM with no voting rights as a director or shareholder.  However, the High Court of New Zealand found that the issue of the value of WWNZ's twenty five percent (25%) interest payable by the Jacobsen Parties was still an open question.  WWNZ, through the Receiver, has appealed these orders and a hearing with the appellate court is currently scheduled for August 21, 2006 in Wellington, New Zealand.

In addition to the above, prior to the appointment of the Receiver, in September, 2005, WWNZ and Utsick filed a Statement of Claim in a case styled: *Worldwide NZ, LLC and John Paul Utsick v. Quay Park Arena Management Ltd., Kevin George Jacobsen, Michael Aaron Jacobsen and Amber Lucy Jacobsen, In the High Court of New Zealand, Auckland Registry, CIV-2005-404-5093* (Quay Park Arena Management Ltd., Kevin George Jacobsen, Michael Aaron Jacobsen and Amber Lucy Jacobsen are collectively referred to as the "New Zealand Defendants" and this case is hereinafter referred to as the "Ticketmaster7 Litigation").  WWNZ and Utsick filed an Amended

Statement of Claim on December 12, 2005. Through the Amended Statement of Claim, WWNZ and Utsick filed a derivative suit seeking leave of the court to bring an action for damages on behalf of QPAM against the three other directors of QPAM (i.e. the Jacobsen Parties) for various breaches of their fiduciary duties owed to QPAM and WWNZ/Utsick (the "Amended Statement of Claim").

Through the Amended Statement of Claim, WWNZ alleged that the Jacobsen Parties, through JVM (their related entity), improperly entered into a ticketing agreement with a company called Ticketmaster7 Pty Ltd. ("Ticketmaster7") on very favorable terms provided that Ticketmaster7 agreed to lend JVM $5 million to enable it to contribute the required debt funding and purchase its interest in QPAM. As consideration, JVM granted to Ticketmaster7 the right to act as the exclusive ticket selling agent at the Vector Arena. As also alleged in the Amended Statement of Claim, the Jacobsen Parties wrongfully entered into the ticketing agreement with Ticketmaster7 because: (1) the New Zealand Defendants did not disclose to WWNZ/Utsick the terms of the ticketing agreement or the condition under which Ticketmaster7 agreed to make available the sum of $5 million to JVM; (2) the New Zealand Defendants, through their private dealings with Ticketmaster7, foreclosed any negotiations with a competitor called Ticketek Pty Limited ("Ticketek"), with whom QPAM could very well have obtained a more favorable deal; and (3) the New Zealand Defendants represented to Utsick that they would not enter into any agreements, including a ticketing services agreement, without Utsick's approval. The Amended Statement of Claim alleged that, as a result of the foregoing, the New Zealand Defendants (i.e. the Jacobsen Parties as directors of QPAM), breached their fiduciary duties to QPAM and WWNZ/Utsick by, among other things, preferring the Jacobsen

Parties' own interests over the interests of QPAM. According to the Amended Statement of Claim, the measure of possible damages to QPAM is the difference between the benefit QPAM obtained from the ticketing agreement with Ticketmaster7 and the benefit they would have received if the ticketing agreement was negotiated with Ticketek. It is currently estimated that the loss totals $3.5 million.

Trial of the Tickmaster7 Litigation was scheduled in New Zealand for July 24, 2006. On May 1, 2006, the Jacobsen Parties filed a memorandum with the High Court of New Zealand arguing that WWNZ had no further standing to proceed with the derivative suit because the Jacobsen Parties contended that the appointment of a Receiver over WWNZ's business affairs constituted a "change of control" in the ownership of QPAM, which then purportedly provided the Jacobsen Parties the right to purchase WWNZ's twenty five percent (25%) interest in QPAM for $0.00. Thus, the Jacobsen Parties argued that WWNZ has no further interest in QPAM and cannot act on behalf of shareholders of QPAM. On June 30, 2006, the Jacobsen Parties filed a motion for summary judgment in the High Court of New Zealand to have the Ticketmaster7 Litigation dismissed. In addition, on July 3, 2006, QPAM and the Jacobsen Parties filed an application in the Ticketmaster7 Litigation for a determination as to whether the WWNZ has standing to bring the claim. A hearing has been scheduled for July 26, 2006 in New Zealand to consider these issues. WWNZ, through the Receiver, is opposing the application and summary judgment motion of QPAM and the Jacobsen Parties.

### c.  3A London

3A is a partnership based in London, England. The four partners are Dennis Arnold ("Arnold"), Martyn Stanger ("Stanger"), Pete Wilson ("Wilson") and Jack Utsick Presents ("JUP"). Arnold, Stanger and Wilson together own approximately forty-nine

percent (49%) and JUP owns forty-nine percent (49%) and there is a floating two percent (2%) ownership interest. Prior to forming 3A, Arnold, Stanger and Wilson had a combined 60 years experience in the entertainment and promotion business. Arnold, Stanger and Wilson are the managing partners of the venture. Arnold concentrates on productions. His role with the company is primarily that of the producer overseeing the production of every tour event, controlling budgets, securing and implementing licensing agreements and generally insuring the smooth running of the events. Stanger concentrates on the financial issues. Prior to his involvement with the company, he served as financial controller for Harvey Goldsmith Entertainments, LTD, managing the company's investments and negotiating transactions at all levels of the business. Wilson also spent many years with Harvey Goldsmith, initially as a touring manager and eventually becoming an expert in all aspects of the promotion business.

