# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 06-20975-CIV-HUCK/O'SULLIVAN

**SECURITIES AND EXCHANGE COMMISSION,**

                    Plaintiff,

**v.**

**JOHN UTSICK, et al.,**

                    Defendants,

_____/

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT ORDERING DISGORGEMENT, PREJUDGMENT INTEREST, AND A CIVIL PENALTY AGAINST DEFENDANT JOHN P. UTSICK

### FINDINGS OF FACT

### I.  Introduction

1.    This action came before the Court on the Plaintiff, the Securities and Exchange Commission's (the "Commission"), Motion for Final Judgement Ordering Disgorgement, Prejudgment Interest and a Civil Penalty Against Defendant John P. Utsick.  An evidentiary hearing was held on April 2, 2009 and continued on April 14-15, 2009.  The parties submitted their respective evidence, including the testimony of two witnesses, exhibits and parties' proposed findings of fact and conclusions of law.  After the considering all the evidence, the Court hereby enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

### II.  Jurisdiction

2.    The Commission brought this case against Defendant John P. Utsick ("Utsick") and two other individual defendants, Robert Yeager and Donna Yeager, and four corporate defendants, Worldwide Entertainment, Inc. ("WEI"), The Entertainment Group Funds, Inc. ("TEGFI"), American Enterprises, Inc. and Entertainment Funds, Inc., seeking injunctive and

ancillary relief against all Defendants for Defendants' alleged violations of Sections 5 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§77e and 77q(a) ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b) ("Exchange Act"), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5, arising from Defendants' offer and sale of securities, consisting of loan agreements and units of various limited liability companies, to finance the production and promotion of rock concerts, tours, and other events and enterprises of a similar nature and related thereto.

### III.  Background

3.      The complaint alleged that Utsick and his companies offered and sold shares and other interests in various entertainment projects, including concerts for well-known artists, theatrical productions, and investments in arenas and theaters.  The complaint further alleged Utsick's activities violated Sections 5(a) and (c) and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5.

4.      Among other relief, the complaint sought the entry of permanent injunctions, disgorgement, and civil penalties against Utsick and the other defendants.

5.      Simultaneously with filing the complaint, the Commission submitted the consents of every defendant, including Utsick, to the entry of a permanent injunction (D.E. 4-10).  In the consent, Utsick neither admitted nor denied the allegations of the complaint.

6.      On April 20, 2006, the Court entered a Judgment of Permanent Injunction and Other Relief as to Defendant John P. (Jack) Utsick (D.E. 14) ("Judgment").  The Judgment enjoined Utsick from violating the aforementioned provisions of the federal securities laws, and ordered that he pay disgorgement, prejudgment interest, and a civil penalty.

7.      The Court appointed a receiver, Michael Goldberg ("Goldberg" or the "Receiver") to take over the management and control of the corporate defendants, to take steps

to maximize the return to investors of their investments, and to review and pass upon investor claims.  The consent injunctions against the individual defendants, including Utsick, provided that the Commission's claims for disgorgement, prejudgment interest and civil penalty would be deferred pending further inquiry.  The Commission was to make demands on the individual defendants for disgorgement, prejudgment interest and a civil penalty.  If the demands were satisfied or negotiated informally, an appropriate order was to be entered by consent.  The consent injunctions provided that if the parties could not agree to disgorgement, interest and civil penalty amounts, the Court would decide the issue upon motion of the Commission.  The Yeager Defendants agreed to pay certain amounts and to transfer certain assets to the Receiver and to pay a civil penalty, and an order was entered.

8.      The Commission and Utsick did not reach agreement as to the amount of disgorgement, prejudgment interest or civil penalty.  Accordingly, the Commission filed the subject Motion against Utsick on September 8, 2008.

## IV.  The Subject Motion

9.      On September 9, 2008, the Commission filed the current Motion for a Final Judgment Ordering Disgorgement, Prejudgment Interest, and a Civil Penalty against Defendant John P. Utsick (D.E. 283) ("Final Judgment Motion").  In the motion, the Commission seeks (1) disgorgement from Utsick, (2) prejudgment interest on disgorgement, and (3) a civil money penalty of $120,000.

10.     Utsick opposed the Final Judgment Motion, arguing that: (1) many of the expenses the Commission alleged were Utsick's personal expenses were appropriate business expenses of his companies, or (2) to the extent they were personal expenses they were appropriate compensation for his services in running WEI and TEGFI.

11.     In his response to the motion, Utsick requested the opportunity to take discovery. On November 19, 2008, the Court held a hearing, and issued an order the following day which,

3

among other things, set a discovery schedule. Pursuant to that order, both parties were to complete discovery by January 16, 2009.

12.     Following that order, both parties filed numerous motions relating to Utsick's unavailability for discovery, and specifically his refusal to appear for deposition.[1] The full procedural history and substance of those motions are set forth in the Court's Order on (1) Plaintiff's Motions for Sanctions against Defendant Utsick, (2) Defendant Utsick's Renewed Motion to Modify the Protective Order and (3) Rescheduling Hearing on Plaintiff's Motion for Final Judgment ("Sanctions Order"). The contents of those orders speak for themselves and are by reference made a part of this Order. In summary, however, despite several opportunities and orders from this Court for Utsick to appear for his deposition, he refused to do so. This was after several accommodations requested by Utsick were provided by the Court and after being warned that failure to appear for his deposition would result in sanctions.

13.     As a result of Utsick's failure to appear, the Court granted the Commission's Second Motion for Sanctions (D.E. 489). In the subsequent Sanctions Order, the Court (1) struck Utsick's pleadings responding to the current motion, (2) ordered Utsick to pay the Commission's attorney's fees and costs related to the expenses incurred in attempting to take his deposition, (3) set a hearing on the Final Judgment Motion, and (4) ordered that Utsick not be allowed to testify at the hearing unless he appeared for deposition in the Commission's offices by March 30, 2009. Utsick did not so appear.

