# UNITED STATES DISTRICT COURT
## Southern District of Florida
## Miami Division

SECURITIES AND EXCHANGE COMMISSION

    Plaintiff,

vs.

Case No.: 06-20975-CIV-HUCK
Magistrate Judge Sullivan

JACK P. UTSICK,
ROBERT YEAGER,
DONNA YEAGER,
WORLDWIDE ENTERTAINMENT, INC.,
THE ENTERTAINMENT GROUP FUND, INC.,
AMERICAN ENTERPRISES, INC., and
ENTERTAINMENT FUNDS, INC.,

    Defendants.

_____/

## NOTICE OF FILING

Michael I. Goldberg (the "Receiver"), hereby gives Notice of the Filing of Receiver, Michael I. Goldberg's, Eighth Report Concerning the Condition of the Entertainment Group Fund, Inc., Worldwide Entertainment, Inc., American Enterprises, Inc., and Entertainment Funds, Inc..

                                                  Respectfully submitted,

                                                 **AKERMAN SENTERFITT**
                                                 Counsel for Receiver
                                                 Las Olas Centre II, Suite 1600
                                                 350 East Las Olas Boulevard
                                                 Fort Lauderdale, FL 33301-2229
                                                 Telephone: (954) 463-2700
                                                 Facsimile: (954) 463-2224
                                                 Email: joan.levit@akerman.com


                                                 By: /s/ Joan Levit
                                                    Joan Levit, Esquire
                                                    Florida Bar Number: 987530

{FT635388;1}

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of December,, 2009, I electronically filed the foregoing *Notice of Filing of the Receiver, Michael I. Goldberg's, Eighth Report Concerning the Condition of the Entertainment Group Fund, Inc., Worldwide Entertainment, Inc., American Enterprises, Inc., and Entertainment Funds, Inc.* with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic notices.

                                                             /s/ Joan Levit

SEC v. Utsck, et al.
Case No.: 06-20975-CIV-HUCK

**SERVICE LIST**

Robert K. Levenson
Regional Trial Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
(305) 982-6341 (Direct Dial)
(305) 982-6300 (Telephone)
(305) 536-4154 (Facsimile)
E-Mail: levensonr@sec.gov
*Counsel for Plaintiff*
Served by CM/ECF

Teresa Jacqueline Verges
Yolanda Gonzalez
Andre Zamorano
Securities & Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
E-Mail: vergest@sec.gov
E-Mail: gonzalezlm@sec.gov
E-Mail: zamoranoa@sec.gov
*Counsel for Plaintiff*
Served by CM/ECF

Richard Kraut, Esq.
Dilworth Paxson LLP
655 Fifteenth Street, NW, Suite 810
Washington, DC 20005
(202) 466-9152 (Telephone)
(202) 452-0930 (Facsimile)
E-Mail: rkraut@dilworthlaw.com
*Counsel for Jack P. Utsick*
Served by CM/ECF

David R. Chase, Esq.
David R. Chase, P.A.
1700 East Las Olas Blvd., Penthouse 2
Fort Lauderdale, Florida 33301
(954) 920-7779 (Telephone)
(954) 923-5622 (Facsimile)
E-Mail: david@davidchaselaw.com
*Counsel for Jack P. Utsick*
Served by CM/ECF

Richard A. Serefini, Esq.
Adams Cassidy & Phillippi, P.A.
One East Broward Boulevard, Suite 1410
Fort Lauderdale, FL 33301
(954) 764-6430 (Telephone)
(954) 764-6448 (Facsimile)
Email: rserafini@acplaw.net
*Counsel for Robert Yeager, Donna Yeager*
*American Enterprises, Inc. and*
*Entertainment Funds, Inc.*
Served by CM/ECF

David M. Levine, Esq.
Tew Cardenas LLP
Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, Florida 33131-3407
(305) 536-1112 (Telephone)
(305) 536-1116 (Facsimile)
E-Mail: dml@tewlaw.com
*Counsel for First Source Bank*
Served by CM/ECF

UNITED STATES DISTRICT COURT
Southern District of Florida
Miami Division

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

vs.

