# UNITED STATES DISTRICT COURT
## Southern District of Florida
## Miami Division

SECURITIES AND EXCHANGE COMMISSION

      Plaintiff,

vs.

JACK P. UTSICK,
ROBERT YEAGER,
DONNA YEAGER,
WORLDWIDE ENTERTAINMENT, INC.,
THE ENTERTAINMENT GROUP FUND, INC.,
AMERICAN ENTERPRISES, INC., and
ENTERTAINMENT FUNDS, INC.,

      Defendants.

_____/

Case No.: 06-20975-CIV-HUCK
Magistrate Judge Sullivan

## NOTICE OF FILING

Michael I. Goldberg (the "Receiver"), hereby gives Notice of the Filing of Receiver,

Michael I. Goldberg's, Ninth Report Concerning the Condition of the Entertainment Group Fund,

Inc., Worldwide Entertainment, Inc., American Enterprises, Inc., and Entertainment Funds, Inc.

Respectfully submitted,

**AKERMAN SENTERFITT**
Counsel for Receiver
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2229
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Email: joan.levit@akerman.com

By: /s/ Joan Levit
    Joan Levit, Esquire
    Florida Bar Number: 987530

{FT714621;1}

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of September, 2010, I electronically filed the foregoing *Notice of Filing of the Receiver, Michael I. Goldberg's, Ninth Report Concerning the Condition of the Entertainment Group Fund, Inc., Worldwide Entertainment, Inc., American Enterprises, Inc., and Entertainment Funds, Inc.* with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic notices.

<u>   /s/ Joan Levit                          </u>

SEC v. Utisck, et al.
Case No.: 06-20975-CIV-HUCK

## SERVICE LIST

Robert K. Levenson
Regional Trial Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
(305) 982-6341 (Direct Dial)
(305) 982-6300 (Telephone)
(305) 536-4154 (Facsimile)
E-Mail: levensonr@sec.gov
*Counsel for Plaintiff*
Served by CM/ECF

Teresa Jacqueline Verges
Yolanda Gonzalez
Andre Zamorano
Securities & Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
E-Mail: vergest@sec.gov
E-Mail: gonzalezlm@sec.gov
E-Mail: zamoranoa@sec.gov
*Counsel for Plaintiff*
Served by CM/ECF

Richard Kraut, Esq.
Dilworth Paxson LLP
655 Fifteenth Street, NW, Suite 810
Washington, DC 20005
(202) 466-9152 (Telephone)
(202) 452-0930 (Facsimile)
E-Mail: rkraut@dilworthlaw.com
*Counsel for Jack P. Utsick*
Served by CM/ECF

David R. Chase, Esq.
David R. Chase, P.A.
1700 East Las Olas Blvd., Penthouse 2
Fort Lauderdale, Florida 33301
(954) 920-7779 (Telephone)
(954) 923-5622 (Facsimile)
E-Mail: david@davidchaselaw.com
*Counsel for Jack P. Utsick*
Served by CM/ECF

Richard A. Serefini, Esq.
Adams Cassidy & Phillippi, P.A.
One East Broward Boulevard, Suite 1410
Fort Lauderdale, FL  33301
(954) 764-6430 (Telephone)
(954) 764-6448 (Facsimile)
Email: rserafini@acplaw.net
*Counsel for Robert Yeager, Donna Yeager*
*American Enterprises, Inc. and*
*Entertainment Funds, Inc.*
Served by CM/ECF

David M. Levine, Esq.
Tew Cardenas LLP
Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, Florida 33131-3407
(305) 536-1112 (Telephone)
(305) 536-1116 (Facsimile)
E-Mail: dml@tewlaw.com
*Counsel for First Source Bank*
Served by CM/ECF

# UNITED STATES DISTRICT COURT
## Southern District of Florida
### Miami Division

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.

Case No.: 06-20975-CIV-HUCK
Magistrate Judge O'Sullivan

JACK P. UTSICK,
ROBERT YEAGER,
DONNA YEAGER,
WORLDWIDE ENTERTAINMENT, INC.,
THE ENTERTAINMENT GROUP FUND, INC.,
AMERICAN ENTERPRISES, INC., and
ENTERTAINMENT FUNDS, INC.,

      Defendants.