3A is active in the entertainment promoting, servicing and producing fields. The acts which have aligned themselves with 3A include Eric Clapton, Westlife, Paul Weller, Blondie, Yes, Jeff Beck, Daniel Bedingfield, The Doors and Bjorn Again. At the time the business was formed it assumed 1.5 million pounds sterling of debt from AAA Entertainment, a company operated by Arnold, Stanger and Wilson for the six years preceding the formation of 3A. The Receivership Entities invested/loaned approximately 2.5 million pounds sterling (roughly $5 million) in 3A Entertainment at the time of its formation in June of 2003.

Arnold, Stanger and Wilson have drawn reduced salaries since the inception of 3A. During this time, the company successfully retired the original 1.5 million pounds of debt. As a result of financial accommodations extended to JUP by 3A, JUP allegedly

owes 3A approximately 212,000 pounds sterling. No dividends have been made to the partners since the inception of the venture. Moreover, 3A owes the British government approximately $685,000 in taxes.

In June 2006, the Receiver traveled to London to meet with Wilson, Stanger and Arnold to learn about the status of Worldwide's investment in 3A. At the meeting, the Receiver learned that 3A was losing money and that Wilson, Stanger and Arnold no longer wanted to be partners with Worldwide and were contemplating dissolving 3A. The Receiver informed Wilson, Stanger and Arnold that such course of action was unacceptable and the Receiver threatened to institute legal action against them if they dissolved 3A. Moreover, the Receiver threatened to enforce non-competition agreements entered when 3A was formed. Thereafter, the parties engaged in settlement negotiations and have recently agreed on a settlement, subject to the Court's approval, whereby Wilson, Stanger and Arnold shall repay loans and/or buy Worldwide's interest in 3A for $1 million (paid $800,000 immediately and $200,000 on or before April 1, 2007). Additionally, 3A shall be fully responsible to pay the British government any taxes owed and Worldwide's alleged debt of 212,000 pounds sterling shall be forgiven. Finally, to the extent 3A is sold within the next year, Worldwide shall share in fifty percent (50%) of any profit. The Receiver shall file a motion to approve this settlement shortly.

### d. Amsterdam

On November 22, 2004, Worldwide Entertainment, Inc. entered into an agreement with Big Brother & Holding Company, B.V. pursuant to which the company purchased 90 shares of stock in The Alternative Holding B.V. (the "Alternative") for 500,000 euros and the providing of a credit facility of 350,000 euros to the Alternative. The business of the Alternative is the organization and promotion of live music and related events,

including buying and selling of live performances of music bands, theatrical and other events, including festivals. The company is still operating.

The Receiver traveled to Amsterdam in June 2006 and met with the Alternative's principals. At the meeting, the Receiver learned that the Alternative is losing a great deal of money and unless the Receiver forwarded additional money pursuant to the 350,000 euros credit facility, the Alternative would most likely cease operations. The Receiver does not intend on forwarding any funds to the Alternative as the Receiver believes that such an action would further compound Worldwide's losses in Amsterdam. The Receiver will further investigate the Alternative's business dealings over the next few months to determine if Worldwide has any claims against the Alternative or its principals.

### e. China

The Receiver learned that the Receivership Entities had a relationship with certain promoters in China pursuant to which the Receivership Entities invested millions of dollars in promoting, among other things, Rolling Stones' concerts, Nora Jones concerts and a Titanic artifacts exhibition in China. Although the Receiver has not yet had a chance to complete his examination with respect to the Receivership Entities' activities in China, upon information and belief, the Receivership Entities lost more than $2 million with respect to their activities in China. The Receiver is in the process of investigating this relationship and will provide updates in future reports.

### E. Miscellaneous Investments

#### 1. Real Estate

In addition to the Jacksonville Property that was more fully discussed above, the Receivership Entities own two condominium units in the Portofino Towers (Unit Nos. 3702 and 3503) located in Miami Beach, Florida. Utsick resides in Unit No. 3503 and

Unit No. 3702 is utilized by the Receivership Entities as an office. Each unit has an approximate fair market value of $2 million. Upon information and belief, Unit 3702 is owned free and clear and Unit 3503 has a mortgage on it in the approximate amount of $450,000. Unit 3702 is being placed on the market this month. Currently, Utsick is being permitted to reside in Unit 3503 under the terms of his living expense agreement with the SEC. In time, however, the Receiver expects to sell this unit as well.

### 2. Joe Zada

As discussed in the Receiver's Initial Report, allegedly, Joe Zada ("Zada") was presented to Worldwide as someone who could assist in arranging a $100 million letter of credit which Worldwide allegedly needed to demonstrate Worldwide's financial capacity to promote a Barbra Streisand Tour. According to Utsick, Zada represented to Utsick, among other things, that before Zada could deliver the letter of credit, Worldwide needed to be in a pre-existing business relationship enabling Zada to promote this relationship to a third-party lender and demonstrate Worldwide's financial strength. Ultimately, Worldwide advanced $1.5 million. On September 27, 2005, in consideration for said funds and prior to entry of the Receivership Order, Zada Enterprises, LLC ("Zada Enterprises") executed two separate promissory notes in favor of Worldwide, one in the principal amount of $1,000,000 (the "$1,000,000 Note"), and the other in the principal amount of $500,000 (the "$500,000 Note"). Both promissory notes were guaranteed by Zada ("Zada" and "Zada Enterprises" are hereinafter collectively referred to as the "Zada Parties").