14.     At the evidentiary hearing on the Final Judgment Motion, the Commission presented testimony from two witnesses, Andrew Bernstein, the Commission's forensic accountant, and Goldberg, in the form of affidavits, and Utsick's counsel cross-examined both witnesses. Both parties introduced documentary evidence.

---

[1] Since the events which led to the Commission's filing of this action, Utsick left the United States and currently lives in Brazil.

4

## V.  The Allegations of the Complaint Deemed as True

15.    In the agreed Judgment, the Court ordered Utsick to pay disgorgement, prejudgment interest, and a civil penalty as follows:

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Defendant shall pay disgorgement, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  If the parties cannot agree on the appropriate amounts of disgorgement, prejudgment interest and/or civil penalty, the Court shall determine those amounts, or any of them, upon motion of the Commission.  Prejudgment interest shall be calculated from April 17, 2006, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). In connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.  In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take relevant discovery, including discovery from appropriate non-parties on written notice to the other party.  Nothing in this Judgment shall prevent Defendant from presenting evidence of factors mitigating against the imposition of a civil penalty or the amounts of disgorgement, prejudgment interest, and a civil penalty.  Nothing herein or hereunder shall constitute a waiver of Defendant's constitutional or any other rights and privileges, or is deemed to be an admission for any other purpose.

Judgment at Section IX, Pages 8-9.

16.    Utsick has agreed in his consent (as set forth in the Judgment) that, for purposes of this motion, the Court shall deem the allegations of the complaint as true. Thus, the only issues on this motion are the amounts of disgorgement, prejudgment interest, and a civil penalty which Utsick should pay.

17.    The complaint alleges that Utsick, in combination with his companies and the Yeagers and their companies, raised at least $300 million from 3,300 investors from at least 1998 through 2005 through the sale of securities in the form of loan agreements and units in

special-purpose limited liability companies.  Complaint at ¶1.  Utsick and the other defendants represented to prospective investors, without a reasonable basis, that their investments would earn annual returns of 15 to 25 percent.  *Id.*

18.     In connection with the offer, purchase, and sale of these investments, Utsick and the other defendants made material misrepresentations and omissions to investors about, among other things, the profitability of their investments, the use of proceeds, the payment of commissions, and the existence of state disciplinary actions.  Complaint at ¶2.

19.     The defendants' promises of 15 to 25 percent annual returns were baseless.  Because all the funds Utsick received through WEI and TEGFI were commingled in two operating accounts, from which the companies paid all expenses (including Utsick's personal expenses), there was no basis from which to determine the profitability of any individual project.  Complaint at ¶2.

20.     Additionally, many of the entertainment projects the companies promoted or produced lost money.  Complaint at ¶2.  As a result, the companies paid some earlier investors with funds they raised from new investors.  *Id.*

21.     The complaint alleged that Utsick, a former airline pilot, was the president and sole shareholder of both TEGFI and WEI.  Complaint at ¶¶5, 15.  Utsick raised money for his entertainment projects both through his companies and, beginning in 1998, through his long-time friends the Yeagers and their companies.  *Id.* at ¶¶15, 16, 20.  Combined, the defendants raised $300 million from more than 3,000 investors.  *Id.* at ¶¶16-20.

22.     Although the offering materials the defendants provided to prospective investors changed over the years depending on the project and the particular issuer of the securities, the essential elements of the investment remained the same.  Complaint at ¶24.

23.     Specifically, the offering materials identified the particular entertainment project or projects to be funded, provided for a definite loan or investment term (usually one year),

promised a return of 15 to 25 percent, and, in some instances, promised investors at least three percent of the profits Utsick generated through the specific WEI or TEGFI entertainment project. Complaint at ¶24.

24.     Utsick reviewed and approved all offering materials, and dictated the terms of the offering, including how much he needed raised, the rate of return, and the investment term. Complaint at ¶26.

25.     No registration statement was filed or in effect with the Commission in connection with any of the securities sold.  Complaint at ¶30.

26.     Utsick and the other defendants made several misrepresentations and omissions to investors in connection with the offering.  First, their promises of 15 to 25 percent annual returns were baseless, because many of the projects lost money, which Utsick and other defendants knew was occurring even as they promised the profits.  Complaint at ¶¶31-34.

27.     In addition, Utsick and the other defendants told investors they would pay the 15 to 25 percent annual returns with revenues generated by the specific entertainment project each investment was purportedly funding.  Complaint at ¶31.

28.     However, Utsick commingled the investor funds in operating accounts maintained at WEI and TEGFI, from which each company paid all business and non-business expenses. Complaint at ¶32.  Because the companies did not establish separate accounts and maintain separate books and records for each offering, it was impossible for the defendants to determine the profitability of any particular offering.  *Id.*  Accordingly, any representations the defendants made about the profitability of each project and the source of investor returns lacked any reasonable basis in fact.  *Id.*

29.     Second, Utsick and the other defendants made material misrepresentations and omissions concerning their use of investor proceeds.  The offering materials for most of the entertainment projects and, in many cases the investment documents investors signed, limited

TEGFI and WEI to using investor funds for the specific project or venture identified.  Complaint at ¶¶35-36.

30.    However, as previously discussed, WEI and TEGFI commingled all investor funds in operating accounts that they used to pay interest and principal to earlier investors, general corporate expenses, payroll, sales commissions, and Utsick's living and other personal expenses (as identified in more detail below).  Complaint at ¶¶35-37.

31.    Furthermore, Utsick used approximately $17 million of investor proceeds to unsuccessfully trade stock options – a use of proceeds none of the offering materials ever disclosed.  Complaint at ¶38.