JACK P. UTSICK,
ROBERT YEAGER,
DONNA YEAGER,
WORLDWIDE ENTERTAINMENT, INC.,
THE ENTERTAINMENT GROUP FUND, INC.,
AMERICAN ENTERPRISES, INC., and
ENTERTAINMENT FUNDS, INC.,

    Defendants.
_____/

Case No.: 06-20975-CIV-HUCK
Magistrate Judge O'Sullivan

## RECEIVER'S EIGHTH REPORT ON THE CONDITION
## OF THE RECEIVERSHIP ENTITIES

Michael I. Goldberg, court-appointed receiver (the "Receiver") for The Entertainment Group Fund, Inc. ("TEGFI"), Worldwide Entertainment, Inc. ("Worldwide"), American Enterprises, Inc. ("AEI") and Entertainment Funds, Inc. ("EFI") (collectively "the Receivership Entities"), files the Receiver's Eighth Report on the Condition of the Receivership Entities to provide the Court and Creditors with an update on the following matters:

**I.    VENUES**

The Receivership Entities wholly or partially own and/or operate various live entertainment venues throughout the world. The status of these venues are as follows:

    **A.    Keswick Theatre**

In February 2002, TEGFI purchased the Keswick Theatre (the "Keswick"), a 1365 seat theater, located in Glenside, Pennsylvania (suburban Philadelphia) for approximately $900,000.

{FT633397;1}

The Keswick was owned free and clear of any recorded liens. In connection with TEGFI's purchase of the Keswick, TEGFI formed two entities (currently referred to as subsidiaries). Keswick Holdings, LLC ("Keswick Holdings") was established to own the real estate as well as Keswick Entertainment Group, Inc., an operating company to manage the Keswick. TEGFI owned ninety-five percent (95%) and Robert Yeager ("Yeager") owned five percent (5%) of Keswick Holdings. TEGFI also owned a one-hundred percent (100%) interest in Keswick Entertainment Group, Inc.

After diligently marketing the Keswick, the Receiver entered into an Asset Purchase Agreement to sell the Keswick for $2.8 million to AEG Live PA, LLC ("AEG"), one of the leading owners and operators of entertainment and sports venues in the world. After receiving Court approval of the Asset Purchase Agreement, the transaction closed in June, 2008. The receivership estate realized approximately $2.9 million from the sale after deducting closing fees and costs.

*Update:* The Receiver is dealing with some post closing matters and is in the process of filing the final tax returns for this entity.

    B.    **Wuhlheide Amphitheater**

The Wuhlheide is an outdoor amphitheater located in what used to be East Berlin, Germany. The Wuhlheide is a well known site that is approximately 50 years old and on Berlin's list of historic sites. Uniquely shaped in a horseshoe, the theater has a capacity for 17,000 persons – space for 12,000 in the surrounding forum type seating and another 5,000 in the open area in front of the stage. Because it is an outdoor theater, the Wuhlheide's show season is limited, running from May to September.

In 1997, a private group that was running the facility (who invested about $10 million into it for upgrades and renovations) went into bankruptcy. At that time, Bruce Glatman

("Glatman"), an acquaintance of Jack Utsick ("Utsick"), introduced Utsick to a local promoter named Wolfgang Kollen ("Kollen"). Utsick, Glatman, and Kollen partnered and negotiated a ten-year lease with the city of Berlin, to operate the Wuhlheide for €160,000 the first year, increasing by €20,000 each year thereafter. In exchange for this privilege, Utsick, Glatman, and Kollen paid the prior ownership's bankruptcy estate approximately $2.7 million, the majority of which TEGFI funded. TEGFI owns 75% of the entity that holds the lease; Kollen owns 15%; and Glatman owns 10% the ("Wuhlheide Partnership").

Shortly after his appointment, the Receiver visited Berlin and met with representatives of AEG and Live Nation, two of the world's largest live music venue owners and concert promoters, to attempt to sell them the Wuhlheide Partnership's leasehold interest in the Wuhlheide. However, their interest was limited because the lease only had an additional six (6) year term (one remaining year under the base term and one five year option). Accordingly, no deal was reached at that time.

The lease was for an initial term of 10 years with one five year option. The initial term of the lease was set to expire in December 2006. At the end of 2006, the Receiver directed Kollen to exercise the final five year option on the lease and to negotiate new terms. At the time of the extension of the lease, the Wuhlheide was in need of further repairs totaling nearly €2 million. Kollen requested the city to make the repairs as required under the terms of the lease. Short of funds, the city offered to sell the underlying land and all improvements to the partnership for €3.5 million. After months of extensive negotiations, the Wuhlheide Partnership agreed to purchase the Wuhlheide from the city for approximately €550,000. This sum was funded by each partner's share of the Wuhlheide Partnership's 2007 net income. Accordingly, the Wuhlheide Partnership converted its status of a tenant to one of an owner, which the Receiver

believes will significantly improve the Wuhlheide Partnership's ability to sell its interest in the Wuhlheide.