_____/

## RECEIVER'S NINTH REPORT ON THE CONDITION
## OF THE RECEIVERSHIP ENTITIES

Michael I. Goldberg, court-appointed receiver (the "Receiver") for The Entertainment Group Fund, Inc. ("TEGFI"), Worldwide Entertainment, Inc. ("Worldwide"), American Enterprises, Inc. ("AEI") and Entertainment Funds, Inc. ("EFI") (collectively "the Receivership Entities"), files the Receiver's Ninth Report on the Condition of the Receivership Entities to provide the Court and Creditors with an update on the following matters:

## I.    VENUES

The Receivership Entities wholly or partially own and/or operate various live entertainment venues throughout the world.  The Receiver has previously sold several of these venues and this report does not discuss such venues.  The status of the venues the Receiver is still administering is as follows:

### A.    Wuhlheide Amphitheater

The Wuhlheide is an outdoor amphitheater located in what used to be East Berlin, Germany. The Wuhlheide is a well known site that is approximately 50 years old and on Berlin's list of historic sites.  Uniquely shaped in a horseshoe, the theater has a capacity for 17,000 persons – space for 12,000 in the surrounding forum type seating and another 5,000 in the open area in front of the stage. Because it is an outdoor theater, the Wuhlheide's show season is limited, running from May to September.

In 1997, a private group that was running the facility (who invested about $10 million into it for upgrades and renovations) went into bankruptcy. At that time, Bruce Glatman ("Glatman"), an acquaintance of Jack Utsick ("Utsick"), introduced Utsick to a local promoter named Wolfgang Kollen ("Kollen").  Utsick, Glatman, and Kollen partnered and negotiated a ten-year lease with the city of Berlin, to operate the Wuhlheide for €160,000 the first year, increasing by €20,000 each year thereafter.  In exchange for this privilege, Utsick, Glatman, and Kollen paid the prior ownership's bankruptcy estate approximately $2.7 million, the majority of which TEGFI funded. TEGFI owns 75% of the entity that holds the lease; Kollen owns 15%; and Glatman owns 10% the ("Wuhlheide Partnership").

Shortly after his appointment, the Receiver visited Berlin and met with representatives of AEG and Live Nation, two of the world's largest live music venue owners and concert promoters, to attempt to sell them the Wuhlheide Partnership's leasehold interest in the Wuhlheide.  However, their interest was limited because the lease only had an additional six (6) year term (one remaining year under the base term and one five year option).  Accordingly, no deal was reached at that time.

The lease was for an initial term of 10 years with one five year option. The initial term of the lease was set to expire in December 2006. At the end of 2006, the Receiver directed Kollen to exercise the final five year option on the lease and to negotiate new terms. At the time of the extension of the lease, the Wuhlheide was in need of repairs totaling nearly €2 million. Kollen requested the city to make the repairs as required under the terms of the lease. Short of funds, the city offered to sell the underlying land and all improvements to the partnership for €3.5 million. After months of extensive negotiations, the Wuhlheide Partnership agreed to purchase the Wuhlheide from the city for approximately €550,000. This sum was funded by each partner's share of the Wuhlheide Partnership's 2007 net income. Accordingly, the Wuhlheide Partnership converted its status of a tenant to one of an owner, which the Receiver believes will significantly improve the Wuhlheide Partnership's ability to sell its interest in the Wuhlheide.

*Update:*   The Wuhlheide Partnership has been actively marketing the Wuhlheide for sale. The Wuhlheide Partnership received two LOI's for the potential purchase of the Wuhlheide in 2010, however, both of these LOI's never materialized into a binding contract. The Wuhlheide Partnership will continue to operate the Wuhlheide, which is operating profitably, until such time as a sale on acceptable terms can be consummated.

B.   **Quay Park Arena (Vector Arena)**

Worldwide owns a one hundred percent (100%) interest in Worldwide New Zealand, LLC ("WWNZ"). WWNZ owns a twenty five percent (25%) interest in a New Zealand company known as the Quay Park Arena Management Trust ("QPAM"). QPAM is the legal owner of a valuable lease to manage and operate the Quay Park Arena, a modern 12,000 seat facility in Auckland, New Zealand. The remaining seventy five (75%) percent interest in QPAM is held by Jacobsen Venue Management New Zealand, Ltd. and Jacobson F.T. Pty, Ltd. (the

"Jacobson Parties"). Quay Park Arena is a world class multi-use indoor sports and entertainment arena. It is now known as the "Vector Arena." As of 2008, WWNZ had invested approximately $3.5 million in QPAM.