Upon his appointment, the Receiver made demand on the Zada Parties to satisfy their obligations owed under both promissory notes. Recently, the Receiver consensually negotiated a settlement with the Zada Parties whereby the Zada Parties agreed to pay the

full $1.5 million obligation owed under both promissory notes and all accrued, unpaid interest.  A definitive settlement agreement was executed by the Zada Parties and the Receiver, on behalf of Worldwide, (the "Zada Settlement Agreement") in which the following terms are set forth:  i)  the Zada Parties are to pay the Receiver the sum of $44,000 as an interest payment on, or before, July 18, 2006;  ii) the Zada Parties are to pay the Receiver the sum of $8,800 as an interest payment owed for August, 2006 on, or before, August 18, 2005; and iii) the Zada Parties are to pay the Receiver a final payment of $1.5 million by no later than September 26, 2006.[14]  In the event of default of any payment owed under the Zada Settlement Agreement, the Zada Parties have consented to the entry of a judgment in favor of the Receiver for the full $1.5 million, including interest, reasonable attorneys' fees and costs, or other litigation expenses, less any payments received from the Zada Parties.  Furthermore, in the event of default, the Zada Parties shall waive any defenses it may have to the enforcement of this Zada Settlement Agreement.   The Receiver filed a motion with the Receivership Court to approve the Zada Settlement Agreement with the Zada Parties and awaits the Receivership Court's ruling on the motion to approve the Zada Settlement Agreement.

### 3.  Michele Pommier Model Management , LLC

As discussed in the Receiver's Initial Report, in September, 2004, Utsick invested $850,000 from Worldwide in Michele Pommier Model Management, LLC, ("MPMM"), a company that manages models.[15]  The other partners in the deal are Donald Soffer and Michele Pommier.  Soffer and Utsick were to receive seventy-five percent (75%) of the

---

[14] There is a three (3) day grace period for all payments due under the Zada Settlement Agreement with the Zada Parties.

[15] Although this and other investments are technically in Utsick's individual name, Utsick has stated such investments belong to Worldwide and were made for Worldwide's benefit.

profits and Pommier, the managing partner, was to receive twenty-five percent (25%). The investment was made in an effort to foster an entertainment/promotion concept titled "Fashion Rocks". According to Utsick, no profits have been distributed to date.

Since the filing of the Receiver's Initial Report, the Receiver has continued to monitor the business operations of MPMM through reviewing tax returns and other financial information produced by MPMM, and meeting with representatives of MPMM to learn more about Utsick's $850,000 investment in that company. Just prior to filing this Report, the Receiver received MPMM's final 2005 U.S. and state tax returns as well as its final 2005 financial statements. The Receiver just received MPMM's updated 2006 financial statements. The Receiver and his counsel are continuing to evaluate this investment and determine how to proceed in the best interest of the receivership.

### 4. Marvana Day Spa

As discussed in the Receiver's Initial Report, in May, 2005, Utsick invested $25,000 into Marvana Day Spa ("Marvana"), a 780 square foot storefront located at 2263 NW 2nd Ave., Suite 104 (Heritage Place) Boca Raton, Florida. Utsick owns fifty percent (50%) of the business. Marvana is a "day spa" offering nail, skin, body, massage and meditation/wellness treatments to its clientele ranging from $5 to $200 a treatment. Customers are booked by appointment and the business operates six days a week. Combs is the only full time employee and, from time to time, she brings in temporary contract employees to assist. The business has a three year lease and rent is approximately $1,390 per month. The business has not made any substantial money and no dividends and/or profits have been paid to the shareholders to date. Since the filing of the Receiver's Initial Report, the Receiver has continued to monitor the business operations of Marvana.

The Receiver is continuing to evaluate this investment and determine how to proceed in the best interest of the receivership.

### 5. Luna Restaurant

As discussed in the Receiver's Initial Report, in February, 2003, Utsick wired $350,000 from TEGFI to invest in a bar and lounge on the island of St. Barthelemy ("St. Barts") called "Luna". The $350,000 was for twenty percent (20%) of "Marina Partners Ltd", an Antiguan corporation that was to own and operate the property. Other partners in the deal were Jerry Powers, Kevin Brady and Eric Omores. Allegedly, there were undisclosed claims pending against the property that were revealed to the investors post-closing resulting in the club being returned to the seller. Notwithstanding email correspondence of September 20, 2003 from Eric Omores that the $350,000 would be repaid, no portion of the investment has been recovered to date. The Receiver will further investigate this matter and commence all appropriate legal actions required to attempt to recoup this money.

### 6. Omega Records

The Receivership Entities own a company called Omega Records. It has agreements with three upstart artists – Zasha, The Goods, and Candice. Since the filing of the Receiver's Initial Report, the Receiver and his counsel have continued to investigate the receivership's ownership in Omega Records. To date, the records produced by Worldwide and/or Utsick have been incomplete and do not assist the Receiver in determining how to administer this potential asset. Thus, the Receiver is seeking additional records and information from third parties through discovery and

should be prepared shortly to make a determination as to how best to maximize this asset for the benefit of the receivership's creditors and/or investors.