32.    Third, many of the offering materials specifically stated the defendants were not paying any commissions or fees in connection with the sale of the investments.  Complaint at ¶40.  Contrary to these representations, Utsick routinely used investor funds to pay three-to-five percent sales commissions to the Yeagers and their companies, which amounted to more than $7 million in undisclosed sales commissions.  *Id.*

33.    Fourth, the states of Wisconsin, Michigan and Missouri issued orders finding the investments Utsick was selling were securities, and that he and his companies were offering the investments in those states without valid licenses or registrations.  Complaint at ¶¶42-44.  Utsick and the other defendants never disclosed the existence of these orders to prospective investors. *Id.*

### VI. The Nature and Amount of WEI and TEGFI Funds Utilized by Utsick[2]

34.    Goldberg testified concerning the companies' operations.  In sum, Goldberg described Utsick's operation of WEI and TEGFI as a Ponzi scheme.  Goldberg testified that TEGFI's tax returns showed the company lost money in 1995 and 1996, and that his review of

---

[2]Utsick offered no testimony.  His opposition to the Commission's Motion consisted of a few, mostly irrelevant, exhibits and cross-examination of the Commission's two witnesses.

TEGFI and WEI business records showed the companies lost money every year from 1997 through 2005, with the possible exception of 1998.

35.     Goldberg further testified the two companies would not have been able to operate without the constant inflow of investor funds.  Although the companies promoted entertainment events, some of which were individually profitable, he testified the majority of them lost money and that the overall operations lost large sums of money.  Therefore, the companies relied on investor money to stay in business and to pay promised returns to investors.

36.     As a result, Goldberg concluded that from at least 1997 through 2005, TEGFI and WEI were operated by Utsick as a Ponzi scheme by using new investor funds to repay older investors.  Although Goldberg confirmed that investor funds were commingled with concert revenues, because the companies were constantly losing money, the only source of funds available to pay old investors had to come from new investors.

### VII.  Utsick's Improper Personal Use of WEI and TEGFI Funds

37.     Bernstein has been licensed as a certified public accountant in the State of Florida since 1981.  Since 2003, he has been a director at the certified public accounting firm of Berkowitz Dick Pollack & Brandt in the firm's financial advisory services practice group, which includes forensic accounting services, economic dispute analysis, corporate investigations, valuation services, and bankruptcy and reorganization services.

38.     The Commission retained Bernstein to review and analyze the books and records of WEI and TEGFI to determine the payments these two companies made to or on behalf of Utsick for non-business purposes from 1997 through January 2006.

39.     Bernstein and his firm's work included reviewing what general ledgers were available for WEI and TEGFI, credit card statements, bank statements, cancelled checks to document the date, amount, and recipient of the companies' disbursements, and the "reconstruction" of the companies' books and records done by Goldberg.  Bernstein also

documented the location and description of the goods or services provided and interviewed Goldberg as a source of information regarding the operation of the companies.

40.      Bernstein and Goldberg determined through their collective work that WEI and TEGFI paid a total of $4,105,243.41[3] in personal disbursements either directly to Utsick or to third parties on his behalf.  This determination was based on entries in the two companies' general ledgers, cancelled checks, bank statements, deposit slips, and credit card records, as well as Goldberg's investigation and research.

41.      It is clear that a substantial amount of the companies' funds were expended by Utsick for expenses which were not the companies' legitimate business expenses.  The following are some examples of such non-business expenditure.

42.      $423,582.40 was paid as alimony and child support from TEGFI to Utsick's former wife.  These were purely personal payments on Utsick's behalf.  They served no business purpose for TEGFI or WEI.  Accordingly, Utsick must disgorge them as ill-gotten gains.

43.      TEGFI paid $33,957.18 for artwork for Utsick.  Goldberg testified that his review of company records did not show TEGFI bought any artwork for itself.  Goldberg further testified that Utsick bought the artwork in question for his former residence at Portofino Towers, and that upon vacating those premises, Utsick either kept the artwork or sold it and retained the proceeds for himself.  The Court rejects Utsick's counsel's suggestion that Utsick hung the artwork in an area of his condominium that he used for business purposes.  Utsick presented no evidence that he used the condominium as office space, or he hung the artwork there. Accordingly, because the only evidence before the Court indicates the artwork was a personal expense, the Court finds these non-business expenses expended on behalf of Utsick must be disgorged.

---

[3] The Commission originally requested $4,180,979.49 in its Final Judgment Motion.  However, the Commission reduced its request to $4,105,243.41 at the conclusion of the hearing based on its reevaluation of the evidence presented at the hearing.

44.     TEGFI spent $34,909.08 for leasing, repairs, accessories, and license fees for four collector cars – two Shelbys, a 1961 Mercedes and a 1976 Porsche. Goldberg determined that these were Utsick's cars.  The Court notes that the Mercedes and the Porsche are the subject of prior Court orders.  Utsick admitted selling the cars and keeping the proceeds of one sale, which violated the asset freeze in this case.  The Court has ordered him to repay the proceeds of that sale over the next 17 months.  Although Utsick's attorney suggests that at least one of these cars was used for company business, Utsick did not present any evidence to support this claim.  Accordingly, and in light of the fact that Utsick kept and sold two of the cars and these antique cars were not typical company automobiles, the Court finds these automobile expenses to be personal expenses on Utsick's behalf and the expenditures must be disgorged.