*Update:* The Wuhlheide Partnership has been actively marketing the Wuhlheide for sale. Currently, there is a contract on the Wuhlheide. The potential buyer is still completing its due diligence and it is expected that the Receiver will sell the Receivership Entities' interest in the Wuhlheide within the next couple of months. It is expected that the sale will generate a profit for the estate, however, due to confidentiality concerns, the Receiver is unable to specify the exact amount in this report. The Receiver will provide further details on this in his next report.

    C.    **Quay Park Arena (Vector Arena)**

Worldwide owns a one hundred percent (100%) interest in Worldwide New Zealand, LLC ("WWNZ"). WWNZ owns a twenty five percent (25%) interest in a New Zealand company known as the Quay Park Arena Management Trust ("QPAM"). QPAM is the legal owner of a valuable lease to manage and operate the Quay Park Arena, a modern 12,000 seat facility in Auckland, New Zealand. The remaining seventy five (75%) percent interest in QPAM is held by Jacobsen Venue Management New Zealand, Ltd. and Jacobson F.T. Pty, Ltd. (the "Jacobson Parties"). Quay Park Arena is a world class multi-use indoor sports and entertainment arena. It is now known as the "Vector Arena." As of 2008, WWNZ had invested approximately $3.5 million in QPAM.

Prior to the Receiver's appointment, WWNZ commenced litigation against the Jacobsen Parties alleging, among other things, that they diverted partnership assets for their own use. When the receivership was commenced, the Jacobsen Parties asserted that there was a change in control of WWNZ that triggered their right of first refusal to purchase WWNZ's interest in QPAM. A dispute soon developed between the Receiver and the Jacobsen Parties as to the

process to be used to value WWNZ's interest. The Jacobsen Parties took the unreasonable position that they had the unilateral right to value WWNZ's interest. After nearly two years of litigating over this issue, with numerous hearings and appeals, the High Court of New Zealand handed down a thirty five page decision in favor of WWNZ. Essentially, the High Court of New Zealand stated that the Jacobsen Parties do not have the unilateral right to value WWNZ's interest.

*Update:* A trial on the value of WWNZ's interest is scheduled to commence in April, 2010. The Receiver has retained experts to value WWNZ's interest in the Vector Arena, and the Receiver believes he will ultimately be successful in obtaining the fair market value for WWNZ's interest. For confidentiality reasons and due to the pending litigation, the Receiver is not listing the expected value in this report.

D. **Jacksonville Property**

In January 2003, Worldwide purchased 49.6 acres of land just off of I-95 near Route 16 between Jacksonville and St. Augustine, Florida with the intent of building an amphitheater on the property (the "Jacksonville Property"). The Jacksonville Property is highly visible from I-95, a major interstate highway.

The Jacksonville Property was originally purchased for $1.5 million; however, due to the downturn in the Florida market for raw-land, the Receiver is unsure of the current value of the Jacksonville Property. There is no mortgage on the Jacksonville Property and the costs of holding the property are minimal. Accordingly, the Receiver, with the advice of his Investor Advisory Panel, decided not to aggressively market the Jacksonville Property for sale, but to "mothball" the property in hopes that the market will recover. The Receiver is hopeful that the real estate market will recover in the next year and the eventual sale of the Jacksonville Property will bring significant value to the Receivership Estate.

*Update:* Thus far, one bid has been submitted by St. Johns County. The Receiver believes this bid is too low and will continue to negotiate and market the property.

## II.   INTERNATIONAL AFFILIATES

### A.   Australia

The Receivership Entities had two promoting relationships in Australia with well known Australian promoters: Kevin Jacobsen with the Jacobsen Group and Michael Chugg with MCE Entertainment. The current status of these relationships is as follows:

#### 1.   The Jacobson Group (Dirty Dancing)

Worldwide Australia, LLC ("WWA")[1] was created in 2003 after Utsick partnered with Kevin Jacobsen ("Jacobsen") and/or his affiliate(s) forming Jacobsen Utsick, Pty, Ltd. ("JJU" or the "JJU Partnership"). On or about December 17, 2004, a dispute developed over the rights to the musical production of *Dirty Dancing* which was based on the screenplay of the motion picture known as *Dirty Dancing*, and WWA filed a lawsuit (hereinafter referred to as the "Australian Case") against nine (9) defendants in The Supreme Court of New South Wales, Sydney Registry, Equity Division, Commercial Division, in a case styled: "*Worldwide Australia, LLC v. Jacobsen Platinum Pty Limited, Kevin George Jacobsen, Time of My Life Pty Limited, Dirty Dancing Investments Pty Limited, Dirty Dancing Asia Pacific, Jacobsen Entertainment Limited, Amber Lucy Jacobsen, Michael Aaron Jacobsen, and Jacobsen-Jack Utsick Pty Limited, No. 50183 of 2004,*" (these nine defendants are hereinafter referred to as the "Australian Case Defendants").

Specifically, the Australian Case alleges that the JJU Partnership was formed to, among other things, exploit and profit from the Dirty Dancing rights acquired on behalf of, and for the

---

[1] Worldwide is the sole member of WWA. WWA is a Delaware limited liability company whose principal place of business was 300 South Point Drive, Suite 3702, Miami Beach, Florida 33139.

benefit of, the JJU Partnership by the Australian Case Defendants known as, Time of My Life Pty Limited, Dirty Dancing Investments Pty Limited, and Dirty Dancing Asia Pacific Pty Limited, and that therefore, any profits derived from the *Dirty Dancing* work were obtained for the benefit of, and on behalf of, the JJU Partnership. The Australian Case also seeks an order for an account of profits derived from the exploitation of the *Dirty Dancing* rights from any and all of the Australian Case Defendants. In June 2008, the Receiver attended mediation in Sydney, Australia; however, the parties failed to reach a settlement.

*Update:* The Receiver believes the parties have reached a settlement with respect to this litigation, but due to the fact that it is not finalized, the Receiver cannot disclose the details of the settlement and the reasons the Receiver opted to settle the matter.

### 2. Michael Chugg/MCE Entertainment

Prior to commencement of the Receivership, Worldwide had a co-promotional relationship with Michael Chugg ("Chugg") and Michael Chugg Entertainment Pty Limited ("MCE") pursuant to which the parties were to co-promote live entertainment events throughout Australia. In connection with this relationship, Worldwide invested several million dollars with MCE to co-promote various events. A few years lapsed and MCE reported that Worldwide's investment was worthless. The Receiver disagreed with this conclusion.

In Spring 2006, the Receiver traveled to Sydney, Australia, in an attempt to settle with MCE; however, no settlement was reached. Accordingly, the Receiver sued Chugg and MCE to collect the $1.8 million allegedly owed to Worldwide. In July 2007, the Receiver traveled back to Sydney to attend court-ordered mediation. Once again, no settlement was reached, but the parties did continue to attempt to reach a mutually acceptable settlement. Finally, in Spring 2008, the parties were able to reach a settlement, whereby MCE is to pay the Receiver $1.5 million (Australian Dollars) with $500,000 down and 15 monthly payments of $66,666.66.

*Update:* The settlement with Chugg has been approved by the Court and Chugg is current in his settlement payments.

## III. OTHER LITIGATION

### A. *Michael I. Goldberg, Receiver v. Paris Hilton, et al.*

TEGFI, through a wholly-owned subsidiary named SBO, LLC ("SBO") made a significant investment in a movie entitled *National Lampoon's Pledge This* ("Pledge This"). SBO invested approximately $5.3 million in Pledge This Holdings, LLC, the entity formed to finance the movie. Additionally, TEGFI loaned approximately $500,000 to Pledge This Holdings, LLC. There are other investors in the movie, including an initial investor group, comprised of three hedge funds, that invested $1 million which is secured by a copyright mortgage (the "Initial Investor Group"), English Distribution, which invested additional money, on an unsecured basis, and is also entitled to a percentage of the net distribution, and several smaller investors in the movie. Distribution of the net proceeds of *Pledge This*, which is broken down by domestic and international revenues, are distributed ("Waterfall") as follows:

<u>Domestic Revenues</u>

1. Initial Investor Group receives the first $1.4 million;
2. TEGFI receives the next $650,000;
3. SBO receives 92% of the next revenues (up to $6.89 million); and
4. English Distribution receives 8% of the remaining domestic revenues.