Prior to the Receiver's appointment, WWNZ commenced litigation against the Jacobsen Parties alleging, among other things, that they diverted partnership assets for their own use. When the receivership was commenced, the Jacobsen Parties asserted that there was a change in control of WWNZ that triggered their right of first refusal to purchase WWNZ's interest in QPAM. A dispute soon developed between the Receiver and the Jacobsen Parties as to the process to be used to value WWNZ's interest. The Jacobsen Parties took the unreasonable position that they had the unilateral right to value WWNZ's interest. After nearly two years of litigating over this issue, with numerous hearings and appeals, the High Court of New Zealand handed down a thirty five page decision in favor of WWNZ. Essentially, the High Court of New Zealand stated that the Jacobsen Parties do not have the unilateral right to value WWNZ's interest.

*Update:* A trial on the value of WWNZ's interest took place in July, 2010. The Receiver traveled to New Zealand and testified at the trial. The Receiver's valuation expert also testified at the trial. The Receiver believes the trial went well and is awaiting the Court's decision. The Receiver will publish the Court's decision as soon as it is rendered.

C.   **Jacksonville Property**

In January 2003, Worldwide purchased 49.6 acres of land just off of I-95 near Route 16 between Jacksonville and St. Augustine, Florida with the intent of building an amphitheater on the property (the "Jacksonville Property"). The Jacksonville Property is highly visible from I-95, a major interstate highway.

The Jacksonville Property was originally purchased for $1.5 million; however, due to the downturn in the Florida market for raw-land, the Receiver is unsure of the current value of the Jacksonville Property. There is no mortgage on the Jacksonville Property and the costs of holding the property are minimal. Accordingly, the Receiver, with the advice of his Investor Advisory Panel, decided not to aggressively market the Jacksonville Property for sale, but to "mothball" the property in hopes that the market will recover. The Receiver is hopeful that the real estate market will recover in the next year and the eventual sale of the Jacksonville Property will bring significant value to the Receivership Estate.

*Update:*   The carrying costs on the property is very low and the Receiver is currently "mothballing" the property in hopes that the market will soon improve.

## II.   INTERNATIONAL AFFILIATES

### A.   **Australia**

The Receivership Entities had two promoting relationships in Australia with well known Australian promoters: Kevin Jacobsen with the Jacobsen Group and  Michael Chugg with MCE Entertainment. The current status of these relationships is as follows:

### 1.   **The Jacobson Group (Dirty Dancing)**

Worldwide Australia, LLC ("WWA")[1] was created in 2003 after Utsick partnered with Kevin Jacobsen ("Jacobsen") and/or his affiliate(s) forming Jacobsen Utsick, Pty, Ltd. ("JJU" or the "JJU Partnership"). On or about December 17, 2004, a dispute developed over the rights to the musical production of *Dirty Dancing* which was based on the screenplay of the motion picture known as *Dirty Dancing*, and WWA filed a lawsuit (hereinafter referred to as the

---

[1] Worldwide is the sole member of WWA.  WWA is a Delaware limited liability company whose principal place of business was 300 South Point Drive, Suite 3702, Miami Beach, Florida 33139.

"Australian Case") against nine (9) defendants in The Supreme Court of New South Wales, Sydney Registry, Equity Division, Commercial Division, in a case styled: "*Worldwide Australia, LLC v. Jacobsen Platinum Pty Limited, Kevin George Jacobsen, Time of My Life Pty Limited, Dirty Dancing Investments Pty Limited, Dirty Dancing Asia Pacific, Jacobsen Entertainment Limited, Amber Lucy Jacobsen, Michael Aaron Jacobsen, and Jacobsen-Jack Utsick Pty Limited, No. 50183 of 2004,*" (these nine defendants are hereinafter referred to as the "Australian Case Defendants").

Specifically, the Australian Case alleges that the JJU Partnership was formed to, among other things, exploit and profit from the Dirty Dancing rights acquired on behalf of, and for the benefit of, the JJU Partnership by the Australian Case Defendants known as, Time of My Life Pty Limited, Dirty Dancing Investments Pty Limited, and Dirty Dancing Asia Pacific Pty Limited, and that therefore, any profits derived from the *Dirty Dancing* work were obtained for the benefit of, and on behalf of, the JJU Partnership. The Australian Case also seeks an order for an account of profits derived from the exploitation of the *Dirty Dancing* rights from any and all of the Australian Case Defendants. In June 2008, the Receiver attended mediation in Sydney, Australia; however, the parties failed to reach a settlement.