## IV.   Utsick

Utsick has generally been available to assist the Receiver. However, because Worldwide's concert promotion operations have been substantially reduced, the widespread assistance of Utsick has not been needed. Utsick has assisted the Receiver in attempting to finalize the film "Pledge This" by working with editors to finish its score.

Utsick provided an accounting to the SEC which indicates that his personal assets consists of approximately $85,000 in unrestricted bank accounts, $23,000 in IRAs, a $500,000 prepayment to the IRS, a small monthly pension benefit and diminimis personal property. The Receiver has frozen Utsick's bank accounts and will attempt to verify the accuracy of this accounting over the next few months. Moreover, the Receiver is researching whether he can recover the prepayment to the IRS.

In addition to his bank accounts, Utsick also reported that he owns seven term insurance policies with a combined death benefits of $54.2 million. Three of these policies totaling $27 million in death benefits list TEGFI as the beneficiary (the "TEGFI Policies"). Three of the policies totaling $27 million in death benefits list Jennifer Homan and/or Utsick's personal trust or his estate as the beneficiary (the "Homan Policies"). One policy with $200,000 in death benefits lists Utsick's ex-wife as beneficiary. The annual premium for the Homan Policies is approximately $292,000 and for the TEGFI Policies is approximately $222,000. The Receiver has paid approximately $20,000 to keep the TEGFI Policies current since the commencement of the receivership providing him ample time to decide whether it is in the estate's best interest to pay the

high premiums. To that extent, the Receiver requested Utsick to voluntarily sit for a physical examination enabling the Receiver to make an educated decision based on Utsick's current health. However, Utsick has declined this request based on his belief that it is unnecessary. The Receiver disagrees with Utsick's position. Accordingly, the Receiver intends on permitting the Homan Policies to lapse and is filing a motion seeking direction from the Receivership Court on whether to let the TEGFI policies lapse.

Pursuant to the Permanent Injunctions which froze Utsick's assets, Utsick is entitled to a monthly living expense until such time as the Receivership Court rules otherwise. To that extent, Utsick provided a monthly budget to the SEC indicating that his monthly expenses are approximately $15,000. The SEC, however, has only agreed to permit the estate to pay Utsick $10,000 per month and to allow Utsick to reside in his condominium for the time being.

## V.   **American Enterprises**

AEI is a Florida company. AEI served as the manager of numerous limited liability corporations that were created in connection with financing the business operations of Utsick, either through Worldwide and/or TEGFI. Robert Yeager is the sole owner of AEI. Since 1998, Yeager, as a principal of AEI, served as a consultant to Worldwide. According to a private placement memorandum of November 5, 2004, AEI served as a consultant to Worldwide for approximately $207 million worth of funding for entertainment projects. It is believed that approximately 2,000 investors invested money in the Receivership Entities through AEI and its affiliates. Donna Yeager, the wife of Yeager, is the president of AEI and carries out various administrative functions for AEI.

AEI was instrumental in raising money for various Receivership Entities' entertainment projects. Typically, limited liability companies ("LLC" or "LLCs") were formed by AEI for a particular project or types of projects with AEI serving as the manager of the newly formed LLC. Funds were raised by offering unit-holders significant rates of return on investments. The terms varied from program to program but a typical arrangement provided that the LLC would enter into a business loan agreement with Worldwide for a specific project. Under the terms of the loan agreement, the LLC received eighteen percent (18%) interest on its loan plus an additional three percent (3%) of the "profits" generated on the project. The loan agreement further required Worldwide to reimburse the LLC for operating expenses up to a certain amount based on the profits made by Worldwide. Typically, LLC's sold units to purported qualified investors pursuant to a private placement of securities. It is the Receiver's current understanding that the programs were offered and sold in many different states, including but not limited to, California, Washington, Pennsylvania, Missouri, Montana and Georgia. AEI's principal office is located in Hahnville, Louisiana, which is near New Orleans.

Immediately after AEI was placed into receivership, the Receiver traveled to New Orleans to meet with the Yeagers and AEI's employees. At the meeting, the Yeagers were extremely forthcoming and spent hours with the Receiver answering all of his questions. AEI's records appear to be organized and well maintained. The Yeagers and AEI's employees continue to fully cooperate with the Receiver through the date of this report and are assisting the Receiver in compiling data that will be used to verify investors' claims. AEI's database indicates the existence of over 4,500 investors

representing approximately $135 million in net invested capital (inclusive of rollover balances brought forward).  This data must be verified.

## VI.   Yeagers

The Yeagers have been extremely cooperative in assisting the Receiver and his professionals.  They have traveled from their home in New Orleans to South Florida on numerous occasions to meet with the Receiver to answer questions and assist in his investigation.  The Yeagers provided the Receiver with thousands of personal and business documents and assisted the Receiver and his professionals in understanding the Receivership Entities' pre-receivership affairs--including the facts surrounding various oil and gas investments and a potentially large claim against the estate of Shari DiSalvo, the deceased former president of American National Pension Services.  Simply put, the cooperation of the Yeagers is significantly benefiting the receivership estate.