45.     TEGFI spent $11,344.23 in monthly payments, primarily from 1997 through 1999, for a stock quotation service. These expenses were in connection with Utsick's unauthorized investment and trading of investor funds in the stock market (Goldberg testified, and Utsick did not dispute, that TEGFI lost at least $17 million).  Nevertheless, Utsick contends that this expense need not be disgorged because it was a business expenses incurred in his attempt to recoup investor losses.  Such investments were not a legitimate business activity of TEGFI and the losses were incurred as a result of Utsick's improper use of company funds in an effort to bail Utsick out of the financial predicament in which he had improperly placed himself and his companies.  Accordingly, the Court finds these expenditures to be personal expenses TEGFI incurred on Utsick's behalf that must be disgorged.

46.     The evidence reflects numerous credit card and other payments were made to stores, merchants and other service providers by TEGFI and WEI totaling $491,012.21.  These payments were for obvious personal items and went to, among other merchants, department stores, veterinarians, lingerie stores, airlines, restaurants, hotels, and appliance stores.  They are among the evidence that shows Utsick and his girlfriend, Jennifer Homan, were using corporate

accounts and credit cards as their personal "piggy bank" on a routine, almost daily basis.  The Court requires this sum to be disgorged.

47.    A number of payments were made to or on behalf of Utsick's children, Homan and her daughter.  The total of these payments was $107,172.02. These included disbursements to college funds, schools, summer camps, and tutors, clearly personal expenses.  The Court requires this sum to be disgorged.

48.    TEGFI made $653,756.00 in annual payments to the Internal Revenue Service or the U.S. Treasury from 1997 through 2005 for Utsick's personal income taxes.  Through his counsel, Utsick has acknowledged these were personal income tax payments.  This sum must be disgorged.

49.    TEGFI and WEI purchased and paid the premiums on several life insurance policies.  As Bernstein and Goldberg testified, some of these policies were plainly "key man" life insurance policies on Utsick similar to those businesses often purchase on their top officers or directors.  The Commission acknowledged at the evidentiary hearing that these may be legitimate business expenses and therefore it is not seeking disgorgement of the premiums on those policies.  However, the two companies also bought and paid premiums on five policies that named Utsick, Utsick's estate, Utsick's ex-wife and Homan as the beneficiaries.  These were personal policies the businesses purchased on Utsick's behalf, not legitimate business expenses. The total spent on these policies was $890,477.92.  The analysis of the five policies is as follows:

| Company Name | Policy No. | Beneficiary | Annual Premium | Total Paid |
|---|---|---|---|---|
| TransAmerica | 42308313 | Jennifer Homan | $37,760.00 | $37,760 |
| TransAmerica | 41858054 | Maria Utsick | $4,219.00 | $27,712.22 |
| TransAmerica | 42317501 | Utsick Estate | $127,730 | $127,760 |
| Travelers | 7447253 | John Utsick | $126,648.36 | |

| Travelers | 7298261 | John Utsick | Unknown | $697,245.70[4] |
| | | | | **$890,477.92** |

Utsick's counsel acknowledged at the hearing that the two TransAmerica policies whose beneficiaries were Homan and his ex-wife were personal in nature. The premiums paid on those two policies – $65,472.22 – must be disgorged. Utsick's counsel suggests, but there is no evidence to establish, that Utsick had his companies purchase the remaining three policies to back personal guarantees Utsick gave regarding various business deals and Utsick thus may be used to pay legitimate business obligations in the event of Utsick's death. He therefore claims these were proper business expenses because the ultimate beneficiaries of the policies were investors. Utsick, however, produced insufficient evidence to support this claim.[5] There was no direct evidence that the purpose of the insurance policies were as counsel suggested. Utsick produced no evidence of such personal guarantees or how they were relevant. Even if Utsick's unsupported claim that the reason for buying the policies was true, the companies bought them to support Utsick's personal guarantees to repay loans. The ultimate beneficiary of these policies was Utsick or his estate. The premiums on those policies, $890,477.92, constituted a personal benefit to Utsick, and that sum will be disgorged.

   50.   Bernstein identified $6,166.09 in other insurance-related payments, including automobile insurance policies, that TEGFI and WEI made on Utsick's behalf, which will be disgorged.

   51.   Two payments totaling $8,000 were made to an IRA account at Citibank in Utsick's name. These payments were made on Utsick's behalf, and will be disgorged.

---

[4] As indicated in Bernstein's testimony because many of the Travelers' premium payments did not correlate to premium amounts on the policies, this number for both Travelers' policies represents an allocation based on payments for all Travelers' policies.

[5] On May 12, 2009, almost a month after the conclusion of the evidentiary hearing, Utsick's counsel submitted one signed personal guarantee of a loan made to TEGFI by a lender referred to in the exhibit as EFI No. 36, LLC. Nonetheless, the Court has considered the exhibit. However, that exhibit does not provide the amount of the guaranteed loan and does not establish that Utsick's life insurance premium payments were legitimate business expenses.

52.      TEGFI made a number of payments, totaling $20,093.46, to doctors and hospitals for Utsick's medical care.  Utsick did not present any evidence concerning these payments at the hearing, and has not disputed the Commission's contention that these were payments for his personal medical bills.  Accordingly, this amount will be disgorged.

53.      TEGFI and WEI made regular cash payments to Utsick totaling $80,769.36 between October 2004 and July 2005.  Utsick has argued these were permissible salary payments.  However, as discussed below, Utsick was not entitled to compensate himself from investor proceeds raised through violations of the securities laws.  Accordingly, the Court is ordering Utsick to disgorge the amount of these payments.

54.      WEI and TEGFI paid $58,890 to accountant Ira Baraz from 2000 through 2004.  Although the Commission originally sought the entire amount of these payments as part of its disgorgement, during the hearing and upon further investigation, the Commission conceded that most of Baraz's services were related to legitimate business purposes and indicated it would not dispute Utsick's claim that $56,390 of this amount was for accounting services to TEGFI and WEI.  Utsick's counsel acknowledged during the hearing that the remaining $2,500 was for work on Utsick's personal income taxes. Therefore only that $2,500 will be disgorged.