<u>International Revenues</u>

1. SBO receives 92% of the next revenues (up to $6.89 million); and
2. English Distribution receives 8% of the remaining international revenues.

After SBO receives $6.89 million, the Waterfall changes for both Domestic and International revenues to the following:

{FT633397;1}   8

    1.  Miscellaneous investor group receives $750,000;

    2.  SBO receives 38% of the net revenues and other investors, actors, the director, writer, etc. receive 62% of the net revenues.

After filming began, the movie encountered a number of problems resulting in delays and increased expenses, which resulted in SBO paying an additional $500,000 and guaranteeing $800,000 of the $1 million note owed to the Initial Investor Group. In return, SBO received five "equity points" from National Lampoon and five "equity points" from the Initial Investor Group (resulting in the above stated percentages). In August 2005, part of the movie had to be re-filmed at a cost of $425,000 to SBO. English Distribution also paid $400,000 in overrun costs. Additionally, there was an approximate $500,000.00 in additional expenses to complete the film's editing, visual effects and music.

In addition to the added costs of production, actress Paris Hilton completely refused to promote the movie in breach of her contractual obligations. Therefore, in an attempt to recover damages incurred as a result of Ms. Hilton's breach, the Receiver filed a lawsuit against Paris Hilton and Paris Hilton Entertainment, Inc. on August 12, 2008, styled *Michael I. Goldberg, Receiver v. Paris Hilton, et al.* The Receiver sought to collect "reliance damages" from Hilton due to her breach. That is, the Receiver sued Hilton in an attempt to recover all sums SBO invested in Pledge This in reliance on Pledge This' contract with Hilton based on the theory that the SBO would not have invested the funds in Pledge This if it knew that Hilton would have breached her contract. Accordingly, the Receiver requested the Court to grant him judgment against Hilton in the approximate amount of $7 million to put SBO in the position it would have been prior to the formation of the contract with Hilton.

***Update:*** A trial took place in July, 2009. At the conclusion of the trial, the Court rejected the Receiver's reliance damage claim. Instead, the Court asked both parties to brief the

issue of whether a "restitution" theory of damages is more appropriate. If appropriate, restitution damages would require Hilton to disgorge all or part of the $1 million fee she was paid based on the damages caused by her breach of the agreement. Both sides have briefed the issue and are awaiting the Court's decision as to whether Hilton must repay all or part of the fee she received.

      B.    *Michael I. Goldberg, Receiver v. Estate of Geraldine DiSalvo, et al.*

When she served as pension administrator for the Individual Retirement Account ("IRA") funds, Sheri DiSalvo ("DiSalvo"), through her company American National Pension Services ("ANPS") misappropriated millions of dollars of investor funds. DiSalvo passed away in late August 2005. On or about October 19, 2005, a notice of administration of probate estate of DiSalvo was filed in the Superior Court for Santa Clara County, California, Case No. 1-05-PR-158259 (the "California Probate Estate"). On or about June 19, 2006, the Receiver filed a Petition to file a Creditor's Claim After Expiration of the Deadline for Filing a Claim (the "Petition"), along with a Creditor's Claim on behalf of the Receiver against the California Probate Estate. On August 30, 2006, Duane DiSalvo and Wayne DiSalvo, the Co-Personal Representatives of the California Probate Estate served a Notice of Rejection of the Receiver's Claim.

On November 30, 2006, the Receiver filed a Complaint on the Rejected Claim and for Restitution of Receivership Property, in a case styled *Michael I. Goldberg, Receiver for Worldwide Entertainment, Inc. et al. v. Duane DiSalvo, et al.*, Case No. 106 CV-075625 in the Superior Court of California, County of Santa Clara (the "California Probate Litigation"). In the California Probate Litigation, the Receiver sued Duane DiSalvo and Wayne DiSalvo in their capacities as Co-Personal Representatives, the California Probate Estate and ANPS for fraud, constructive fraud, conversion, common count for money had and received, for an accounting, and to pierce the corporate veil of ANPS. Additionally, the Receiver sued Duane DiSalvo,

Wayne DiSalvo, Candy DiSalvo and Lisa Dickey for conversion, unjust enrichment, common count for money had and received, and for an accounting.