*Update:*  Several of Kevin Jacobsen's entities are in financial turmoil and the Jacobsens are mired in inter-family litigation. Although the London staging of Dirty Dancing has generated substantial revenue, information obtained by the Receiver indicates that such production had tremendous costs and in reality did not generate significant profit. Moreover, several investors in London have sued the Jacobsens for fraud. All shows that were opened in North America have ceased operating. Accordingly, based in large part on the Jacobsens' precarious financial condition and the advice of Australian counsel, and with the permission of

the Court, the Receiver settled his claims against the Jacobsens with respect to Dirty Dancing for a sum that cannot be disclosed due to confidentiality reasons.

### 2.   Michael Chugg/MCE Entertainment

Prior to commencement of the Receivership, Worldwide had a co-promotional relationship with Michael Chugg ("Chugg") and Michael Chugg Entertainment Pty Limited ("MCE") pursuant to which the parties were to co-promote live entertainment events throughout Australia. In connection with this relationship, Worldwide invested several million dollars with MCE to co-promote various events. A few years lapsed and MCE reported that Worldwide's investment was worthless. The Receiver disagreed with this conclusion.

In Spring 2006, the Receiver traveled to Sydney, Australia, in an attempt to settle with MCE; however, no settlement was reached. Accordingly, the Receiver sued Chugg and MCE to collect the $1.8 million allegedly owed to Worldwide. In July 2007, the Receiver traveled back to Sydney to attend court-ordered mediation. Once again, no settlement was reached, but the parties did continue to attempt to reach a mutually acceptable settlement. Finally, in Spring 2008, the parties were able to reach a settlement, whereby MCE is to pay the Receiver $1.5 million (Australian Dollars) with $500,000 down and 15 monthly payments of $66,666.66.

*Update:*  Chugg has satisfied all of his obligations under the settlement agreement.

## III.   OTHER LITIGATION

### A.   *Michael I. Goldberg, Receiver vs. Paris Hilton, et al.*

TEGFI, through a wholly-owned subsidiary named SBO, LLC ("SBO") made a significant investment in a movie entitled *National Lampoon's Pledge This* ("Pledge This"). SBO invested approximately $5.3 million in Pledge This Holdings, LLC, the entity formed to finance the movie. Additionally, TEGFI loaned approximately $500,000 to Pledge This

Holdings, LLC.   There are other investors in the movie, including an initial investor group, comprised of three hedge funds, that invested $1 million which is secured by a copyright mortgage (the "Initial Investor Group"), English Distribution, which invested additional money, on an unsecured basis, and is also entitled to a percentage of the net distribution, and several smaller investors in the movie.   Distribution of the net proceeds of *Pledge This*, which is broken down by domestic and international revenues, are distributed ("Waterfall") as follows:

Domestic Revenues

1.   Initial Investor Group receives the first $1.4 million;

2.   TEGFI receives the next $650,000;

3.   SBO receives 92% of the next revenues (up to $6.89 million); and

4.   English Distribution receives 8% of the remaining domestic revenues.

International Revenues

1.   SBO receives 92% of the next revenues (up to $6.89 million); and

2.   English Distribution receives 8% of the remaining international revenues.

After SBO receives $6.89 million, the Waterfall changes for both Domestic and International revenues to the following:

1.   Miscellaneous investor group receives $750,000;

2.   SBO receives 38% of the net revenues and other investors, actors, the director, writer, etc. receive 62% of the net revenues.

After filming began, the movie encountered a number of problems resulting in delays and increased expenses, which resulted in SBO paying an additional $500,000 and guaranteeing $800,000 of the $1 million note owed to the Initial Investor Group.   In return, SBO received five "equity points" from National Lampoon and five "equity points" from the Initial Investor Group

(resulting in the above stated percentages).  In August 2005, part of the movie had to be re-filmed at a cost of $425,000 to SBO.  English Distribution also paid $400,000 in overrun costs.  Additionally, there was an approximate $500,000.00 in additional expenses to complete the film's editing, visual effects and music.