Pursuant to the terms of the Permanent Injunctions which froze their assets, the Yeagers provided a detailed accounting of their personal assets to the SEC, the highlights of which are as follows:[16]

1.     Automobiles: The Yeagers reported owning many automobiles including a Ferrari, Aston Martin DB7, Mercedes Benz SL500, Lexus SC430, a Range Rover, a Porsche Boxster, an antique Buick, a Morgan and a Hummer.  Most of these automobiles were delivered to the Receiver and are in the process of being sold for the benefit of the estate.  Moreover, the Yeagers, with the Receiver's permission, sold a Toyota that was located in Saint Croix at market value and turned the funds over to the Receiver;

---

[16] The Yeagers provided separate accountings which have been consolidated for this report.

2.      Motorcycles: The Yeagers reported owning several Harley Davidson motorcycles and two Yamaha dirt bikes that will be turned over to the Receiver and sold for the benefit of creditors;

3.      Boat: The Yeagers disclosed to the Receiver that they were in the process of building a 38' Strike Boat Walkaround with the approximate value of $300,000. The boat is in the final stages of construction and will be sold within the next few months. The proceeds of the boat will be distributed to creditors;

4.      Bank Accounts: The Yeagers reported that they and their companies had bank and brokerage accounts totaling approximately $2 million. The Receiver has frozen these accounts;

5.      Real Estate: The Yeagers reported that they owned the following real estate as of the commencement of the receivership (the Yeagers also disclosed that they owned a condominium in St. Croix, USVI that was sold prior to the commencement of the receivership and the proceeds are in their bank accounts);

        a)      Three homes outside of New Orleans. The Yeagers live in one of the homes, Donna Yeager's mother lives in one and the third home is used by AEI as its offices;

        b)      A condominium in Sunny Isles, Florida. This condominium was recently sold and after payment of the mortgages the estate realized approximately $120,000; and

        c)      An investment property purchased with Shari DiSalvo in Sunny Isles, Florida. This home is in the process of being rebuilt and the Yeagers and DiSalvo each contributed $1.2 million into the project. The Receiver

is making claim to the entire project and it is believed that the property, in its current state, can be sold for between $2.5 and $3.5 million.

6.　　Personal Injury Lawsuits:  Both Robert and Donna Yeager are parties to personal injury lawsuits based on automobile accidents.  Donna Yeager recently settled one of the lawsuits for $100,000 and she has turned these funds over to the Receiver.  The Receiver is unsure what, if any, is the value of the remaining lawsuits; and

7.　　Miscellaneous:  The Yeagers also reported owning numerous other assets, including but not limited to, artwork, a stamp collection and furnishings.  Robert Yeager also disclosed a TWA monthly pension payment.

Subsequent to his appointment, the Receiver learned that Yeager, or entities owned or controlled by Yeager, hold a significant investment in a certain oil drilling venture in Louisiana known as the "EP-3 Project". After researching the matter, conducting several witness interviews, and reviewing documents concerning the EP-3 Project, the Receiver understood that, through a series of transactions involving entities known as "LA-3 Lease Acquisition Group, LLC" ("LA-3") and its predecessor, "One America Energy Exploration, LLC" ("Exploration"), both owned or controlled by Yeager, LA-3 was about to enter into a joint venture agreement with a Texas corporation known as Browning Oil Co. ("Browning") to drill the EP-3 Project.  Under the proposed agreement, Browning, LA-3 and some other parties will drill EP-3 and split the expenses and profits on an approximate 50/50 basis. The Receiver understands that the total cost to drill the well will approximate $3.6 million, with LA-3's share of expenses coming to approximately $1.6 million.   The Receiver understands that the deal with Browning

depended in part upon the retention of certain necessary land leases from landowners who owned property where the EP-3 Project would be drilled.

The Receiver also learned that in furtherance of the EP-3 Project, Yeager caused the sum $1,097,774.14 to be transferred to an individual named Robert Verret in Louisiana to be held until LA-3 (controlled by Yeager) executed the agreement with Browning and drilling was to commence. The Receiver then learned that LA-3 obtained the funds to send to Mr. Verret from two entities related to Yeager known as RF Yeager, LLC and RFY Company, LLC.

Over the last month, the Receiver has taken steps to retrieve and safeguard the $1,097,774.14 which was sent to Mr. Verret. Specifically, the Receiver made demand on Mr. Verret for return of the funds and ultimately was successful in having all of the funds returned to the Receiver's control without having to expend significant funds on litigation. The Receiver also met with Browning and retained certain professionals including geophysicists to assist him in determining whether the continuation and funding of this investment is in the best interest of the creditors. As of the date of this Second Report, the Receiver has not made a decision whether to continue with the investment in the EP-3 Project.

VII. **Pension Custodians**

A. **American National Pension Services**

As part of his investigation, on April 25, 2006, the Receiver interviewed the Yeagers in New Orleans, Louisiana. At that meeting, Yeager first advised the Receiver of his and his wife's many business transactions with Sheri DiSalvo ("DiSalvo") and her company American National Pension Services ("ANPS") and of his suspicion that

DiSalvo and ANPS had misappropriated Individual Retirement Account ("IRA") funds that were to be invested into the Receivership Entities through ANPS.

Yeager informed the Receiver that, from approximately 1990 to 2004, DiSalvo owned and operated a company called Group Benefit Specialists, Inc. ("GBS"), where she served as a pension administrator. Yeager stated that he and Utsick were looking for a way to facilitate investments by a growing number of investors who wanted to invest their IRA funds or 401K monies (jointly the "Investor Funds") with the Receivership Entities. Yeager said that they were introduced to DiSalvo through a mutual friend while she was managing GBS.