55.      TEGFI paid $307,500 to attorney Michael Rosen, with all but $7,500 of that money paid in 2005.  Utsick acknowledged he retained Rosen in connection with a possible criminal investigation of his activities in connection with TEGFI and WEI.  Utsick claims the payments to Rosen qualified as business expenses because they were advances to Utsick to indemnify him as an officer or director of WEI and TEGFI under Florida Statute 607.0850.  The Commission disputes this claim.  There was insufficient evidence presented by Utsick to support his claim on this issue.  On the face of the records, the payments appear to be for Utsick's

personal expenses.  Utsick did not present any testimony or documents to support his claim these expenses were permissible advances or indemnification under the Florida statutes.  The Commission's only evidence came from Goldberg, who testified he did not believe these fees were permissible business expenses under the statute because Utsick is not entitled to indemnification by the companies.  The Court agrees with the Commission that these payments to Rosen were not proper under the statute. Florida Statute Section 607.0850(6) states that a corporation *may* pay advance expenses related to defending a civil or criminal proceeding.  Thus, it is permissive, not mandatory.  Moreover, the statute states the corporation may pay the expenses "upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if he or she is ultimately found not to be entitled to indemnification by the corporation pursuant to this section."  Utsick did not produce any evidence that he had provided such an undertaking to TEGFI or WEI in 2000 or 2005.  Thus, it does not appear from the evidence before the Court that TEGFI or WEI could have properly advanced Utsick's legal expenses in either year because Utsick did not fulfill the statutory requirement for such an advance.  In addition, the evidence before the Court indicates that Utsick was not entitled to indemnification.  As previously noted, indemnification is permissive, not mandatory.  Fla. Stat. §607.0850(1).  Indemnification is only mandatory if the officer or director has succeeded on the merits of his defense – which has not happened in this case.  Fla. Stat. §607.0850(3)   In light of the statutory requirements and the outcome of this proceeding, the Court finds the $307,500 in payments to Rosen were not permissible advances or indemnification by TEGFI or WEI under the Florida Statute §607.0850 and will be disgorged.[6]

56.        TEGFI paid a second attorney, Ed Guttenmacher, $92,748.56.  Goldberg testified that the evidence available to him indicated these payments were for personal services

---

[6]  The Court notes that it has repeatedly rejected Utsick's similar requests that the receivership estate funds be provided to him for payment of his legal fees in these proceedings.

to Utsick.  During the resumption of the hearing, the Commission indicated that based on its counsel's conversations with Guttenmacher and review of Guttenmacher's bills, done at the Court's direction, the Commission acknowledged that approximately only one-half of Guttenmacher's work was personal and subject to disgorgement.  Although Utsick's counsel contended that the amount of personal work was less than half, he presented no evidence to support that contention.   Given Goldberg's testimony, the Commission's counsel's representation and the nature of the bills, the Court finds that one half of Guttenmacher's bills, or $46,374.28, will be disgorged.

57.     TEGFI paid $224,340.43 in rent, mortgage and condominium maintenance fee payments related to the condominium at Portofino Towers in Miami.  Goldberg identified this condominium as Utsick's personal residence, and there is no real dispute among the parties that Utsick lived in the condominium from 1998 through 2007.  Utsick, however, has argued that he used a portion of the condominium as office space from at least 1998 through 2003. Therefore, he argues, the Court should apportion some part of the condominium payments as a business expense.  However, as with most of his other arguments, Utsick has not produced any evidence to support this claim.  Given Goldberg's testimony that this was Utsick's residence and the lack of contrary evidence, the Court finds the money the company paid towards condominium maintenance and upkeep was a personal expense.  Utsick will disgorge the entire $224,340.43.

58.     The evidence shows $9,500 in payments for Utsick and others, including Homan, as travel expenses, including trips to Europe and Las Vegas.  These particular expenses appear to be personal, not business related.  Utsick presented no evidence to the contrary and therefore $9,500 shall be disgorged.

59.      The record establishes that $190,500 in payments were related to a yacht. Utsick's counsel implied through his questioning of Goldberg that this was a yacht that belonged to one of his co-defendants, Robert Yeager, which the Receivership had already sold as part of the estate.  Goldberg, however, testified that the subject yacht expenses were for a different yacht, not the yacht that belonged to Yeager, and for which there was no legitimate company purpose.  Goldberg's testimony is unrefuted.  The entire $190,500 in yacht expenses shall be disgorged.

60.      TEGFI and WEI paid $403,063.70 for an American Express credit card which the Commission alleges were personal expenses of Utsick's.  These expenses are detailed in the Commission's summary exhibits and further discussed below.  The overwhelming majority of them show Utsick and Homan used the company credit card as their own personal piggy bank for everyday, ordinary and extraordinary personal items and services.  $119,426.65 was for restaurant expenses – primarily in South Florida – that Utsick and Homan incurred. Bernstein testified at the hearing that his conservative analysis of these expenses assumed, based on discussions with Goldberg, that all restaurant expenses Utsick incurred in South Florida were personal, but that all travel and related expenses he incurred outside South Florida were for business purposes.  While Utsick's counsel contended that some of the South Florida restaurant charges were for business purposes, he produced no such evidence.  Further, given Goldberg's testimony that Utsick did not have to entertain many artists in this area, the Court finds Bernstein's assumption entirely reasonable and most likely erring in Utsick's favor. Accordingly, the Court is ordering Utsick to disgorge $119,426.65 in restaurant charges.