On or about January 24, 2006, a Petition for Ancillary Administration was recorded in the official records for Miami-Dade County, Florida, and filed with the Clerk of the 11th Judicial Circuit in and for Miami-Dade County, Probate Division, Case No. 06-277-CP (01) (the "Florida Probate Estate"). On May 15, 2006, the Receiver timely filed a claim (the "Receiver's Probate Claim") in the Florida Probate Estate. On May 22, 2006, Wayne DiSalvo and Duane DiSalvo, as Co-Personal Representatives of the Florida Probate Estate, through their counsel, served notice of their objection to the Receiver's Probate Claim.

On June 21, 2006, the Receiver filed a lawsuit in the U.S. District Court for the Southern District of Florida, the same court presiding over the receivership, in a case styled, *Michael Goldberg, as Receiver over Worldwide Entertainment, Inc. et al. v. Wayne DiSalvo, et al.*, Case No.: 06-21582-CIV-HUCK/SIMONTON (the "Florida Probate Litigation"). In the Florida Probate Litigation, the Receiver asserted claims against the Florida Probate Estate and ANPS for fraud, conversion, restitution, breach of fiduciary duty, to pierce the corporate veil of ANPS, and to impose a constructive trust on the Florida Probate Estate. Additionally, the Receiver sought recovery against Wayne DiSalvo and Duane DiSalvo in their individual capacities for conversion, restitution, and to impose a constructive trust on Wayne DiSalvo's and Duane DiSalvo's personal assets, as well as a declaratory judgment that the Receivership Entities have a valid claim in the Florida Probate Estate.

On June 4, 2007, the Receiver filed a motion in the Florida Probate Litigation, to abate the case and stay the proceedings in Florida pending the outcome of the proceedings in California, thus avoiding litigating the same issues in two separate courts. On June 27, 2007, the Court in the Florida Probate Litigation granted the Receiver's motion to abate the case.

{FT633397;1}                                11

*Update:* The Receiver settled all claims against the Disalvo defendants. Under the settlement agreement, the Disalvos were required to disclose, under oath, all of their assets to the Receiver. Thereafter, most of the assets, including approximately $2.3 million in cash, one condominium in Florida, six homes in California and other miscellaneous property were turned over to the Receiver. The Receiver values these assets, depending on real estate values, somewhere between $5 and $7 million.

On May 9, 2009, CJ Braisel of Fireside Realty was retained by the Receiver to manage, market, and sell the six Disalvo properties in California. To date, the following properties have been sold:

(a)    207 32nd Avenue, Santa Cruz, California. This property was listed for sale at $525,000. The Court approved the sale of this property on July 27, 2009. On August 9, 2009, the property closed, and the net proceeds realized from the closing, after payment of broker's fees and other expenses, was $486,007.63.

(b)    7576 Turnberry Way, Gilroy, California. This property was listed for sale at $550,000. The Court approved the sale of this property on August 31, 2009. On September 11, 2009, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $511,264.

(c)    2475 Sunflower Circle, Gilroy CA. This property was listed for sale at $870,000. The Court approved this sale of this property on October 2, 2009. On October 7, 2009, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $808,159.68; and

(d)    260 Lake Avenue, #8, Santa Cruz, California. This property was listed for sale at $760,000. The Court approved this sale of this property on November 9, 2009. On November 30,

2009, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $708,969.03.

The Receiver will continue to market the remaining properties.

    C.    **Fraudulent Transfer Actions**

During the course of the Receiver's administration of the receivership estate and during the review of investor claims, the Receiver discovered that some investors actually profited by receiving "interest" in excess of their initial capital investments (the "Profit Payments"). Furthermore, some investors received commission payments from the Receivership Entities commonly referred to as "client representative fees" (the "Commission Payments"). It is the Receiver's position that these Profit Payments and Commission Payments from the Receivership Entities are in violation of Florida's Uniform Fraudulent Transfer Act and are recoverable by the Receiver. To that end, the Receiver instituted approximately 150 lawsuits against investors totaling over $20 million seeking to avoid the Profit Payments and Commission Payments made by the Receivership Entities to the investors. In addition, the Receiver settled claims with over 100 investors who received Profit Payments and Commission payments, and received approximately $2.5 million in settlement payments as of 2008.

*Update:* The Receiver has concluded bringing the fraudulent transfer actions and collected approximately $5.7 million for the benefit of creditors to date.[2]

    D.    **Michael I. Goldberg, Receiver v. Lyn Chong and Kevin Karl Wills, Jr.**

In April, 2007, the Receiver sued Utsick's former assistant, Lynn Chong and her husband for various causes of action (collectively "Chong"), including counts for fraudulent transfer and unjust enrichment, in connection with her unlawful transfer of $5 million dollars from TEGFI's bank account for her own benefit. On July 11, 2007, the Court entered an order granting the Receiver partial summary judgment on his fraudulent transfer and unjust enrichment claims,

---

[2] The Receiver is still collecting small monthly settlement payments from some investors.