In addition to the added costs of production, actress Paris Hilton completely refused to promote the movie in breach of her contractual obligations.  Therefore, in an attempt to recover damages incurred as a result of Ms. Hilton's breach, the Receiver filed a lawsuit against Paris Hilton and Paris Hilton Entertainment, Inc. on August 12, 2008, styled *Michael I. Goldberg, Receiver v. Paris Hilton, et al.*   The Receiver sought to collect "reliance damages" from Hilton due to her breach.  That is, the Receiver sued Hilton in an attempt to recover all sums SBO invested in Pledge This in reliance on Pledge This' contract with Hilton based on the theory that the SBO would not have invested the funds in Pledge This if it knew that Hilton would have breached her contract.  Accordingly, the Receiver requested the Court to grant him judgment against Hilton in the approximate amount of  $7 million to put SBO in the position it would have been prior to the formation of the contract with Hilton.

*Update:*  A trial took place in July, 2009.  At the conclusion of the trial, the Court rejected the Receiver's reliance damage claim.  Instead, the Court asked both parties to brief the issue of whether a "restitution" theory of damages is more appropriate.  Both sides briefed the issue and the Court determined that Hilton breached her obligation to promote the film and determined that the monetary value of such breach was $160,000.  The parties are in the process of finalizing a settlement.

B.   *Michael I. Goldberg, Receiver v. Estate of Geraldine DiSalvo, et al.*

When she served as pension administrator for the Individual Retirement Account ("IRA") funds, Sheri DiSalvo ("DiSalvo"), through her company American National Pension Services ("ANPS") misappropriated millions of dollars of investor funds.  DiSalvo passed away in late August 2005.  On or about October 19, 2005, a notice of administration of probate estate of DiSalvo was filed in the Superior Court for Santa Clara County, California, Case No. 1-05-PR-158259 (the "California Probate Estate").  On or about June 19, 2006, the Receiver filed a Petition to file a Creditor's Claim After Expiration of the Deadline for Filing a Claim (the "Petition"), along with a Creditor's Claim on behalf of the Receiver against the California Probate Estate.  On August 30, 2006, Duane DiSalvo and Wayne DiSalvo, the Co-Personal Representatives of the California Probate Estate served a Notice of Rejection of the Receiver's Claim.

On November 30, 2006, the Receiver filed a Complaint on the Rejected Claim and for Restitution of Receivership Property, in a case styled *Michael I. Goldberg, Receiver for Worldwide Entertainment, Inc. et al. v. Duane DiSalvo, et al.,* Case No. 106 CV-075625 in the Superior Court of California, County of Santa Clara (the "California Probate Litigation").  In the California Probate Litigation, the Receiver sued Duane DiSalvo and Wayne DiSalvo in their capacities as Co-Personal Representatives, the California Probate Estate and ANPS for fraud, constructive fraud, conversion, common count for money had and received, for an accounting, and to pierce the corporate veil of ANPS.  Additionally, the Receiver sued Duane DiSalvo, Wayne DiSalvo, Candy DiSalvo and Lisa Dickey for conversion, unjust enrichment, common count for money had and received, and for an accounting.

On or about January 24, 2006, a Petition for Ancillary Administration was recorded in the official records for Miami-Dade County, Florida, and filed with the Clerk of the 11th Judicial Circuit in and for Miami-Dade County, Probate Division, Case No. 06-277-CP (01) (the "Florida Probate Estate").  On May 15, 2006, the Receiver timely filed a claim (the "Receiver's Probate Claim") in the Florida Probate Estate.  On May 22, 2006, Wayne DiSalvo and Duane DiSalvo, as Co-Personal Representatives of the Florida Probate Estate, through their counsel, served notice of their objection to the Receiver's Probate Claim.

On June 21, 2006, the Receiver filed a lawsuit  in the U.S. District Court for the Southern District of Florida, the same court presiding over the receivership, in a case styled, *Michael Goldberg, as Receiver over Worldwide Entertainment, Inc. et al. v. Wayne DiSalvo, et al.*, Case No.: 06-21582-CIV-HUCK/SIMONTON (the "Florida Probate Litigation").   In the Florida Probate Litigation, the Receiver asserted claims against the Florida Probate Estate and ANPS for fraud, conversion, restitution, breach of fiduciary duty, to pierce the corporate veil of ANPS, and to impose a constructive trust on the Florida Probate Estate.  Additionally, the Receiver sought recovery against Wayne DiSalvo and Duane DiSalvo in their individual capacities for conversion, restitution, and to impose a constructive trust on Wayne DiSalvo's and Duane DiSalvo's personal assets, as well as a declaratory judgment that the Receivership Entities have a valid claim in the Florida Probate Estate.