Originally, DiSalvo, in her role as pension administrator with GBS, would receive referrals from Utsick and Yeager and she would arrange for those investors to forward their IRA accounts to her company's account. She would then, at the direction of Utsick or Yeager, transfer the Investor Funds to either a Worldwide or TEGFI account, or to a limited liability company established by the Yeagers, in order to make investments in the Receivership Entities. DiSalvo later incorporated ANPS in both California and Florida, as a successor entity to GBS. According to the records of the Florida Secretary of State, DiSalvo was president of ANPS. Those records also indicate that her two sons, Duane DiSalvo and Wayne DiSalvo, were the officers and shareholders of ANPS. It appears that shortly after the creation of ANPS, DiSalvo transferred all of the accounts and funds of GBS to ANPS and sold her interest in GBS. DiSalvo continued to administer the Investor Funds until shortly before her death in August of 2005.

The Yeagers informed the Receiver that they believed DiSalvo may have been skimming money from ANPS, TEGFI, and Worldwide because her wealth seemed to

have grown dramatically during the time that they had known her. In 2005, she entered into a joint venture agreement with the Yeagers and invested as a partner with the Yeagers in a piece of real property located at 279 Atlantic Isle, Sunny Isles Beach, Florida, 33160 (the "Sunny Isles Property"). According to the joint venture agreement, the Yeagers and DiSalvo, respectively owned a fifty percent (50%) interest in the Sunny Isles Property. Although the Yeagers obtained financing for their interest in the property, they said that DiSalvo paid for her half of that investment with a $1.4 million check drawn from her bank account.

The Yeagers informed the Receiver that they observed DiSalvo make other cash purchases for real estate, and they estimated her total cash purchases for real estate at $5 million (including her share of the joint investment in the Sunny Isles Property). The Yeagers estimated that DiSalvo's assets had grown to $20 to $30 million in the last few years. The Yeagers further informed the Receiver that a friend of DiSalvo's, Sarah Simmons ("Simmons"), had additional knowledge of DiSalvo's activities and that she might have documentation in the form of computer data.

When he returned to South Florida, the Receiver immediately contacted Simmons, who agreed to meet with him and his staff. Simmons informed the Receiver that she originally met DiSalvo when they were both residing in California. At that time, DiSalvo was administering pensions through GBS. Simmons said that DiSalvo later relocated to South Florida at Utsick's request to operate ANPS from Florida where Worldwide's main office and Utsick's residence are located. Simmons further stated that DiSalvo told her that she was making a great deal of money operating ANPS and requested that Simmons join her in Florida and help her administer ANPS. Simmons

agreed, and they worked together in an office located in a cabana room at DiSalvo's high-rise condominium residence in Miami Beach, Florida.

Simmons stated that while working at ANPS, she observed several events which made her skeptical of DiSalvo's wealth and was concerned that DiSalvo was embezzling funds from Worldwide and TEGFI and their investors. Simmons explained that she routinely handled wire transfers of Investor Funds from ANPS to Worldwide and TEGFI, and on one occasion, Simmons had just completed a $3 million wire transfer, when she overheard a telephone call wherein DiSalvo told Jennifer Homan ("Homan"), Utsick's long-time girlfriend and a Worldwide employee, that she had just wired $5 million to the bank, and she requested that Homan send her loan agreements for $5 million of investments.

Simmons stated that she witnessed DiSalvo purchase millions of dollars in real estate, cars, and jewelry for herself, her children and third parties. Simmons said that she did not know how DiSalvo could afford these luxury purchases since ANPS serviced IRA accounts for only approximately 1,000 investors and received a $250 annual fee for administering each account, which resulted in total fees of only approximately $250,000 per year. Simmons stated that she remained close to DiSalvo until her death and on her deathbed, DiSalvo asked Simmons whether she would go to hell for what she had done.

Simmons also informed the Receiver that after she became suspicious of DiSalvo's actions, she had all of the computer files of ANPS copied. Simmons gave the Receiver copies of the computer files and the computer hard drives, which the Receiver turned over to a certified forensic examiner, hired by the Receiver, to conduct a forensic analysis of ANPS.

As mentioned above, Simmons stated that she had witnessed DiSalvo purchase millions of dollars in real estate, cars, and jewelry for herself, her children and third parties. The Yeagers also informed the Receiver that DiSalvo had purchased many luxury items, such as a Porsche for one of her sons, jewelry, and other items for herself and her adult children, Wayne DiSalvo and Duane DiSalvo. The Yeagers knew of these purchases because DiSalvo had shown them some of the items and because Wayne DiSalvo had acknowledged to Yeager in late August 2005 that his mother had purchased the new Porsche he was driving and that she had also purchased a million dollar home for him in California.

DiSalvo passed away in late August, 2005. The Receiver discovered that, on or about October 19, 2005, a notice of administration of probate estate of DiSalvo was filed in the Superior Court for Santa Clara County, California, Case No. 1-05-PR-158259 (the "California Probate Estate"). Also, on or about January 24, 2006, a Petition for Ancillary Administration was recorded in the official records for Miami-Dade County, Florida, and filed with the Clerk of the 11th Judicial Circuit in and for Miami-Dade County, Probate Division, Case No. 06-277-CP (01) (the "Florida Probate Estate"). On or about June 19, 2006, the Receiver filed a Petition to file a Creditor's Claim After Expiration of the Deadline for Filing a Claim (the "Petition"), along with a Creditor's Claim on behalf of the Receiver against the California Probate Estate. The Receiver expects a hearing to take place on the Petition shortly.