61.      The second major category of credit card charges involved $108,066.41 for travel expenses on behalf of Utsick and Homan's relatives.  Utsick's counsel suggested that he believes Utsick personally incurred some of these travel expenses.  The evidence shows that

each of the expenses included in this category were for Homan or someone other than Utsick as the traveler and were non-business related.  This $108,066.41 must be disgorged.

62.     The Commission claims an additional $50,012.63 in hotel and lodging expenses expended primarily for Homan's benefit.  The evidence shows that Homan, not Utsick, incurred these non-business expenses.  Therefore, the Court will require Utsick to disgorge $50,012.63, the amount of these expenses.

63.     Evidence relating to another major category of credit card expenses reveals that Utsick and Homan paid $46,939.91 from 2000 through 2005 for a variety of clearly personal services, including dry cleaning bills, department store charges, sports tickets, electronics store purchases, clothing store bills, beauty salon visits, movie ticket purchases, and duty-free shops, among others.  There was no business purpose for these expenses, and on their face they are clearly personal.  Utsick shall disgorge the $46,939.91.

64.     The evidence also establishes that numerous other categories of personal expenses for which Utsick and Homan used the companies' credit cards, including, but not limited to: $23,423.83 in grocery bills; $12,021.85 in automobile expenses in addition to those identified through general ledgers and bank statements; $10,454.18 in medical expenses for Utsick in addition to those identified through general ledgers and bank statements; $8,147.46 in veterinary bills and other animal-related expenses; $7,094.71 in pharmacy charges; and $2,472.66 for floral charges.  Despite Utsick's claim that many of the flowers were bought for artists, he has produced no evidence to support this claim.  Utsick shall disgorge the $78,618.10 of personal expenses.

65.     To some extent, Utsick acknowledges, as he must, that many of these expenditures were personal.  However, he contends that they are simply appropriate

compensation for his services as a corporate officer.  As discussed below, the Court rejects this contention  and finds them to be personal payments that must be disgorged.

66.        The Commission also asks the Court to order disgorgement of the $139,528.20 in salary payments to Homan.  The evidence shows that Homan was overly compensated by Utsick because of his personal relationship with her.  However, Homan apparently performed some useful services to the company, including answering investors' questions and reconciling payments after concerts and other events.  The Court finds that only one-half of these salary payments were personal payments made on Utsick's behalf because of Utsick's personal relationship with Homan.  That sum, $69,764.10, shall be disgorged.

## CONCLUSIONS OF LAW

### I.  Disgorgement

1.        The laudable purpose of disgorgement is to insure that a wrongdoer does not profit from his actions.  It requires that the wrongdoer surrender his ill-gotten gains and acts to deter others from violating the securities laws.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2nd Cir. 1996); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Manor Nursing Ctrs*, 458 F.2d 1082, 1103-04 (2nd Cir. 1972) ("the effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable").

2.        The Eleventh Circuit Court of Appeals does not require precision in determining the amount of disgorgement.  Rather, the disgorgement "need only be a reasonable approximation of profits causally connected to the violation."  *First City,* 890 F.2d at 1231.  *See also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) ("the SEC's burden for showing the amount of assets subject to disgorgement . . . is light: a reasonable approximation of a defendant's ill-gotten gains . . . Exactitude is not a requirement") (quoting *SEC v. Calvo,* 378 F.3d 1211, 1217 (11th Cir. 2004)).  Disgorgement should recapture "all gains flowing from the

illegal activities." *SEC v. Cross Fin. Servs.,* 908 F. Supp. 718, 734 (C.D. Cal. 1995). Where the fraud is pervasive, the Court should order the wrongdoer to disgorge all profits stemming from the scheme. *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2nd Cir.), *cert. denied*, 479 U.S. 853 (1986).

3.      The Court has broad discretion to calculate the amount of disgorgement. *First Jersey*, 101 F.3d at 1475. The wrongdoer, who by his actions made the calculation in any way uncertain, bears the risk of such uncertainty. *First City*, 890 F.2d at 1232; *SEC v. Bilzerian*, 814 F. Supp. 116, 121-22 (D.D.C. 1993) ("The SEC need only offer a prima facie reasonable approximation; the burden then shifts to the defendant to rebut the presumption, and the risk of uncertainty should fall on the wrongdoer").

4.      Once the Commission presents evidence reasonably approximating the amount of a defendant's ill-gotten gains, the burden of proving the amount is not a reasonable approximation shifts to the defendant. *Calvo*, 378 F.3d at 1217; *First City*, 890 F.2d at 1232; *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3rd Cir. 1997). The defendant is then obliged to *clearly* demonstrate the disgorgement figure is not a reasonable approximation of his gains. *First City*, 890 F.2d at 1232.

5.      Under the Judgment, Utsick, for purposes of this motion, admits the complaint's allegations, including: (i) that he perpetrated a massive securities fraud lasting at least eight years on thousands of investors, raising at least $300 million in the process, (ii) that he and his companies represented that investors' money would be used solely for specific entertainment projects, when in fact, he commingled investor funds into operating accounts from which TEGFI and WEI paid Utsick's living and other personal expenses, as described above. As the Court observed earlier, investors' funds were used as Utsick's personal piggy bank without due regard for the investors' rights.

6.      Utsick argues that the Court should not order him to disgorge all of the personal expenses because, in part, his companies put on concerts and other events that were profitable and when the expenses were personal, they were for compensation for his services. However, Utsick did not present credible evidence to support these arguments. Utsick did not rebut the Commission's evidence establishing that the majority of Utsick's events lost money, that funds were comingled and, as described by Goldberg, that Utsick operated WEI and TEGFI as a Ponzi scheme for approximately the last 10 years of their existence. Goldberg established that TEGFI and WEI lost money every year except one from 1995 through 2005, the majority of their concerts and other events lost money, and that the companies could not have survived without raising new investor funds on a continuous basis.