{FT633397;1}                13

essentially holding that the money Chong received was excessive compensation. Subsequent to the Court's order, the Receiver entered into settlement discussions with Chong and her husband in order to provide for a voluntary turnover of the remaining funds in their possession along with all material assets they purchased with the $5 million. An agreement was reached whereby Chong and her husband turned over substantially all of their assets consisting of approximately $1.45 million held in various bank accounts, a waterfront house, a BMW automobile, $24,000 in cash and artwork. The Receiver entered into a contract for sale of the waterfront home for $800,000. It appears that Chong also paid approximately $1.5 million in taxes to the Internal Revenue Service and the Receiver is seeking a return of those funds.

*Update:* The Receiver, through his accountants, prepared and filed Chong's amended tax returns and has been waiting for several months on a response from the IRS concerning the status of the requested refund. The Receiver is hopeful he will be able to recover all or part of this money from the IRS.

### IV.  MISCELLANEOUS

#### A.  **Life Insurance Policies**

At the commencement of the receivership, the Receiver learned that Utsick owned several life insurance policies with a combined death benefit of $54.2 million[3]. Three of the active policies are Universal Life policies totaling $27 million in death benefits and list TEGFI as the beneficiary. There is one additional active Universal Life policy with a face amount of $15 million and listed Jack Utsick's personal trust as beneficiary. The remaining two active policies are Term policies having a combined death benefit of $12 million. These two policies previously listed Utsick's girlfriend, Jennifer Homan, and Utsick's estate as the beneficiary, however, Ustick subsequently assigned the policies to the Receiver on behalf of Worldwide. The premiums for all

---

[3] The Receiver uncovered nine policies altogether, however, three (3) of the policies had lapsed prior to his discovery of same. The remaining six active policies consist of $54 million in death benefits.

{FT633397;1}                                          14

of the active policies are approximately $700,000 per year.

*Update:* Upon the advice of the Investor Advisory Panel, the Receiver continues to pay these premiums.

### B. Jack Utsick's Condo – Unit 3702

The Receivership Entities owned two condominium units in the Portofino Towers (Unit Nos. 3702 and 3503) located in Miami Beach, Florida. Utsick resided in Unit No. 3503, while Unit No. 3702 was utilized by the Receivership Entities as an office. In July, 2008, the Receiver sold Unit 3503 for $2.3 million, and after payment of the mortgage, the estate netted approximately $1.825 million.

*Update:* Unit 3702 is presently under contract for $1.150 million and is free and clear of any liens or mortgages (except approximately $110,000 in property taxes). The Receiver anticipates closing on this property very soon.

### V. DISTRIBUTIONS

The Receiver made an initial distribution to creditors of approximately $21.3 million in February 2009. This distribution equaled approximately 14 percent. The Receiver expects to make a second distribution to creditors with allowed claims in the second or third quarter of 2010. At this point in time, it is impossible to tell how large the distribution will be. The current amount being held in trust by the Receiver is approximately $8.2 million.

### VI. UTSICK JUDGMENT

In April, 2009 the Court held evidentiary hearings concerning the SEC's claims against Utsick. At the conclusion of the hearings, the Court determined that Utsick utilized the Receivership Entities to perpetrate a massive Ponzi scheme and diverted money from investors

for his personal benefit. The Court entered a judgment against Utsick in the amount of $5,077,188.15. Utisck has appealed this ruling.

## VII. CONCLUSION

The Receiver continues to work diligently to complete his investigation and will seek the Court's authorization prior to making any major decisions. Additionally, the Receiver will continue to file reports updating the Court and creditors of his progress.

Dated: December 8, 2009

Respectfully Submitted,

**AKERMAN SENTERFITT**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2229
Telephone: (954) 463-2700
Facsimile:  (954) 463-2224
Email: michael.goldberg@akerman.com


By:  /s/ Michael I. Goldberg
    MICHAEL I. GOLDBERG, Receiver
    Florida Bar Number: 886602

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 8th day of December 2009, I electronically filed the foregoing Report with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic notices.

                                                    /s/ Michael I. Goldberg, Receiver