On June 4, 2007, the Receiver filed a motion in the Florida Probate Litigation, to abate the case and stay the proceedings in Florida pending the outcome of the proceedings in California, thus avoiding litigating the same issues in two separate courts.  On June 27, 2007, the Court in the Florida Probate Litigation granted the Receiver's motion to abate the case.

*Update:*   The Receiver settled all claims against the Disalvo defendants. Under the settlement agreement, the Disalvos were required to disclose, under oath, all of their assets to the Receiver.   Thereafter, most of the assets, including approximately $2.3 million in cash, one condominium in Florida, six homes in California and other miscellaneous property were turned over to the Receiver.

On May 9, 2009, CJ Braisel of Fireside Realty was retained by the Receiver to manage, market, and sell the six Disalvo properties in California.   On April 7, 2010, the Receiver also retained Koslovky Realty, Inc. to market and sell the Florida property on behalf of the Receiver. To date, all properties have been sold, and the net recoveries from the sale of same are set forth below:

1.    207 32nd Avenue, Santa Cruz, California. This property was listed for sale at $525,000. The Court approved the sale of this property on July 27, 2009.  On August 9, 2009, the property closed, and the net proceeds realized from the closing, after payment of broker's fees and other expenses, was $486,007.63.

2.    7576 Turnberry Way, Gilroy, California. This property was listed for sale at $550,000.  The Court approved the sale of this property on August 31, 2009.  On September 11, 2009, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $511,264.

3.    2475 Sunflower Circle, Gilroy, California. This property was listed for sale at $870,000.  The Court approved the sale of this property on October 2, 2009.  On October 7, 2009, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $808,159.68; and

4.   <u>260 Lake Avenue, #8, Santa Cruz, California</u>.  This property was listed for sale at $760,000.  The Court approved the sale of this property on November 9, 2009.  On November 30, 2009, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $708,969.03.

5.   <u>733 Harrison Street, Santa Cruz, California</u>.  The property was listed for sale at $549,000.  The Court approved the sale of this property on November 19, 2009.  On January 8, 2010, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $488,721.96.

6.   <u>856 Duffin Drive, Hollister, California</u>.  The property was originally listed for $399,000.  There was only one showing and no offer, and after four months, the listing price was reduced to $348,000.  There were two showings and no offers at this price.  On January, 20, 2010, the listing price was further reduced to $309,000.  The Receiver accepted a bid at $300,000 and the Court approved the sale of this property on March 10, 2010.  On April 15, 2010, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $280,660.72.

7.   <u>16500 Collins Avenue, Unit 1251, Sunny Isles Beach, Florida</u>.  The property was listed for sale at $599,000.  The Receiver received a total of two (2) offers to purchase the Property.  The first offer was for $463,000.  The Receiver rejected this offer.  The second offer was for $500,000. After the exchange of multiple counteroffers, the final offer of $540,000 was accepted by the Receiver.  The Court approved the sale of this property on August 19, 2010.  On August 26, 2010, the property closed, and the net proceeds realized from this closing after payment of broker's fees and other expenses was $487,257.24.

C.   *Michael I. Goldberg, Receiver vs. Lyn Chong and Kevin Karl Wills, Jr.*

In April, 2007, the Receiver sued Utsick's former assistant, Lynn Chong and her husband for various causes of action (collectively "Chong"), including counts for fraudulent transfer and unjust enrichment, in connection with her unlawful transfer of $5 million dollars from TEGFI's bank account for her own benefit.   On July 11, 2007, the Court entered an order granting the Receiver partial summary judgment on his fraudulent transfer and unjust enrichment claims, essentially holding that the money Chong received was excessive compensation.   Subsequent to the Court's order, the Receiver entered into settlement discussions with Chong and her husband in order to provide for a voluntary turnover of the remaining funds in their possession along with all material assets they purchased with the $5 million.   An agreement was reached whereby Chong and her husband turned over substantially all of their assets consisting of approximately $1.45 million held in various bank accounts, a waterfront house, a BMW automobile, $24,000 in cash and artwork.   The Receiver entered into a contract for sale of the waterfront home for $800,000.   It appears that Chong also paid approximately $1.5 million in taxes to the Internal Revenue Service and the Receiver is seeking a return of those funds.