On May 15, 2006, the Receiver timely filed a claim (the "Receiver's Probate Claim") in the Florida Probate Estate. On May 22, 2006, Wayne DiSalvo and Duane DiSalvo, as co-personal representatives of the Florida Probate Estate, through their

counsel, served notice of their objection to the Receiver's Probate Claim. Pursuant to Florida Statutes, Sec. § 733.705(4), a party that receives an objection to his claim, has thirty days to file an independent action on the claim. The independent action may not be filed in the probate estate, but rather may be brought in any court of competent jurisdiction.

On June 21, 2006, the Receiver filed a complaint in the U.S. District Court for the Southern District of Florida, the same jurisdiction where the Receivership Case is located. The case, *Michael Goldberg, as Receiver over Worldwide Entertainment, Inc. et al. v. Wayne DiSalvo, et al.*, Case No. 06-21582-CIV-MOORE (the "Probate Litigation") was filed against Wayne DiSalvo, individually and as co-personal representative of DiSalvo's estate, Duane DiSalvo, individually and as co-personal representative of DiSalvo's estate and ANPS (collectively referred to as the "Probate Litigation Defendants") and was assigned to the Honorable K. Michael Moore. The Receiver intends to file a Motion to Transfer the Probate Litigation to the Honorable Paul Huck who presides over the Receivership Case.

In the Probate Litigation, the Receiver asserts a claim against the Florida Probate Estate for fraud perpetrated by DiSalvo, through ANPS, based upon DiSalvo's misrepresentations and false statements in advising Utsick, the Yeagers and/or their employees that she was properly maintaining Investors Funds through ANPS to induce the Receivership Entities to use ANPS as the pension administrator for Investors Funds. The Receiver also seeks to pierce the corporate veil of ANPS based on DiSalvo's failure to properly maintain the books and records of ANPS and her use of the Investor Funds held by ANPS as her personal bank account. The Receiver further seeks recovery against

the Florida Probate Estate, Wayne DiSalvo and Duane DiSalvo for DiSalvo's conversion of funds that were placed into ANPS for the purpose of investing in the Receivership Entities. The Receiver contends that the receivership estate is the beneficial owner of the funds misappropriated, converted or embezzled by DiSalvo and has a present immediate right of possession of the Investor Funds. The Receiver seeks the imposition of a constructive trust against the Florida Probate Estate, Wayne DiSalvo and Duane DiSalvo as a result of ANPS and DiSalvo's breach of fiduciary duty to the Receivership Entities and their unjust enrichment by the use of the Investor Funds.

The Receiver seeks the entry of a permanent injunction as to the following: i) that the co-personal representatives, their officers, and agents, be enjoined from directly or indirectly transferring, selling, assigning, encumbering, impairing, or otherwise disposing of in any manner, the funds, assets, or property obtained from the fraudulent misappropriation of funds through ANPS; ii) that a constructive trust be placed on any funds, assets, or property obtained from the underlying fraudulent scheme perpetrated by DiSalvo, and that any funds, assets, or property obtained from the underlying scheme be disgorged and turned over to the Receiver; and iii) for restitution of the money and property wrongfully obtained without consideration by DiSalvo, Wayne DiSalvo, Duane DiSalvo and others. The Receiver seeks judgment against the Probate Litigation Defendants for damages equal to the amount of the Investor Funds misappropriated by DiSalvo, plus interest, attorneys' fees and costs. The Receiver also seeks turnover and disgorgement of the Investor Funds and/or the real and personal property wrongfully obtained, maintained or improved with the Investor Funds. In addition to the damages equal to the amount of the Investor Funds misappropriated by DiSalvo, the Receiver

seeks the imposition of punitive damages as a result of the intentional misconduct perpetrated by DiSalvo.

Finally, as part of the Probate Litigation, the Receiver seeks declaratory relief with regard to his timely filed claim in the Florida Probate Estate. The Receiver seeks a declaration from the court that the Receivership Entities possess valid claims against the Florida Probate Estate and requests the court to enter declaratory relief in favor of the Receiver, declaring that Receivership Entities possess valid claims in the Florida Probate Estate.

Since April 25, 2006, when the Receiver first heard about DiSalvo's misappropriation of Investor Funds intended for the Receivership Entities, he has diligently worked to corroborate and substantiate the allegations of her theft of Investor Funds. His investigation is continuing, but based on his investigation to date, and the information reviewed by the Receiver's forensic examiner in connection with this investigation, he is informed and believes that DiSalvo's probate estates include assets that came from the Receivership Entities or that were acquired with funds wrongfully taken by DiSalvo from the Receivership Entities. The amount, yet to be determined, is believed to be in excess of $10 million.

The bank records obtained by the Receiver, thus far, illustrate that DiSalvo commingled investor funds and used the ANPS bank account as her personal bank account. The Receiver is examining the potential recovery of personal property and transfers of funds by DiSalvo to, or for the benefit of, her sons, their spouses, their girlfriends, their former spouses and other third parties. The Receiver is also examining the source of funds used by DiSalvo to make cash purchases of real properties located in

California and Florida, including her residence in a high rise condominium located in Miami Beach, Florida, and her investment in the Sunny Isles Property.