7.      Accordingly, the Court finds that the Commission has met its burden of showing a reasonable approximation of Utsick's ill-gotten gains, gains made at the investors' expense. The evidence, in combination with the allegations of the complaint deemed true for purposes of this motion, established that Utsick improperly used his companies to spend $4,035,479.31 on his behalf. The funds to pay for these expenses came from the investors. Thus, it is appropriate to order Utsick to disgorge them.

8.      The Court next turns to Utsick's defense that many of the admittedly personal payments were appropriate compensation for his services as CEO and director of WEI and TEGFI. Utsick contends he was entitled expend the companies' money for his personal benefit because these expenditures constituted and were comparable to reasonable compensation that executives at legitimate entertainment companies earn. Utisck points out, and the evidence seems to confirm, that he received no official salary during the period in question. However, Utsick did not present any credible evidence establishing what constitutes an appropriate salary for an executive of an entertainment company from 1997 through 2005 doing similar work at a

similar company.  Nor is there credible evidence as to the value of Utsick's services to WEI or TEGFI.  Nevertheless, he contends that he was entitled to a salary of $300,000 per year.   Utsick presented no employment agreement, written or oral, providing for his compensation, much less the unfettered compensation to which he helped himself while his companies continued to dramatically decline.   The only evidence Utsick presented on the compensation issue were excerpts from two periodic reports filed with the Commission by two publicly traded companies, the 2001 10-K of Clear Channel Communications and the 2006 annual report of Live Nation. There was no testimony or evidence that the circumstances of these companies were ever remotely comparable.  The only support Utsick offers is his counsel's unsupported suggestion that these reports set the standard for corporate officer compensation.  Ironically, as the Court pointed out to counsel at the hearing, those reports undermine Utsick's contention because, as the Clear Channel Communication 10-K reflects, executive officers' compensation "should be directly and materially linked to operating performance."  Given that the evidence establishes that WEI and TEGFI, operating as a Ponzi scheme, consistently lost money, based on Utsick's own exhibit, he was not entitled to compensation from 1997 through 2005.

9.        It is apparent that Utsick's contention that his expenditures on personal items were actually fair compensation is simply an after-the-fact attempt to justify his improper taking from the WEI/TEGFI piggy bank.  In addition, Utsick's argument that he was entitled to use investor funds to compensate himself ignores the admitted allegations of the complaint that show he raised at least $300 million from investors by violating the federal securities laws. Utsick's argument also ignores evidence that Utsick operated WEI and TEGFI as a Ponzi scheme. The money Utsick raised from investors came through violations of the securities laws and his operation of a Ponzi scheme. There should be no appropriate or legitimate compensation for Utsick's operation of a Ponzi scheme.  Utsick was not entitled to use the funds to compensate

himself.  *SEC v. United Monetary Servs., Inc.*, No. 83-8540-CIV-PAINE, 1990 WL 91812 at *9 (S.D. Fla. May 18, 1990) (courts "have routinely required wrongdoers in securities frauds to disgorge the gross sums received from investors"); *British American Commodity Options*, 788 F.2d at 93-94 (where the fraud is pervasive, the Court should order the wrongdoer to disgorge all profits stemming from the scheme); *SEC v. Wallenbrock*, 440 F.3d 1109, 1115 (9th Cir. 2006) (refusing to allow defendants credit against disgorgement for "entirely illegitimate expenses incurred to perpetuate an entirely fraudulent operation"); *SEC v. Infinity Group Co.*, 993 F. Supp. 324, 331 (E.D. Pa. 1998) (services rendered in furtherance of a fraud do not constitute a legitimate claim on the ill-gotten gains of the fraud).

10.     The *British American* and *Wallenbrock* cases are especially instructive here. In *British American*, the defendant argued he should not be forced to disgorge the salary he received from running a fraudulent commodities trading firm because the CFTC had not traced the payments to illegal activity.  The Second Circuit, however, rejected that argument, holding that because the entire commodities trading operation was fraudulent, all of the profits derived from the operation were illegally derived, and the defendant should disgorge them.  Similarly, the Ninth Circuit in *Wallenbrock* held that the defendant's personal income should be disgorged because his entire operation was illegitimate.  That court found that all claimed expenses were thus  illegitimate because the operation was illegitimate.  Here, because Utsick's companies derived their funds from investors through violating the securities laws and operating a Ponzi scheme, Utsick is not entitled to compensation.

11.     Utsick argues that the evidence does not demonstrate a "causal connection" between the funds sought to be disgorged and his illegitimate activities.  This argument ignores both the allegations of the complaint establishing such a causal connection and the law.  There is no requirement under the securities laws that the evidence trace funds subject to disgorgement

directly to illegal conduct. *SEC v. Glauberman*, No. 90 Civ. 5205, 1992 WL 175270 at \*2 (S.D.N.Y. July 16, 1992) (rejecting defendant's argument that funds subject to disgorgement must be traced "dollar for dollar" to the illegal activity). Rather, as discussed above, "the SEC's burden for showing the amounts of assets subject to disgorgement . . . is light: a reasonable approximation of a defendant's ill-gotten gains. Exactitude is not a requirement." *ETS Payphones*, 408 F.3d at 735. The Commission has carried this burden.

12.       Furthermore, Utsick's "causal connection" argument misstates the burden of proof. Once the Commission presents evidence reasonably approximating the amount of a defendant's ill-gotten gains, the burden of proving the amount is not a reasonable approximation shifts to the defendant. *Calvo*, 378 F.3d at 1217. The Commission has also met this burden.