*Update:*   The Receiver, through his accountants, continues to deal with the IRS and is hopeful he will be able to recover all or part of this money from the IRS.

## IV.   MISCELLANEOUS

### A.   Life Insurance Policies

At the commencement of the receivership, the Receiver learned that Utsick owned several life insurance policies with a combined death benefit of $54.2 million[2].   Three of the active policies are Universal Life policies totaling $27 million in death benefits and list TEGFI as the

---

[2] The Receiver uncovered nine policies altogether, however, three (3) of the policies had lapsed prior to his discovery of same. The remaining six active policies consist of $54 million in death benefits.

beneficiary. There is one additional active Universal Life policy with a face amount of $15 million and listed Jack Utsick's personal trust as beneficiary. The remaining two active policies are Term policies having a combined death benefit of $12 million. These two policies previously listed Utsick's girlfriend, Jennifer Homan, and Utsick's estate as the beneficiary, however, Ustick subsequently assigned the policies to the Receiver on behalf of Worldwide. The premiums for all of the active policies are approximately $700,000 per year.

*Update:* Upon the advice of the Investor Advisory Panel, the Receiver continues to pay these premiums. However, the Receiver is mindful of the fact that the estate has paid more than $2 million in premiums since the commencement of the case and is not sure if the estate should continue paying the premiums as Utsick is currently residing in Brazil and the Receiver has no way of determining his health condition. The Receiver is also exploring the possibility of selling the policies.

B.     **Jack Utsick's Condo – 300 South Pointe Dr., Unit 3702, Miami Beach, Florida**

The Receivership Entities owned two condominium units in the Portofino Towers (Unit Nos. 3702 and 3503) located in Miami Beach, Florida. Utsick resided in Unit No. 3503, while Unit No. 3702 was utilized by the Receivership Entities as an office. In July, 2008, the Receiver sold Unit 3503 for $2.3 million, and after payment of the mortgage, the estate netted approximately $1.825 million.

*Update:* On January 7, 2010, the Receiver closed on Unit 3702. The property was sold for $1.150 million less $110,000 in property taxes and approximately $30,000 in broker's commissions and closing costs. The net proceeds realized from the sale of Unit 3702 was $1,012,906.91.

## V.      DISTRIBUTIONS

The Receiver made an initial distribution to creditors of approximately $21.3 million in February 2009. This distribution equaled approximately 14 percent. At the Court's direction, the Receiver has been waiting for the Wuhlheide to be sold and the Vector litigation to be concluded prior to making a second distribution. However, due to the fact that the Wuhlheide sale fell through, the Receiver is requesting permission form the Court to make a second interim distribution to creditors with allowed claims by the end of 2010. The Receiver believes that this distribution will be in the approximate amount of $7 million. The current amount being held in trust by the Receiver is approximately $9 million. The Receiver anticipates making a third and final distribution of approximately $6 million to $10 million upon the sale of all remaining assets.

## VI.     UTSICK JUDGMENT

In April, 2009 the Court held evidentiary hearings concerning the SEC's claims against Utsick. At the conclusion of the hearings, the Court determined that Utsick utilized the Receivership Entities to perpetrate a massive Ponzi scheme and diverted money from investors for his personal benefit. The Court entered a judgment against Utsick in the amount of $5,077,188.15. Utsick appealed this ruling, but it was affirmed by the appellate court. Utsick did not appeal the appellate court's ruling and it is final.

## VII.   CONCLUSION

The Court recently closed the underlying case and retained jurisdiction over the administration of the receivership. The Receiver will continue to liquidate the remaining assets. Additionally, the Receiver will continue to file reports updating the Court and creditors of his progress.

Dated:  September 29, 2010

Respectfully Submitted,

**AKERMAN SENTERFITT**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL  33301-2229
Telephone: (954) 463-2700
Facsimile:  (954) 463-2224
Email: michael.goldberg@akerman.com

By:  /s/ Michael I. Goldberg
      MICHAEL I. GOLDBERG, Receiver
      Florida Bar Number: 886602

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 29th day of September 2010, I electronically filed the foregoing Report with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic notices.


　　　　　　　　　　　　　　　　　　　　　　　 /s/ Michael I. Goldberg, Receiver