To further aid his investigation into transfers made by DiSalvo, the Receiver has served a subpoena for bank records from a dozen accounts opened by, or on behalf of, DiSalvo and held with Comerica Bank.  The Receiver was advised by Comerica Bank that he will receive more than 400 bank statements and other bank records. The Receiver's staff, with the aid of his forensic accountant, will examine the bank records for potential fraudulent transfers of Investor Funds that were designated as investments into the Receivership Entities.

The Receiver is examining other legal means of recovery from ANPS, DiSalvo's probate estates and the third parties who received transfers of the Investor Funds.  The Receiver is investigating the benefits of expanding the Receivership Entities to include ANPS and other corporate entities controlled by DiSalvo and removal of Wayne DiSalvo and Duane DiSalvo as administers of the probate estates.

Recently, the Receiver received correspondence from DiSalvo's California probate attorney seeking a meeting to discuss resolving the various litigations.   The Receiver intends on meeting shortly in an attempt to resolve the various disputes.

**B.     1ˢᵀ Source Bank**

On May 22, 2006, 1ˢᵗ Source Bank ("1ˢᵗ Source") filed a Motion for Interpleader in the United States District Court in the Southern District of Florida, in the action entitled *U.S. Securities and Exchange Commission v. John P. Utsick, et al.*, No. 06-20975-Civ-Huck/Simonton (the "Interpleader Motion") [17]

---

[17]  The full text of the motion, as well as the Receiver's response, is available on the Receiver's website, at www.entertainmentgroupinfo.com.

In its Interpleader Motion, 1st Source seeks to interplead certain funds currently held in IRA accounts at 1st Source (the "1st Source Accounts").  In sum, 1st Source seeks to interplead the 1st Source Accounts funds based on its concern of being subject to competing claims to such funds by account holders, the Internal Revenue Service and the Receiver.  The Receiver's response to the Interpleader Motion filed on May 23, 2006, supports the request by 1st Source (the "Receiver's Response") and sets forth the Receiver's prima facie claim to the funds in the 1st Source Accounts.

The Receiver's Response also details its demand on the 1st Source Accounts. Specifically, the  Receiver is asserting rights to cash funds in the accounts at 1st Source, except those funds that are currently in the 1st Source Accounts that the account holders can prove, with documentary evidence, have never been invested into any promissory note. In other words, the only cash funds excluded from the Receiver's demand are those funds that the investors can prove are fresh investment funds that are still sitting in their 1st Source Accounts and have never been used to purchase notes.  The funds that are excluded from the Receiver's demand are known as the "Direct Funds."  Moreover, pursuant to the Receiver's Response, the Receiver has further agreed to reduce his demand to include only those 1st Source Accounts that have over $1,000 cash. These 1st Source Accounts are referred to as the "Non-Direct Funds."

On June 2, 2006, the Honorable Paul C. Huck of the United States District Court for the Southern District of Florida, issued an order stating that the Receiver had established a prima facie right to assert a claim over the IRA accounts referenced in the Interpleader Motion.  A hearing on 1st Source's Interpleader Motion will take place on July 20, 2006 at 2:30 p.m., before the Judge Huck. If 1st Source's Interpleader Motion is

granted, the 1st Source Accounts with over $1,000 cash will be interpleaded. The purpose of that hearing is not to rule on the rights of the Receiver or any 1st Source account holders to the funds in those accounts with over $1,000 cash. If 1st Source's Motion is granted, the Court will adopt and implement procedures to resolve the claims to the interpleaded funds at a later date.

### C.   Pilot Retirement Services

Pilot Retirement Services ("Pilot") is a company owned by Yeager's son, Chris Yeager. Pilot served as the successor custodian to ANPS, but was replaced by lst Source in October. The Receiver is investigating what if any claims he may have against Pilot.

### VIII.  Claims Process

Within the next month, the Receiver intends to commence the claims process. To that end, the Receiver will file a motion with the Receivership Court setting forth the various methods pursuant to which the Receiver can calculate allowed claims so that the Receivership Court may determine the appropriate method to be used under the circumstances. The Receiver will also request the Receivership Court to set a deadline by which creditors must file claims (the "Claims Bar Date"). Thereafter, the Receiver will distribute claim forms to creditors to be filed with the Receiver by the Claims Bar Date. Upon confirming each claim, the Receiver will commence distributions of available funds to those creditors with allowed claims on a pro-rata basis. At this point in time, the Receiver does not know how long this process will take nor what percentage creditors will receive on their allowed claims.

## IX.   Conclusion

The Receiver will continue working diligently to complete his investigation and will seek the Receivership Court's authorization prior to making any major decisions as to the Receivership Entities' future.  The Receiver will continue to file reports updating the Court and creditors of his progress.

Dated:  July 19, 2006.

Respectfully submitted,

Michael I. Goldberg, Receiver for
Worldwide Entertainment, Inc.,
The Entertainment Group Fund, Inc.,
American Enterprises, Inc. and
Entertainment Funds, Inc.
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301
Tel.:  (954) 463-2700
Email:  michael.goldberg@akerman.com