## II.  Prejudgment Interest

13.       Prejudgment interest on disgorgement is a matter of discretion for the Court. *Hughes Capital*, 917 F. Supp. at 1089. Where a securities law violator has enjoyed access to funds over a period of time as a result of his wrongdoing, requiring the violator to pay prejudgment interest is consistent with the equitable purpose of disgorgement. *Id.* at 1090. Prejudgment interest is based on the wrongful deprivation of an aggrieved party of its money, including depriving the victim of the opportunity to realize a fair rate of return on that money. *Id; SEC v. Hasho*, 784 F. Supp. 1059, 1112 (S.D.N.Y. 1992). In addition, in the context of Section 10(b) and Rule 10b-5 actions, a defendant's scienter is sufficient to justify an award of prejudgment interest. *Rolf v. Blyth*, 637 F.2d 77, 87 (2d Cir. 1980). It is equitable for the Court to order prejudgment interest here. Utsick used investors' money to pay his personal expenses for eight years. He misrepresented to investors during that time how he would use their money, never telling them he was using it to pay his personal expenses. Investors were deprived by Utsick's misrepresentation of the use of their money to make other investments and to realize a

fair rate of return.

14.      In accordance with the terms of the Judgment, the Court orders the Commission to submit a prejudgment interest calculation within ten (10) days of the date of this order, calculating prejudgment interest on disgorgement in accordance with the delinquent tax rate established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis, from April 17, 2006 through the date of this order.

15.      That rate of interest "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant received from the fraud." *First Jersey*, 101 F.3d at 1476.

### III.  The Court Will Also Order A Civil Penalty

16.      The Commission seeks a civil money penalty of $120,000 against Utsick under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.  These statutes are virtually identical and establish three tiers of penalties, depending on the egregiousness of the wrongdoer's actions.

17.      Under the first tier, the Court may impose a penalty of up to (i) $6,500 on a defendant for each securities law violation or (ii) the gross amount of pecuniary gain to a defendant as a result of his violations.

18.      Under the second tier, the Court may impose a penalty of up to (i) $65,000 on a defendant for each securities law violation or (ii) the gross amount of pecuniary gain to a defendant as a result of his violations.  The second tier applies where the violation involved "fraud, deceit, manipulation or deliberate or reckless disregard of a statutory requirement." Section 20(d)(2)(B) of the Securities Act, 15 U.S.C. §77t(d)(2)(B).

19.      Finally, under the third tier, the Court may impose a penalty of up to (i) $130,000 on a defendant for each securities law violation, or (ii) the gross amount of pecuniary

gain to a defendant as a result of his violations.  The third tier applies where the requirements of a second-tier penalty are present and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  Section 20(d)(2)(C) of the Securities Act, 15 U.S.C. §77t(d)(2)(C).  The listed statutory amounts for the tiers are $5,000, $50,000 and $100,000, respectively.  However, under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, those tiered amounts were adjusted due to inflation in 1996, 2001, and to the present amounts in 2005.  *See* 17 CFR Pt. 201, §201.103 and Table III to Subpart E.  Adjusted rates apply to this case because Utsick's fraudulent conduct began no later than 1998 and continued through 2005.  Utsick's conduct overlaps all three of the adjusted amounts – $110,000 per violation for a third-tier penalty for conduct occurring from 1998 until 2001, $120,000 per violation for conduct occurring from 2001 until February 2005, and $130,000 per violation for conduct occurring after February 2005.  Because the bulk of Utsick's illegal conduct occurred from 2001 through February 2005, the Court uses the 2001 adjusted amount for the penalty it is imposing.

20.     The Commission contends that the third tier penalty is appropriate, given the nature and extent of Utsick's wrongdoing and the substantial losses incurred by the investors.  Utsick contends that the third tier penalty requested by the Commission should be substantially reduced, if not entirely denied, due to mitigating factors.  The Court finds that the requirements for a third-tier penalty are satisfied.  Utsick's actions involved "fraud, deceit, manipulation or deliberate or reckless disregard of a statutory requirement" that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  There are no mitigating factors presented which suggest that third tier penalty is inappropriate.

21.     As set forth above, Utsick and his co-defendants sold investors at least $300 million of unregistered securities by, among other things, falsely promising them annual returns

of 15 to 25 percent, when he knew such returns were virtually impossible.   In fact, most of Utsick's companies' projects lost money.    In addition, Utsick and his co-defendants misrepresented how they were spending investor money, failed to disclose commissions and other payments to sales agents, omitted disclosing cease-and-desist orders from several states, and failed to disclose that returns to earlier investors were paid, not from profits, but from funds invested by later investors.  As a direct result of Utsick's actions, investors in WEI and TEGFI lost almost $300 million, as represented in the numerous reports Goldberg, as Receiver, has filed.  Utsick has presented no credible evidence to rebut those reports.     Under the third tier, the Court could levy a penalty of up to the gross amount of Utsick's pecuniary gain – $4,035,479.31 – or up to $110,000, $120,000 or $130,000 *per violation* depending on the time frame.  Considering that Utsick sold thousands of investments, and that each sale constituted a violation of, at a minimum, Section 5 of the Securities Act of 1933 because it involved the sale of an unregistered security, the Court theoretically could levy a penalty running into the tens of millions of dollars.  However, in view of the disgorgement amount, such a levy is unnecessary here.  However, the facts and the law cited above certainly justify a $120,000 penalty – the maximum, statutory, third-tier amount for a single violation.  For those reasons the Court orders Utsick to pay a $120,000 civil penalty.

## **CONCLUSION**

For all of the reasons stated in this order, the Court is separately entering a Final Judgment against Utsick:

(1) Setting disgorgement at $4,035,479.31;

(2) Ordering the Commission to submit a prejudgment interest calculation within ten days; and

(3) Ordering a civil penalty of $120,000;

DONE AND ORDERED in Chambers, Miami, Florida, this May 19, 2009.

_____

Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record

28